# EXHIBIT 1

# ASSET PURCHASE AGREEMENT

**by and between**

**PERCEPTIVE CREDIT HOLDINGS III, LP, as Purchaser,**

**and**

**SYNTHEGO CORPORATION, as Seller**

**Dated as of May 5, 2025**

## Table of Contents

**Page**

ARTICLE 1 DEFINED TERMS ....... 1
- 1.1 **Defined Terms** ....... 1
- 1.2 **Other Definitional and Interpretive Matters** ....... 14

ARTICLE 2 THE PURCHASE AND SALE; CLOSING ....... 17
- 2.1 **Purchase and Sale** ....... 17
- 2.2 **Excluded Assets** ....... 18
- 2.3 **Assumption of Liabilities** ....... 20
- 2.4 **Excluded Liabilities** ....... 20
- 2.5 **Excluded Contracts** ....... 21
- 2.6 **Nontransferable Assets and Liabilities; Retention of Rights** ....... 21
- 2.7 **Closing** ....... 22
- 2.8 **Closing Deliveries of the Parties** ....... 22
- 2.9 **Purchase Price; Assumed Liabilities** ....... 23
- 2.10 **Transfer Taxes** ....... 24
- 2.11 **Withholding Taxes** ....... 24
- 2.12 **Allocation of Purchase Price** ....... 24

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF SELLER ....... 25
- 3.1 **Organization, Good Standing and Other Matters** ....... 25
- 3.2 **Authority and Enforceability** ....... 25
- 3.3 **No Conflict; Required Filings and Consents** ....... 25
- 3.4 **Litigation** ....... 26
- 3.5 **Intellectual Property** ....... 26
- 3.6 **Privacy and Data Security** ....... 27
- 3.7 **Permits** ....... 27
- 3.8 **Compliance with Laws** ....... 28
- 3.9 **Real Property; Personal Property** ....... 28
- 3.10 **Assets; Sufficiency of and Title to the Transferred Assets** ....... 28
- 3.11 **Taxes** ....... 28
- 3.12 **Material Contracts** ....... 28
- 3.13 **Employee Benefits** ....... 30
- 3.14 **Labor Matters** ....... 31

3.15 **Environmental Matters** .......... 32
3.16 **Absence of Material Developments** .......... 33
3.17 **Brokers and Finders** .......... 33
3.18 **No Other Representations or Warranties** .......... 33

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF PURCHASER .......... 33
4.1 **Organization, Good Standing and Other Matters** .......... 33
4.2 **Authority and Enforceability** .......... 34
4.3 **No Conflict: Required Filings and Consents** .......... 34
4.4 **Financing** .......... 34
4.5 **Solvency** .......... 34
4.6 **Litigation** .......... 35
4.7 **Brokers and Finders** .......... 35
4.8 **Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties** .......... 35
4.9 **No Other Representations or Warranties** .......... 36

ARTICLE 5 BANKRUPTCY COURT MATTERS .......... 36
5.1 **Competing Transaction** .......... 36
5.2 **Bankruptcy Court Filings** .......... 36
5.3 **Assumption of Assigned Contracts** .......... 37

ARTICLE 6 PRE-CLOSING COVENANTS .......... 39
6.1 **Conduct of Business** .......... 39
6.2 **Access to Information; Confidentiality** .......... 41
6.3 **Efforts to Consummate** .......... 42
6.4 **Notices and Consents** .......... 42
6.5 **Employee Matters** .......... 42
6.6 **Free and Clear** .......... 46
6.7 **Update of Schedules** .......... 46

ARTICLE 7 POST-CLOSING COVENANTS .......... 46
7.1 **Access to Information; Books and Records** .......... 46
7.2 **Seller Confidentiality** .......... 47
7.3 **Post-Closing Receipt and Possession of Assets** .......... 48
7.4 **Tax Matters** .......... 48

ARTICLE 8 CONDITIONS PRECEDENT ....................50
8.1 **Conditions to Each Party's Obligation** ....................50
8.2 **Conditions to Obligation of Purchaser** ....................50
8.3 **Conditions to Obligations of Seller** ....................51
8.4 **Waiver of Condition; Frustration of Conditions** ....................51
8.5 **Deliver of a Notice of Readiness to Close** ....................52

ARTICLE 9 TERMINATION ....................52
9.1 **Events of Termination** ....................52
9.2 **Effect of Termination** ....................54
9.3 **Termination Fee and Expense Reimbursement** ....................54

ARTICLE 10 GENERAL PROVISIONS ....................55
10.1 **Survival of Representations, Warranties and Covenants** ....................55
10.2 **Entire Agreement** ....................56
10.3 **Amendment; No Waiver** ....................56
10.4 **Severability; Specific Versus General Provisions** ....................57
10.5 **Expenses and Obligations** ....................57
10.6 **Notices** ....................57
10.7 **Counterparts** ....................58
10.8 **Governing Law** ....................59
10.9 **Submission to Jurisdiction; Consent to Service of Process** ....................59
10.10 **Waiver of Jury Trial** ....................59
10.11 **Rights Cumulative** ....................60
10.12 **Public Announcements** ....................60
10.13 **Assignment** ....................60
10.14 **Specific Enforcement; Remedies** ....................60
10.15 **Third-Party Beneficiaries** ....................60

**EXHIBITS**

| | |
|---|---|
| Exhibit A | Form of Bid Procedures Order |
| Exhibit B | Form of Bill of Sale and Assignment and Assumption Agreement |

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of May 5, 2025 (the "**Agreement Date**") is entered into by and between Perceptive Credit Holdings III, LP, a Delaware limited partnership ("**Purchaser**") and Synthego Corporation, a Delaware corporation ("**Seller**"). Purchaser and Seller are sometimes collectively referred to herein as the "**Parties**" and individually as a "**Party**". Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in Article 1.

## RECITALS

**WHEREAS**, on or about May 5, 2025 (the "**Petition Date**"), Seller will file a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), thereby commencing a Chapter 11 case (the "**Bankruptcy Case**");

**WHEREAS**, Seller will be a debtor-in-possession under the Bankruptcy Code and will manage its properties and assets pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, Seller is engaged in the Business and owns, directly or indirectly, all of the Transferred Assets;

**WHEREAS**, Seller desires to sell (or cause to be sold) to Purchaser, and Purchaser desires to purchase from Seller, all of the Transferred Assets Free and Clear, and Seller desires Purchaser to assume, and Purchaser desires to assume from Seller, all of the Assumed Liabilities, in each case upon the terms and subject to the conditions hereof, pursuant to a Sale Order and Sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure;

**WHEREAS**, the transactions contemplated by this Agreement are subject to approval by the Bankruptcy Court and will only be consummated pursuant, among other things, to the Sale Order to be entered in the Bankruptcy Case; and

**NOW**, **THEREFORE**, in consideration of the premises and the mutual representations, warranties, covenants, agreements and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## DEFINED TERMS

1.1 **Defined Terms**. The following terms shall have the following meanings in this Agreement:

"**Action**" means any legal, governmental or regulatory claim, action, suit, complaint, audit, investigation, inquiry, proceeding, arbitration or litigation (whether civil, criminal or

administrative) commenced, brought, conducted or heard by or before any Governmental Authority.

"**Administrative Expenses**" means, collectively, the expenses (a) incurred by Seller on or after the Petition Date and (b) that are entitled to priority under Section 503 of the Bankruptcy Code.

"**Affiliate**" of any particular Person means any other Person, directly or indirectly, controlling, controlled by, or under common control with, such particular Person. For the purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Agreement Date**" has the meaning set forth in the preamble.

"**Allocation Schedule**" has the meaning set forth in Section 2.12(a).

"**Alternate Transaction**" has the meaning set forth in Section 9.1(b).

"**Applicable Law**" means, with respect to any Person, any federal, provincial, state, local law, act, statute, Order, ordinance, principle of common law, code, regulation or statute applicable to such Person or such Person's subsidiaries or to any of their respective securities, assets, properties or businesses.

"**Approved Budget**" has the meaning ascribed to the term "Approved Budget" in the DIP Financing Agreement.

"**Asset Tax Return**" means a Tax Return relating to an obligation to pay Taxes that are determined based upon the ownership or operation of the Transferred Assets (but, for the avoidance of doubt, not including any Tax Returns relating to Transfer Taxes).

"**Asset Taxes**" means any Taxes with respect to the ownership or operation of the Transferred Assets other than (a) Taxes based on net or gross income, and (b) Transfer Taxes.

"**Assigned Contracts**" has the meaning set forth in Section 2.1(f).

"**Assumed Employee Plan**" has the meaning set forth in Section 2.1(k).

"**Assumed Liabilities**" has the meaning set forth in Section 2.3.

"**Assumption Notice**" has the meaning set forth in Section 5.3(a).

"**Auction**" has the meaning set forth in Section 5.2(c).

"**Avoidance Actions**" means any and all avoidance, recovery, subordination, or other claims, actions, rights, or remedies that may be brought by or on behalf of Seller or its estate or

other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including, but not limited to, actions or remedies under Sections 510, 542, 543, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

"**Back-Up Bid**" means the second highest or otherwise best bid if the successful bidder fails to consummate its bid in accordance with the Bid Procedures.

"**Back-up Termination Date**" means the first to occur of (a) thirty (30) days after the entry of the Sale Order, (b) consummation of the Transactions with the winning bidder at the Auction, (c) Purchaser's receipt of notice from Seller of the release by Seller of Purchaser's obligations under Section 5.2(c) and (d) August 15, 2025.

"**Bankruptcy Case**" has the meaning set forth in the Recitals.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Bid Direction Letter**" means the Credit Bid Direction Letter, in form and substance mutually agreed by the Parties.

"**Bid Procedures**" means those certain bidding procedures for the Sale of Seller's assets approved by the Bankruptcy Court.

"**Bid Procedures Order**" means an Order of the Bankruptcy Court approving the Bid Procedures substantially in the form attached hereto as Exhibit A.

"**Bill of Sale and Assignment and Assumption Agreement**" means the bill of sale and assignment and assumption agreement, dated as of the Closing Date, by and between Seller and Purchaser, substantially in the form attached hereto as Exhibit B.

"**Books and Records**" means all books, records, files, reports, data, databases, advertising and marketing materials, customer lists, cost and pricing information, business plans, catalogs, customer literature, quality control records and manuals, research and development files and material, regulatory filings, records and credit records of customers (including all data and other information stored on discs, tapes or other media or in the cloud) to the extent used (or held for use) in or to the extent relating to the operation of the Business or the ownership of the Transferred Assets (including information relating to strategic plans and practices, accounting, financial or marketing plans, practices or programs, training practices and programs, salaries, bonuses, incentive plans and other compensation and benefits information and accounting and business methods), but excluding the Excluded Books and Records.

"**Breaches**" has the meaning set forth in Section 3.6(c).

"**Business**" means the business of Seller as currently conducted and as proposed to be conducted, in each case, as of the Agreement Date.

"**Business Day**" means any day other than (a) a Saturday, Sunday or federal holiday or (b) a day on which commercial banks in New York, New York are authorized or required to be closed.

"**Business Employee**" means each individual (i) employed by Seller as of the Agreement Date who provides services to the Business or (ii) hired by Seller between the Agreement Date and the Closing, in accordance with the terms of this Agreement, to provide services to the Business.

"**Business Intellectual Property**" means all Owned Intellectual Property together with all other Intellectual Property Used in the Business.

"**Cash and Cash Equivalents**" means all of Seller's cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

"**Closing**" has the meaning set forth in Section 2.7.

"**Closing Date**" has the meaning set forth in Section 2.7.

"**Code**" means the Internal Revenue Code of 1986, as amended, or any successor law, and regulations issued by the IRS pursuant thereto.

"**Company Related Parties**" has the meaning set forth in Section 9.3(d).

"**Competing Bid**" has the meaning set forth in Section 5.1.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement, dated as of April 18, 2025, by and between Seller and Purchaser.

"**Consent**" means any consent, approval, authorization, waiver or license.

"**Contract**" means any agreement, license, sublicense, mortgage, indenture, lease (whether for real or personal property), commitment, contract, subcontract or other legally binding arrangement or understanding, whether oral or written.

"**Cure Costs**" means, with respect to any Assigned Contract, the Liabilities that must be paid or otherwise satisfied to cure all monetary defaults under such Assigned Contracts to the extent required by Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and assignment of such Assigned Contract.

"**Designated Contracts**" has the meaning set forth in Section 5.3(b).

"**Designation Deadline**" has the meaning set forth in Section 5.3(b).

"**Determined Cure Costs**" means, in the aggregate, all Cure Costs payable in respect of the Assigned Contracts as determined pursuant to the Sale Order or by separate order of the Bankruptcy Court.

"**DIP Financing Agreement**" means the Senior Secured Debtor-In-Possession Term Loan Credit Agreement and Guaranty, dated as of May 5, 2025, by and among Seller, as the borrower, and the DIP Lenders, as lenders, as amended, supplemented or otherwise modified from time to time.

"**DIP Lenders**" means all Persons who are lenders under the DIP Financing Agreement, each in its capacity as such.

"**DIP Loans**" has the meaning ascribed to the term "Loans" in the DIP Financing Agreement.

"**DIP Obligations**" has the meaning ascribed to the term "Obligations" in the DIP Financing Agreement.

"**DIP Order**" has the meaning ascribed to the term "DIP Order" in the DIP Financing Agreement, including the Interim DIP Order and the Final DIP Order.

"**DIP Superpriority Claims**" has the meaning given to it in the Interim DIP Order as it may be modified by the Final DIP Order.

"**Employee Plan**" means (a) each "employee benefit plan" (as such term is defined in Section 3(3) of ERISA or any similar plan subject to Applicable Law of a jurisdiction outside of the United States), whether or not subject to ERISA, (b) each other compensation or employee benefit plan, contract, policy, program, practice and arrangement, whether written or unwritten, formal or informal, including each pension, retirement, supplemental retirement, profit-sharing, savings and thrift, bonus, stock bonus, stock option or other cash or equity-based incentive or deferred compensation, employment, severance pay, change in control, retention, vacation, sick leave, paid time off, welfare, disability, death, fringe and medical, retiree medical, surgical, hospitalization, accident death and dismemberment, life insurance, dental or other similar plan, contract, policy, program, practice or arrangement (whether written or unwritten), in each case, adopted, sponsored, entered into, maintained, contributed to, or required to be contributed to by Seller for the benefit of any Business Employee.

"**Enforceability Exceptions**" means applicable bankruptcy, insolvency, reorganization, moratorium, receivership and similar Applicable Law affecting the enforcement of creditors' rights generally and general equitable principles.

"**Environmental Laws**" means any Applicable Law relating to pollution (or the cleanup thereof) or protection of the environment or worker health and safety (in respect of exposure to Hazardous Substances), including such Applicable Law relating to the use, treatment, storage, disposal, Release or transportation of Hazardous Substances.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto, and any regulations promulgated thereunder.

"**ERISA Affiliate**" means any Person other than Seller that, together with Seller, is required to be treated as a single employer for purposes of ERISA or the Code (including under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA), at any relevant time.

"**Excluded Assets**" has the meaning set forth in Section 2.2.

"**Excluded Books and Records**" means the following originals and copies of those books and records, documents, data and information (in whatever form maintained) of Seller and the Business: (a) Seller's Organizational Documents and all corporate minute books (and other similar corporate records) and stock records of Seller, (b) any books and records or portions thereof relating exclusively to the Excluded Assets or Excluded Liabilities, (c) any books and records that Seller reasonably believes are necessary to enable it to prepare and/or file Tax Returns and (d) any books, records or other materials that (i) Seller is prohibited by Applicable Law from delivering to Purchaser at Closing or (ii) include attorney-client communications, work product or other privileged materials; provided, that in each case other than clause (d), copies of which books and records, to the extent permitted by Applicable Law, will be made available to Purchaser upon Purchaser's written request.

"**Excluded Cash**" means the cash on hand and cash drawn by Seller under the DIP Financing Agreement in an amount equal to (a) after taking into account any amounts held by Seller or estate professionals, or any funds of Seller held in escrow or reserves with respect to the fees and expenses of Seller's estate professionals, an amount sufficient to satisfy professional fees and expenses of estate professionals through the effective date of an Acceptable Chapter 11 Plan (as defined in the DIP Financing Agreement) (solely to the extent that such Seller's estate professional fees are included in the Approved Budget, which amount shall not be duplicative of any amounts in the Professional Fee Reserve (as defined in the DIP Financing Agreement)), including any success or transaction fees approved by the Bankruptcy Court plus (b) an amount, consistent with the Approved Budget or otherwise agreed upon by Purchaser and Seller, to pay all other estimated Administrative Expenses arising or incurred on or after the Petition Date and that are accrued and unpaid as of the effective date of an Acceptable Chapter 11 Plan, any allowed priority claims, and any other claims for payroll, compensation, accrued paid time off (but only to the extent not assumed by Purchaser and required by Applicable Law), taxes or other liabilities (in each case, through the effective date of an Acceptable Chapter 11 Plan) that if not paid could result in personal liability of any current officer or director of Seller or its subsidiaries (but only to the extent such Administrative Expenses are not Assumed Liabilities), and plus (c) the Wind-Down Amount (which shall be used solely to fund the Wind-Down Expenses); provided, that if cash on hand and cash drawn under the DIP Financing Agreement is not sufficient to fund all cash of the amounts of (a), (b) and (c) in this definition of "Excluded Cash", Purchaser shall fund an amount in cash at Closing equal to the sum of each of (a), (b) and (c) in this definition of "Excluded Cash" to an account or accounts controlled by Seller.

"**Excluded Contracts**" has the meaning set forth in Section 2.5.

"**Excluded Insurance Policies**" means (a) all directors and officers or management liability insurance policies (including any tail or runoff policy) and (b) any other insurance policy of Seller that, as to item (b) only, (i) relate solely to the Excluded Assets, (ii) are required to cover

claims or expenses in the Bankruptcy Cases or (iii) are required to be retained by Seller in connection with the wind-down of Seller's bankruptcy estate following the Closing.

"**Excluded Liabilities**" has the meaning set forth in Section 2.4.

"**Expense Reimbursement**" means the reimbursement by Seller of Purchaser's actual and reasonable out-of-pocket third-party expenses (including legal, accounting, and other third-party advisory or service costs) and expenses incurred by Purchaser in connection with the consideration, evaluation and negotiation of this Agreement and the Transactions, as evidenced by invoice(s) provided to Seller, on the terms and subject to the conditions of Section 9.3. The Expense Reimbursement shall not exceed $1,000,000.

"**FDA**" means the U.S. Food and Drug Administration.

"**Final DIP Order**" means an order, in form and substance reasonably acceptable to the Purchaser, entered by the Bankruptcy Court authorizing Seller to, among other things, enter into the DIP Financing Agreement and to incur the DIP Obligations on a final basis.

"**Final Order**" means an Order, judgment or other decree of the Bankruptcy Court or any other Governmental Authority of competent jurisdiction that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect; provided, that such Order shall be considered a Final Order only after the time period for third parties seeking appeal has expired without the filing of any appeal or motion for reconsideration.

"**Free and Clear**" means free and clear of all Liens (other than the Permitted Liens and the Assumed Liabilities) to the maximum extent permitted by Section 363(f) of the Bankruptcy Code.

"**GAAP**" means generally accepted accounting principles in the United States as of the Agreement Date.

"**Governmental Authority**" means any domestic or foreign national, provincial, state, multi-state or municipal or other local government, any subdivision, agency, commission or authority thereof, any court (including the Bankruptcy Court), arbitral body or tribunal or any quasi-governmental or private body exercising any regulatory or taxing authority thereunder (including the IRS and the FDA).

"**Hazardous Substances**" means any substances, materials or wastes which are defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "toxic substances", "pollutants", "contaminants" or other similar term or phrase under any Environmental Law, including any petroleum or refined petroleum products, radioactive materials, friable asbestos or polychlorinated biphenyls.

"**Information Privacy and Security Laws**" means all Applicable Law concerning the privacy, data protection and/or security of Personal Data, including, where applicable (as amended and/or replaced from time to time), HIPAA, and all regulations promulgated thereunder, state data privacy and breach notification laws, state social security number protection laws, any Applicable Law concerning requirements for website and mobile application privacy policies and practices, data or web scraping, call or electronic monitoring or recording or any outbound communications

(including, outbound calling and text messaging, telemarketing, and e-mail marketing), the national laws implementing the Directive on Privacy and Electronic Communications (2002/58/EC) (as amended by Directive 2009/136), the GDPR, the Federal Trade Commission Act, the Gramm Leach Bliley Act, the Fair Credit Reporting Act, the Fair and Accurate Credit Transaction Act, the CAN-SPAM Act, the Telephone Consumer Protection Act, Children's Online Privacy Protection Act, state consumer protection laws and the Payment Card Industry Data Security Standard.

"**Intellectual Property**" means any and all intellectual property and proprietary rights in any jurisdiction throughout the world, including rights arising from the following: (i) patents and patent applications, design rights, industrial design registrations and applications therefor, divisions, continuations, continuations-in-part, reissues, substitutes, renewals, registrations, confirmations, reexaminations, *inter partes* reviews, extensions and any provisional applications, and any foreign or international equivalent of any of the foregoing; (ii) trademarks (whether registered, unregistered or applied for), service marks, trade dress, service names, trade names, brand names, product names, slogans, logos, business names, corporate names, and other source or business identifiers, all registrations and applications for registration thereof, and, in each case, together with all of the goodwill associated therewith; (iii) works of authorship, copyrights and all registrations and applications for registration thereof; (iv) trade secrets, inventions, discoveries, developments, improvements, information, data, ideas, concepts, mask works, and know-how; (v) rights in formulae, methods, techniques, processes, assembly procedures, software, software code (in any form, including source code and executable or object code), subroutines, test results, test vectors, user interfaces, protocols, schematics, specifications, drawings, prototypes, molds and models, and other forms of technology (whether or not embodied in any tangible form and including all tangible embodiments of the foregoing); and (vi) social media accounts, social media identifiers, internet domain name registrations.

"**Intellectual Property Registrations**" means, as to any Owned Intellectual Property, any issuance, registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction, including domain names, registered trademarks and copyrights, issued and reissued patents and pending applications for any of the foregoing.

"**Interim DIP Order**" means an order, in form and substance reasonably acceptable to the Purchaser, entered by the Bankruptcy Court authorizing Seller to, among other things, enter into the DIP Financing Agreement and to incur the DIP Obligations on an interim basis.

"**IRS**" means the United States Internal Revenue Service.

"**Knowledge**" means (a) with regard to Seller, the actual knowledge of each of Craig Christianson and Erica Straw, after reasonable inquiry of their respective direct reports but without further investigation, in each case as of the Agreement Date (or, with respect to a certificate delivered pursuant to this Agreement, as of the date of delivery of such certificate) and (b) with regard to Purchaser the actual knowledge of each of Sandeep Dixit and Sam Chawla, after reasonable inquiry of their respective direct reports but without further investigation, in each case as of the Agreement Date (or, with respect to a certificate delivered pursuant to this Agreement, as of the date of delivery of such certificate).

"**Labor Agreement**" has the meaning set forth in Section 3.12(a)(ix).

"**Leases**" means each lease, license or other agreement for use and occupancy of real or personal property leased, licensed or otherwise granted (other than in fee, as to real property) to Seller.

"**Liabilities**" shall mean debts, liabilities, duties, obligations or commitments of any nature whatsoever, whether direct or indirect, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise, whenever or however arising (including whether arising out of any Contract or in a tort claim based on negligence or strict liability).

"**Lien**" means all forms of lien (including mechanic's, contractor's or other similar liens arising under or relating to the provision of goods or services on or to any Transferred Assets, and liens arising under the Bankruptcy Code), encumbrance, defect or irregularity in title, pledge, mortgage, deed of trust, deed to secure debt, security interest, charge, transfer restriction or similar agreement or encumbrance, including any dedication under any gathering, transportation, treating, processing, fractionating, purchase, sale or similar agreements, or any other rights granted or consensual as or against any Transferred Assets including but not limited to easements, encroachments, rights of first refusal, options, or any other interest or right in property that constitutes a lien or interest within the definition or adjudication of such terms under Section 101(37) of the Bankruptcy Code.

"**Material Adverse Effect**" means any fact, condition, change, violation, inaccuracy, circumstance, effect, event, development, or occurrence that individually or in the aggregate (a) has had, or would be reasonably likely to have, a material adverse change in or material adverse effect on the business, financial condition or results of operations of the Transferred Assets, the Assumed Liabilities or the Business, taken as a whole, or (b) prevents, materially delays or materially impairs, or would reasonably be expected to prevent, materially delay or materially impair, Seller's ability to effect the consummation of the Transactions; provided, however, that in the case of clause (a), in no event shall any fact, condition, change, violation, inaccuracy, circumstance, effect, event, development, or occurrence that results from or arises out of the following be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a Material Adverse Effect: (i) any change in, or effects arising from or relating to, general business or economic conditions affecting any industry in which the Business operates; (ii) any change in, or effects arising from or relating to, the United States or foreign economies, or securities, banking or financial markets in general, or other general business, banking, financial or economic conditions; (iii) any change from, or effects arising from or relating to, the occurrence, escalation or material worsening of any act of God or other calamity, natural disaster, pandemic or disease, outbreak, hostility, act of war, sabotage, cyber-attack or terrorism or military action; (iv) any action taken by Purchaser or its Affiliates with respect to the Transactions or with respect to the Business; (v) any action taken, or failed to be taken, by Seller at the written request of or with the written consent of Purchaser or otherwise in compliance with the terms of this Agreement; (vi) any change in, or effects arising from or relating to changes in, Applicable Law or accounting rules (including GAAP) or any interpretation thereof; (vii) the failure of the Business to meet any of its projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or

representatives); provided, that this clause (vii) shall not prevent a determination that any fact, condition, change, violation, inaccuracy, circumstance, effect event, or occurrence underlying such failure to meet projections, forecasts or predictions has resulted in a "Material Adverse Effect" (to the extent such fact, condition, change, violation, inaccuracy, circumstance, effect, event, or occurrence is not otherwise excluded from this definition of "Material Adverse Effect"); (viii) national or international political, labor or social conditions; (ix) the public announcement of, entry into or pendency of, actions required or contemplated by or performance of obligations under, this Agreement and the Transactions or the identity of the parties to this Agreement, including any termination of, reduction in or similar adverse impact on relationships, contractual or otherwise, with any customers, suppliers, financing sources, licensors, licensees, distributors, partners, employees or others having relationships with the Business; (x) any effect arising or resulting from or related to the filing of the Bankruptcy Case; (xi) any action required to be taken under any Applicable Law or Order or any existing Contract by which Seller (or any of its properties) are bound; (xii) seasonal changes in the results of operations of Seller; (xiii) any epidemic, pandemic, outbreak of disease or other public health emergency (including COVID-19) or any escalation or worsening of any such conditions; or (xiv) any objections made in the Bankruptcy Court to this Agreement, the Transactions, the Sale Order or Seller's reorganization efforts, any orders of the Bankruptcy Court and any actions or omissions of Seller in compliance with any order of the Bankruptcy Court and the assumption or rejection of any Assigned Contract; provided, however, that any such change, event, occurrence, development, change of fact or circumstance contemplated in the preceding clauses (i), (ii), (iii), (vi), (viii) or (xiii) may be taken into account in determining whether there has been or is a Material Adverse Effect to the extent such matter adversely affects the Transferred Assets, the Assumed Liabilities or the Business in a substantially disproportionate manner as compared to other similarly situated companies operating in the same industries as the Business (and if so, to the extent so disproportionately affected).

"**Material Contracts**" has the meaning set forth in Section 3.12(a).

"**Non-Transferred Asset**" has the meaning set forth in Section 2.6(a).

"**Offer Employee**" has the meaning set forth in Section 6.5(a).

"**Order**" means any award, order, writ, stipulation, subpoena, decision, injunction, judgment (whether permanent or temporary), decree, ruling, verdict or similar determination entered, issued, made or rendered by any Governmental Authority.

"**Organizational Documents**" means (a) the articles or certificates of incorporation and the by-laws of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and the certificate of formation of a limited liability company, (e) any charter, joint venture agreement or similar document adopted or filed in connection with the creation, formation or organization of a Person not described in clauses (a) through (d), and (f) any amendment to or equivalent of any of the foregoing.

"**Outside Date**" has the meaning set forth in Section 9.1(j).

"**Owned Intellectual Property**" means the Intellectual Property owned by Seller that is Used in the Business.

"**Party**" or "**Parties**" has the meaning set forth in the preamble.

"**Patent Assignment Agreement**" means the patent assignment agreement assigning the patents to Purchaser, in a form reasonably acceptable to Purchaser and Seller and executed and delivered at Closing.

"**Permit**" means all permits, authorizations, certificates, franchises, consents and other approvals from any Governmental Authority (including all applications, renewal applications or documents filed, or fees paid, in connection therewith).

"**Permitted Liens**" means (a) Liens for Taxes, assessments or other governmental charges not yet due and payable or being contested in good faith by appropriate proceedings and for which adequate reserves have been taken in accordance with GAAP; (b) mechanics', carriers', workers', repairers' and other similar Liens arising or incurred in the ordinary course of business and for which adequate reserves have been taken in accordance with GAAP and which would not, individually or in the aggregate, have a material impact on the Business; (c) zoning, entitlement and building regulations and land use restrictions; (d) Liens arising under leases of property or equipment in favor of the owner thereof; (e) pledges or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security; (f) deposits to secure the performance of bids, Contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business; (g) non-exclusive licenses of Intellectual Property granted in the ordinary course of business; (h) Liens arising under or created by this Agreement or any of the Related Documents; and (i) Liens set forth on Schedule 1.1(a).

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization, labor union or any other entity or Governmental Authority.

"**Personal Data**" means, as applicable, (a) any and all information about or related to an individual that either contains data elements that identify the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual, including without limitation Protected Health Information as defined under HIPAA and "personal data" as defined under GDPR, (b) any and all information about or related to an individual that any Information Privacy and Security Laws would require any Person to be notified if such information is lost, misused, wrongly accessed, wrongly disclosed, wrongly acquired or compromised, (c) any and all other information about or related to an individual, the receipt, access, acquisition, collection, compilation, use, storage, processing, transmission, safeguarding, security, disposal, destruction, disclosure, sale, licensing, rental, transfer or other processing of which is regulated by any Information Privacy and Security Law, including, without limitation, personal healthcare information. Personal Data includes (t) information in any form, including paper, electronic and other forms, (u) any information that enables a Person to contact the individual (such as information contained in a cookie or an electronic device fingerprint), (v)

personal identifiers such as name, address, Social Security Number, date of birth, driver's license number or state identification number, Taxpayer Identification Number and passport number, (w) financial information, including credit or debit card numbers, account numbers, access codes, consumer report information, insurance policy number, (x) demographic information, (y) unique biometric data, such as fingerprint, retina or iris image, voice print or other unique physical representation and (z) individual medical or health information (including information of patients, customers, employees, workers, contractors, and third parties who have provided information to Seller, and including information relating to services provided by or to third parties). This definition of Personal Data also applies to information defined or described by Seller as "personal information," "personally identifiable information," "PII" or any similar term in any of their documents, privacy policies or other public-facing statements.

"**Petition Date**" has the meaning set forth in the Recitals.

"**Pre-Petition Financing Agreement**" means the Credit Agreement, dated January 24, 2022, by and among (a) Perceptive Credit Holdings III, LP, (b) Seller, (c) the other guarantors party thereto, and (d) the lenders from time to time party thereto, as amended, restated, supplemented or otherwise modified from time to time.

"**Pre-Petition Loans**" has the meaning ascribed to the term "Loan" in the Pre-Petition Financing Agreement.

"**Pre-Petition Obligations**" has the meaning ascribed to the term "Obligations" in the Pre-Petition Financing Agreement.

"**Purchase Price**" has the meaning set forth in Section 2.9(a).

"**Purchaser**" has the meaning set forth in the preamble.

"**Purchaser Controlled Defense**" has the meaning set forth in Section 7.3(f).

"**Related Claims**" means all claims or causes of action (whether in contract or tort, in law or in equity, or granted by statute or otherwise) that may be based upon, arise out of or relate to this Agreement, the Related Documents and any other document or instrument delivered pursuant to this Agreement or the Related Documents, or the negotiation, execution, termination, validity, interpretation, construction, enforcement, performance or nonperformance of this Agreement or the Related Documents or otherwise arising from the Transactions or the relationship between the Parties (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with, or as an inducement to enter into, this Agreement or the Related Documents).

"**Related Documents**" means the Bill of Sale and Assignment and Assumption Agreement, the Patent Assignment Agreement and any other agreements, documents, instruments or other Contracts to be executed and delivered in connection with this Agreement or the Transactions; provided, however, that the Bill of Sale and Assignment and Assumption Agreement and the Patent Assignment Agreement shall not be a Related Document solely for purposes of applying the provisions in Article 10 to the extent, and only to the extent, that any such document expressly conflicts with Article 10.

"**Release**" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment of any Hazardous Substances.

"**Required DIP Lenders**" has the meaning ascribed to the term "Majority Lenders" in the DIP Financing Agreement.

"**Sale Motion**" means the motion of Seller seeking entry of the Sale Order approving the terms herein, to be filed on or about May 5, 2025, in the Bankruptcy Case.

"**Sale Order**" means an Order of the Bankruptcy Court issued pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code, in form and substance mutually agreed by the Parties.

"**Schedules**" has the meaning set forth in Article 3.

"**Seller**" has the meaning set forth in the preamble.

"**Seller 401(k) Plan**" has the meaning set forth in Section 6.5(h).

"**Seller Controlled Defense**" has the meaning set forth in Section 7.3(f).

"**Seller Tax Claim**" has the meaning set forth in Section 7.4(e).

"**Service Provider**" means a director, officer, employee or individual independent contractor.

"**Solvent**" when used with respect to any Person, means that, as of any date of determination, (a) the fair salable value (determined on a going concern basis) of its assets and property will, as of such date, exceed the amounts required to pay its debts as they become absolute and mature, as of such date, (b) such Person will have adequate capital to carry on its business and (c) such Person will be able to pay its debts as they become absolute and mature, in the ordinary course of business, taking into account the timing of and amounts of cash to be received by it and the timing of and amounts of cash to be payable on or in respect of its indebtedness.

"**Tax**" means any tax (including any income tax, franchise tax, branch profits tax, capital gains tax, value-added tax, sales tax, use tax, property tax, transfer tax, payroll tax, social security tax or withholding tax), and any related fine, penalty, interest, or addition to tax with respect thereto, imposed, assessed or collected by or under the authority of any Governmental Authority.

"**Tax Return**" means any return (including any information return), report, statement, schedule, notice, form, or other document or information (whether in tangible, electronic or other form), including any amendments, schedules attachments, supplements, appendices and exhibits thereto, filed with or submitted to, or required to be filed with or submitted to, any Governmental Authority in connection with the determination, assessment, collection, or payment, of any Tax.

"**Taxing Authority**" means any Governmental Authority responsible for the administration or the imposition of any Tax.

"**Termination Fee**" means a fee equal to 1.5% of the Credit Bid.

"**Trademark Assignment Agreement**" means the trademark assignment agreement assigning the trademarks to Purchaser, in a form reasonably acceptable to Purchaser and Seller and executed and delivered at Closing.

"**Transactions**" means the transactions contemplated by this Agreement and the Related Documents.

"**Transfer Taxes**" has the meaning set forth in Section 2.10.

"**Transferred Assets**" has the meaning set forth in Section 2.1.

"**Transferred Employee**" has the meaning set forth in Section 6.5(a).

"**Used in the Business**" has the meaning set forth in Section 2.1.

"**Welfare Claims**" has the meaning set forth in Section 6.5(d).

"**Wind-Down Activities**" means the confirmation and implementation of a liquidating chapter 11 plan and orderly wind-down of Seller's bankruptcy estate following the Closing.

"**Wind-Down Amount**" means an amount equal to $700,000; provided that such amounts shall only be used to pay Wind-Down Expenses.

"**Wind-Down Expenses**" means the expenses required to implement an Acceptable Chapter 11 Plan and conduct an orderly wind-down of Seller's bankruptcy estate following the effective date of such Acceptable Chapter 11 Plan which are funded by the Wind-Down Amount; provided that $200,000 of the Wind-Down Amount may be utilized as a reserve for the payment of allowed general unsecured claims under a confirmed chapter 11 plan; provided further that, for the avoidance of doubt, Purchaser shall not be liable for any expenses in excess of the Wind-Down Amount.

1.2 **Other Definitional and Interpretive Matters**.

(a) Unless otherwise expressly provided, for purposes of this Agreement and the Related Documents, the following rules of interpretation shall apply:

(i) Calculation of Time Period. All references to a day or days shall be deemed to refer to a calendar day or days, as applicable, unless otherwise specifically provided. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii) Dollars. Any reference to $ shall mean U.S. dollars, which is the currency used for all purposes in this Agreement and the Related Documents. The specification of any dollar amount in the representations and warranties or otherwise in this

Agreement, the Related Documents or the Schedules is not intended and shall not be deemed to be an admission or acknowledgement of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the Parties to determine whether any obligation, item or matter (whether or not described herein or included in any schedule) is or is not material for purposes of this Agreement, the Related Documents or the Schedules.

(iii) Exhibits/Schedules. The Exhibits and Schedules to this Agreement are an integral part of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule. Disclosure of any item on any Schedule shall not constitute an admission or indication that any such item is required to be disclosed, or that such item or matter is material or has resulted in or will result in a Material Adverse Effect or that the included items or actions are not in the ordinary course of business. No disclosure on a Schedule relating to a possible breach or violation of any Contract, Applicable Law or Order shall be construed as an admission or indication that a breach or violation exists or has actually occurred. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv) Gender and Number. Any reference to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v) Headings. The provision of a table of contents, the division of this Agreement or Related Documents into articles, sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement or Related Document, as applicable. Unless otherwise specified, all references in this Agreement to any "Section" or other subdivision are to the corresponding section or subdivision of this Agreement, and all references in a Related Document to any "Section" or other subdivision are to the corresponding section or subdivision of such Related Document.

(vi) Herein. The words such as "herein," "hereinafter," "hereof" and "hereunder" that are used in this Agreement refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. Uses of such words in the Related Documents shall refer to such Related Document as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii) Or. The word "or" shall be construed in the inclusive sense of "and/or" unless otherwise specified.

(viii) Including. The word "including" or any variation thereof means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(ix) Successors. A reference to any party to this Agreement, any Related Document or any other agreement or document shall include such party's successors and permitted assigns.

(x) Legislation. A reference to any legislation or to any provision of any legislation shall include any amendment thereto, and any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(xi) Reflected On or Set Forth In. An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statement, to the extent any such phrase appears in such representation or warranty, if (a) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statement that relates to the subject matter of such representation, (b) such item is otherwise specifically set forth on the balance sheet or financial statement or (c) such item is set forth in the notes to the balance sheet or financial statement.

(xii) Made Available. Any reference in this Agreement to "made available" means a document or other item of information that was provided or made available to Purchaser or its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions.

(b) All representations and warranties set forth in this Agreement or the Related Documents are contractual in nature only and subject to the sole and exclusive remedies set forth herein. No Person is asserting the truth of any representation and warranty set forth in this Agreement or the Related Documents; rather, the Parties have agreed that should any representations and warranties of any party prove untrue, the other parties shall have the specific rights and remedies herein specified as the exclusive remedy therefor, but that no other rights, remedies or causes of action (whether in law or in equity or whether in contract or in tort or otherwise) are permitted to any party hereto as a result of the untruth of any such representation and warranty. The phrase "to Seller's Knowledge" and phrases of similar import or effect are used herein to qualify and limit the scope of any representation or warranty in which they appear and are not affirmations of any Person's "superior knowledge" that the representation or warranty in which they are used is true.

(c) The Parties have participated jointly in the negotiation and drafting of this Agreement and the Related Documents and, in the event an ambiguity or question of intent or interpretation arises, this Agreement and the Related Documents shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement and the Related Documents. The Parties agree that changes from earlier drafts to the final version of this Agreement do not necessarily imply that the party agreeing to such change is agreeing to a change in meaning (as the party agreeing to such change may believe the change is stylistic and non-substantive); consequently, no presumption should exist by virtue of a change from a prior draft.

## ARTICLE 2
## THE PURCHASE AND SALE; CLOSING

2.1 **Purchase and Sale**. Upon the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Purchaser shall (or shall cause its designated Affiliate or Affiliates to) purchase, assume and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver (or shall cause the sale, transfer, assignment, conveyance and delivery) to Purchaser, Free and Clear (except for Permitted Liens), all of the rights, title and interests in, to and under the assets and interests used in (in whole or in part), necessary for, exploited in connection with or otherwise related to the Business ("**Used in the Business**") as the same shall exist on the Closing Date (collectively, the "**Transferred Assets**"), including all of the rights, title and interests in, to and under the following:

(a) all Cash and Cash Equivalents, except Excluded Cash;

(b) all accounts receivable, notes, negotiable instruments and chattel paper owned or held, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto, and other amounts receivable from any Person before the Closing;

(c) all supplies and other inventories;

(d) to the extent transferable pursuant to Applicable Law, all current and prior insurance policies of Seller and any claims thereunder to the extent such policies relate to the operation of the Business or to any Assumed Liabilities, other than the Excluded Insurance Policies;

(e) to the extent transferable, all Permits (including any applications that are in process) Used in the Business;

(f) all Contracts to which Seller is a party and which are Used in the Business, including (i) any confidentiality, non-disclosure and restrictive covenants agreements executed by any Person for the benefit of Seller to the extent relating to the Business, Transferred Assets or Assumed Liabilities and (ii) those listed on Schedule 2.1(f), excluding Contracts that expire or are terminated prior to the Closing and all Designated Contracts that Purchaser elects to exclude pursuant to Section 5.3(b) (collectively, the "**Assigned Contracts**");

(g) all Books and Records, other than the Excluded Books and Records; provided, that Purchaser will provide Seller and any court-appointed trustee, plan agent or other fiduciary charged with implementing a liquidating chapter 11 plan and winding up the affairs of Seller with reasonable access to such Books and Records for the purposes of conducting the Wind-Down Activities;

(h) all Business Intellectual Property, including as set forth on Schedule 2.1(h);

(i) all equipment, and other tangible personal property, including without limitation office furniture and fixtures, computers, security systems, telephone and internet equipment and maintenance equipment and supplies, Used in the Business and owned by Seller, including those listed on Schedule 2.1(i);

(j) all rights of Seller under non-disclosure or confidentiality, invention assignment, work made for hire, non-compete, or non-solicitation agreements with current or former Service Providers of Seller;

(k) all Employee Plans other than Excluded Employee Plans (the "**Assumed Employee Plans**"), together with any funding arrangements relating thereto (including but not limited to all assets, trusts, insurance policies and administration service contracts related thereto) and all rights and obligations thereunder to the extent relating to Transferred Employees;

(l) all Avoidance Actions and all of Seller's other rights, claims or causes of action against (i) any Transferred Employees, (ii) any counterparties to Assigned Contracts or (iii) other third parties relating to the assets, properties, business or operations of Seller with respect to the Business, the Transferred Assets and the Assumed Liabilities (including all guaranties, warranties, indemnities and similar rights in favor of Seller or any its Affiliates to the extent solely related to the Transferred Assets or the Assumed Liabilities), in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date, except for such rights, claims and causes of related to the Excluded Assets or Excluded Liabilities; provided that any Avoidance Actions acquired under this provision shall be extinguished and not be pursued by Purchaser;

(m) any Seller's claims for 'employee retention credits' ("**ERC**") under the Coronavirus Aid, Relief, and Economic Security Act (Pub. L. No. 116-36, "**CARES Act**");

(n) any goodwill associated with any of the Transferred Assets; and

(o) all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, actions, suits, choses in action, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent exclusively used in or held for use for the Transferred Assets listed in clauses (a) through (m) above or the Assumed Liabilities.

2.2 **Excluded Assets**. Notwithstanding the provisions of Section 2.1 or anything to the contrary herein, any and all assets, rights and properties of Seller that are not specifically identified in Section 2.1 as Transferred Assets and, specifically, the following assets, rights and properties of Seller (collectively, the "**Excluded Assets**"), shall be retained by Seller, and Purchaser and its designees shall acquire no right, title or interest in the Excluded Assets in connection with the Transaction:

(a) all Excluded Cash;

(b) all bank accounts of Seller, including such bank account designated on Schedule 2.2(b), which shall be used for Wind-Down Activities or to hold professional fees or other deposits;

(c) all Excluded Books and Records;

(d) all Excluded Insurance Policies and, in each case, all rights and benefits of any nature of Seller with respect thereto except to the extent the proceeds of any directors and officers insurance policy that is an Excluded Insurance Policy relates to any Assumed Liability;

(e) all Permits (including applications therefor and any trade or import/export Permits) that (i) are not Transferred Assets under Section 2.1 or (ii) are not transferable to Purchaser under Applicable Law;

(f) all Excluded Contracts to which Seller is a party;

(g) any interest of Seller under this Agreement or the Related Documents, including, without limitation, the right to receive the Purchase Price and to enforce Seller's rights and remedies thereunder, and any interest of Seller under any agreement providing for the sale of an Excluded Asset;

(h) all Employee Plans set forth on Schedule 2.2(h) (the "**Excluded Employee Plans**"), together with any funding arrangements relating thereto (including but not limited to all assets, trusts, insurance policies and administration service contracts related thereto) and all rights and obligations thereunder;

(i) any net operating losses, Tax assets, Tax attributes, rights of Seller to Tax refunds (but not including Seller's claims for ERC under the CARES Act) or credits for overpayment of Taxes in lieu of a refund attributable to any taxable period (or portion thereof) ending on or before the Closing Date, and Tax Returns, related work papers, Tax information and Tax records of Seller;

(j) any assets not otherwise designated as Transferred Assets or from time to time designated by the Parties as Excluded Assets;

(k) except for the Avoidance Actions, all of Seller's rights, claims or causes of action against (i) any current or former directors, officers, or insiders of Seller (other than any Transferred Employee), and (ii) any Person relating to the assets, properties, business or operations of Seller (including all guaranties, warranties, indemnities and similar rights in favor of Seller or any of its Affiliates) to the extent arising under the Bankruptcy Code or solely relating to any of the Excluded Assets or Excluded Liabilities, in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date;

(l) all of Seller's right, title and interest to any of the assets set forth on Schedule 2.2(l); and

(m) all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, actions, suits, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent exclusively related to or exclusively used in or held for use for the Excluded Assets listed in clauses (a) through (l) above.

2.3 **Assumption of Liabilities**. On the terms and subject to the conditions set forth in this Agreement, Purchaser shall (or shall cause its designated Affiliate or Affiliates to), effective as of the Closing, assume and agree to pay, discharge and perform in accordance with their terms the following Liabilities of Seller (collectively, the "**Assumed Liabilities**"):

(a) all Liabilities arising out of the ownership or operation of the Transferred Assets by Purchaser solely to the extent such Liabilities arise on or after and relate to the period following the Closing;

(b) subject to Section 2.4, all Liabilities arising under the Assigned Contracts solely to the extent such Liabilities arise on or after and relate to the period following the Closing;

(c) all Determined Cure Costs; and

(d) (i) all Liabilities, solely to the extent incurred after the Closing Date, relating to the employment or performance of services, or termination of employment or services, of any Transferred Employee by Purchaser or its Affiliates, (ii) any Liabilities under each Assumed Employee Plan and (iii) any Liabilities specifically assumed by Purchaser pursuant to Section 6.5; and

(e) all Transfer Taxes for which Purchaser is liable pursuant to this Agreement.

2.4 **Excluded Liabilities**. Notwithstanding Section 2.3, Purchaser is assuming only the Assumed Liabilities of Seller and will not assume or be liable for any Liabilities that are not Assumed Liabilities, and Seller shall retain and shall be responsible for all Liabilities that are not Assumed Liabilities, including all Liabilities related to Excluded Assets or any other Liabilities of the Business (all such Liabilities not being assumed herein referred to as the "**Excluded Liabilities**"), including the following:

(a) any Liability to the extent arising from any Excluded Asset;

(b) except as set forth in Section 8.2 with respect to Transfer Taxes (i) all Tax Liabilities of Seller or its Affiliates for any taxable period, and (ii) all Tax Liabilities relating to the Transferred Assets or Business attributable to a Pre-Closing Tax Period;

(c) all Liabilities, to the extent incurred on or prior to the Closing Date, (i) relating to the application of employment or service of, employment or performance of services, or termination of employment or services, of any person (including any current or former Service Provider); (ii) relating to accrued or earned but unpaid payroll (including salary, wages and commissions), bonuses, incentive compensation, any unfunded deferred compensation obligations, accrued but unused vacation, sick leave, parental leave, and long service leave, (iii) relating to all severance or termination agreements and obligations, and (iv) under each Employee Plan of or with respect to any current or former Service Provider relating to such Service Provider's service with Seller, plus the employer portion of any payroll, social security, unemployment or similar Taxes associated with the foregoing, in case of each of clauses (i) through (iv), other than Liabilities arising under the Assumed Employee Plans;

(c) all Liabilities arising out of, relating to or with respect to any Excluded Employee Plan, if any;

(d) all Liabilities arising in connection with any violation of any Applicable Law (by Seller) relating to the period prior to the Closing;

(e) all Liabilities arising under Environmental Law relating to, resulting from, caused by or arising out of the ownership, operation or control of the Business, to the extent accruing, arising out of or relating to events, occurrences, acts or omissions occurring or existing prior to the Closing Date; and

(f) all Actions against Seller, any of its assets, the Business and any of its past or present operations or activities (except to the extent (and only to such extent that) such actions relate to an Assumed Liability).

2.5 **Excluded Contracts**. Pursuant to Section 5.3(b), Purchaser shall be entitled, in its sole discretion, by written notice to Seller up to three (3) Business Days prior to the Closing Date, to elect not to purchase or assume one or more Assigned Contract, in which case, notwithstanding anything in this Agreement or any Related Document to the contrary, such Assigned Contract shall be considered an excluded contract ("**Excluded Contract**") (and shall constitute an Excluded Asset and not be included in the Transferred Assets) for all purposes of this Agreement and Purchaser shall not have any obligation to satisfy or pay any Cure Costs or other Liabilities with respect to such Excluded Contract. Each assignable Assigned Contract that Purchaser does not elect to remove from the list of Assigned Contracts pursuant to Section 5.3(b) shall be an Assigned Contract.

2.6 **Nontransferable Assets and Liabilities; Retention of Rights**.

(a) Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Transferred Asset or any claim, right or benefit arising thereunder or resulting therefrom if an attempted assignment or transfer thereof, without the Consent of a third party (including any Governmental Authority) (after giving effect to the Sale Order or any other applicable order of the Bankruptcy Court that effects such transfer without any required Consents), would constitute a breach or other contravention thereof or a violation of Applicable Law (each, a "**Non-Transferred Asset**").

(b) If, on the Closing Date, any third-party Consent is not obtained for a Non-Transferred Asset, or if an attempted transfer or assignment thereof would be ineffective or a violation of Applicable Law, then, until any requisite consent is obtained therefor and the same is transferred and assigned to Purchaser or its designee, each such Non-Transferred Asset shall be held by Seller as agent for the Purchaser, and Seller shall, to the extent permitted by Applicable Law, provide to Purchaser the benefits and Purchaser shall assume the obligations and bear the economic burdens associated with such Non-Transferred Asset. Seller and Purchaser shall use commercially reasonable efforts to enter into agreements (including subcontracting, sublicensing or subleasing, if permitted) by which (i) Seller shall, at Seller's expense (to the extent amounts are available from the Wind-Down Amount to fund such expense), without interruption of the Business, provide Purchaser with the economic and operational equivalent of obtaining the

requisite third-party Consent and assigning the applicable Non-Transferred Asset to Purchaser (including, with the prior written consent of Purchaser, enforcing for the benefit of Purchaser, and at Purchaser's sole expense, all claims or rights arising thereunder) and (ii) Purchaser shall perform, at its sole expense, the obligations and assume the economic burdens of Seller to be performed after the Closing with respect to such Non-Transferred Asset.

(c) Notwithstanding anything to the contrary in this Agreement or any Related Document, Seller retains, on behalf of itself and its Affiliates, licensees, sublicensees, licensors and distributors, a limited, non-exclusive right to use and the right of reference in, to and under the Transferred Assets (other than the Assigned Contracts and the Owned Intellectual Property set forth on Schedule 2.1(i)), in each case, as may be necessary or useful to exercise its or its Affiliates' respective rights or perform its or its Affiliates' respective obligations under this Agreement or any Related Document.

2.7 **Closing**. The closing of the Transactions (the "**Closing**") will take place remotely by electronic exchange of documents on the date (the "**Closing Date**") that is the second (2nd) Business Day after the date on which all of the conditions set forth in Article 8 (excluding conditions that, by their terms, are to be satisfied at the Closing, but subject to the satisfaction or waiver of all such conditions at the Closing), have been satisfied or waived by the party hereto entitled the benefit of the same, unless another time or date is agreed to in writing by the Parties. Except as otherwise set forth herein, all proceedings to be taken and all documents to be executed and delivered by all parties hereto at the Closing will be deemed to have been taken and executed simultaneously and no proceedings will be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

2.8 **Closing Deliveries of the Parties**. At or prior to the Closing:

(a) Purchaser and Seller shall execute and deliver the Bill of Sale and Assignment and Assumption Agreement and other customary transfer documents necessary to transfer to Purchaser (or its Affiliate) all right, title and interest of Seller to or in the Transferred Assets, in form and substance reasonably acceptable to Purchaser and Seller;

(b) Purchaser and Seller shall execute and deliver (i) the Patent Assignment Agreement and (ii) the Trademark Assignment Agreement, in each case, in a form reasonably acceptable to Purchaser and Seller;

(c) Purchaser shall deliver, or cause to be delivered or released, to Seller or the applicable Person each of the following:

(i) a certificate, dated as of the Closing Date, executed by or on behalf of Purchaser as to the satisfaction of the conditions set forth in Section 8.3(a) and Section 8.3(b);

(ii) the Bid Direction Letter; and

(iii) the Excluded Cash, to the extent any amount is required to be funded at Closing in accordance with the proviso to the definition of "Excluded Cash", to the account or accounts designated in writing by Seller.

(d) Seller shall deliver, or cause to be delivered or released, to Purchaser or the applicable Person each of the following:

(i) all right, title and interest in and to the Transferred Assets;

(ii) certificates of service evidencing that all notices of the assumption and assignment of the Assigned Contracts and of the assumption of the Assumed Liabilities have been given in accordance with the terms of this Agreement and the Bid Procedures Order;

(iii) a certificate (in form and substance reasonably satisfactory to Seller and Purchaser), dated as of the Closing Date, executed by or on behalf of Seller as to the satisfaction of the conditions set forth in Section 8.2(a) and Section 8.2(b);

(iv) a certificate (in form and substance reasonably satisfactory to Seller and Purchaser), dated as of the Closing Date, executed by or on behalf of Seller and certifying that attached thereto are true, correct and complete copies of all resolutions adopted by the board of directors of Seller authorizing the execution, delivery and performance of this Agreement and the consummation of the Transactions and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the Transactions;

(v) all documentation required to effectuate the assumption of the Assumed Employee Plans (if any) by Purchaser;

(vi) certificates, dated as of the Closing Date, of Seller's non-foreign status, in accordance with Treasury Regulation § 1.1445-2(b); and

(vii) such other instruments as are reasonably requested by Purchaser and otherwise necessary to consummate the transactions contemplated by this Agreement and reasonably acceptable to Seller.

2.9 **Purchase Price; Assumed Liabilities**.

(a) At the Closing, upon the terms and subject to the conditions set forth herein, the aggregate consideration for the sale, transfer, conveyance, assignment and delivery of the Transferred Assets will consist of (i) a credit bid pursuant to Section 363(k) of the Bankruptcy Code (the "**Credit Bid**"), on a dollar-for-dollar basis, of (A) the full amount of the DIP Obligations outstanding as of the Closing, plus (B) an amount of the Pre-Petition Obligations equal to (1) the full amount of the Pre-Petition Obligations outstanding as of the Closing less (2) $1,000,000; (ii) the assumption of the Assumed Liabilities; (iii) any amount that is required to be funded at Closing in accordance with the proviso to the definition of "Excluded Cash"; and (iv) a full and final waiver and relinquishment of any and all rights, liens or claim in all other Excluded Cash (the sum of clauses (i) through (iv), collectively, the "**Purchase Price**").

(b) At the Closing, on the terms and subject to the conditions set forth in this Agreement, Purchaser will assume and become responsible for the Assumed Liabilities. Purchaser

agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms hereof.

2.10 **Transfer Taxes**. It is the intention of the Purchaser and Seller that the Transactions be exempt from all transfer, documentary, sales, use, excise, stock transfer, value-added, stamp, recording, registration and other similar taxes, levies and fees (including any penalties, fines and interest), together with any conveyance fees, recording charges and other similar fees and charges, incurred in connection with this Agreement and the Transactions (collectively, "**Transfer Taxes**") pursuant to Section 1146(a) of the Bankruptcy Code. Purchaser and Seller shall cooperate in good faith to minimize, to the extent permissible under Applicable Law, the amount of any Transfer Taxes due with respect to the Transactions. In the event any Transfer Taxes are required to be paid with respect to the Transactions, such Transfer Taxes shall be borne and paid one hundred percent (100%) by Purchaser. Purchaser shall file all necessary Tax Returns and other documentation with respect to such Transfer Taxes.

2.11 **Withholding Taxes**. Purchaser and any of their respective Affiliates shall be entitled to deduct and withhold (or cause to be deducted and withheld) from any payments made pursuant to this Agreement such amounts as they determine are required to be deducted or withheld under the Code or any provision of applicable state, local or non-U.S. Law. To the extent that amounts are so deducted or withheld and paid over to the appropriate Taxing Authority, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction or withholding was made.

2.12 **Allocation of Purchase Price**.

(a) Within ninety (90) days following the Closing, Purchaser shall deliver to Seller a schedule allocating the Purchase Price (and all other amounts treated as consideration for U.S. federal income tax purposes) among the Transferred Assets (the "**Allocation Schedule**"). Purchaser and Seller shall negotiate in good faith to resolve disputed items, if any, in the Allocation Schedule as promptly as practicable. If Purchaser and Seller are unable to reach agreement with respect to the Allocation Schedule within thirty (30) days after the delivery of the Allocation Schedule by Purchaser to Seller, the Parties shall be entitled to use their own Purchase Price allocations for Tax reporting purposes.

(b) To the extent Purchaser and Seller agree on the Allocation Schedule pursuant to Section 2.12(a), Purchaser and Seller shall (i) timely file all Tax Returns required to be filed in connection with the Allocation Schedule, and (ii) prepare and file all Tax Returns and determine all Taxes in a manner consistent with the Allocation Schedule, except as may be required by Applicable Law and except as may be necessary to reflect adjustments to the Allocation Schedule resulting from post-Closing payments or events. Purchaser, on the one hand, and Seller, on the other hand, shall notify the other if it receives notice that any Governmental Authority proposes any allocation different from Allocation Schedule.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as disclosed in a document herewith delivered by Seller to Purchaser (the "**Schedules**"), Seller hereby represents and warrants to Purchaser as of the Agreement Date and as of the Closing Date (or, as to those representations and warranties that address matters as of particular dates, as of such dates), as follows:

3.1 **Organization, Good Standing and Other Matters**. Seller is duly organized, validly existing and in good standing under the Applicable Law of its jurisdiction of organization and has, subject to the necessary authority of the Bankruptcy Court, the requisite corporate power and authority to operate the Business and necessary to own, lease or operate the properties and assets owned, leased or operated by it to carry on the Business as now being conducted, except where the failure to be so duly organized, validly existing and in good standing, or to have such power and authority, would not, individually or in the aggregate, have a Material Adverse Effect. Seller is duly qualified to do business as a foreign company in each jurisdiction in which the nature of the Business as currently conducted by it or the property owned or leased by it makes such qualification necessary, except where the failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect.

3.2 **Authority and Enforceability**. Subject to Bankruptcy Court approval, Seller has all requisite power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Related Documents to which Seller is (or at Closing, will be) a party thereto, and the consummation by Seller of the Transactions, has been duly authorized and approved by all necessary corporate action on the part of Seller and are subject to the approval of the Bankruptcy Court. This Agreement has been, and each Related Document will be, at or prior to the Closing, duly executed and delivered by Seller and, assuming the due execution and delivery by the other parties hereto or thereto, and subject to the approval of the Bankruptcy Court, constitutes a valid and binding obligation of Seller, enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

3.3 **No Conflict; Required Filings and Consents**.

(a) Except as otherwise set forth on Schedule 3.3(a), the execution and delivery of this Agreement by Seller does not and the execution and delivery of the Related Documents by Seller will not, and the consummation of the Transactions hereby and thereby will not (i) violate the provisions of the Organizational Documents of Seller, (ii) subject to the entry of the Sale Order, violate any Applicable Law or Order to which Seller is subject or by which its properties or assets are bound, (iii) subject to the entry of the Sale Order, violate, conflict with, constitute a breach or a default under (or event which, with the giving of notice or lapse of time, or both, would become a default) or give rise to any right of termination, amendment, revocation, suspension, payment, cancellation or acceleration of (A) any Assigned Contract or Assumed Liability, or (B) any right or obligation or to a loss of any benefit relating to any Transferred Asset to which Seller is entitled under any provision of any Assigned Contract binding upon Seller or (iv) result in the creation or

imposition of any Lien on any Transferred Asset, except for Permitted Liens and Assumed Liabilities; excluding from the foregoing clauses (ii), (iii) or (iv) any Consents, approvals, notices and filings the absence of which, and violations, breaches, defaults, rights of acceleration, cancellation or termination, and Liens, the existence of which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b) No Consent of any Governmental Authority is required by or with respect to Seller in connection with the execution and delivery of this Agreement by Seller, or the consummation of the Transactions, except for (i) the Consents set forth in Schedule 3.3(b) of the Schedules, (ii) the entry of the Sale Order by the Bankruptcy Court, (iii) compliance with any applicable requirements of the Exchange Act or Securities Act and (iv) other Consents of Governmental Authorities that if not obtained or made would not (individually or in the aggregate) reasonably be expected to be materially adverse to the Business, taken as a whole.

3.4 **Litigation**. As of the Agreement Date, there is no Action pending or, to Seller's Knowledge, formally threatened in writing, against Seller before any Governmental Authority that would have a Material Adverse Effect or affect the Transferred Assets in any material respect after the entry of the Sale Order, if determined adversely and after taking into effect applicable insurance coverage.

3.5 **Intellectual Property**.

(a) Schedule 3.5(a) sets forth a true, correct and complete list of all material Owned Intellectual Property. Seller exclusively owns all Owned Intellectual Property. Except as set forth on Schedule 3.5(a), Seller is not party to, or bound by, (i) any license, royalty agreement, or other agreement relating to the use of any Business Intellectual Property (other than non-exclusive licenses granted for commercially available, unmodified, off-the-shelf software licensed for aggregate annual fees of less than $25,000), or (ii) any agreement pursuant to which Seller settled any action, litigation, suit or other judicial or administrative proceeding, claim, assertion, or threat with respect to Intellectual Property, including settlement agreements, coexistence agreements, and consent agreements.

(b) Other than with respect to Excluded Contracts or Assigned Contracts that Purchaser does not ultimately assume, no current or former Affiliate, partner, director, stockholder, officer, member, manager, employee, consultant or contractor of Seller will, after giving effect to the Transactions, own, license or retain any Business Intellectual Property. No interference, opposition, reissue, reexamination, or other proceeding is or has been pending or, to the Knowledge of Seller, threatened, in which the scope, validity, or enforceability of any Owned Intellectual Property is being, has been challenged.

(c) All Intellectual Property Registrations remain pending or in full force and effect and have not expired or been abandoned or cancelled. No interference, opposition, reissue, reexamination, or other proceeding is or has been pending or, to the Knowledge of Seller, threatened, in which the scope, validity, or enforceability of any Owned Intellectual Property is being or has been challenged.

(d) To the Knowledge of Seller, (i) the conduct of the Business does not infringe, misappropriate or otherwise violate in any Person's Intellectual Property and (ii) no Person is currently infringing, misappropriating or otherwise violating any Owned Intellectual Property.

(e) Other than the Owned Intellectual Property or any Intellectual Property licensed to Seller pursuant to an Assigned Contract, to Seller's Knowledge, no Intellectual Property is Used in the Business.

(f) To Seller's Knowledge, Seller has taken commercially reasonable steps to safeguard and maintain the confidentiality of all trade secrets that constitute Owned Intellectual Property, including by using good faith efforts to require all Persons having access thereto to execute written non-disclosure agreements.

3.6 **Privacy and Data Security**.

(a) Seller is, and to Seller's Knowledge has been during the last three (3) years, in compliance in all material respects with all applicable Information Privacy and Security Laws with respect to the Business. With respect to the Business, Seller maintains policies and procedures regarding data security and privacy and maintain administrative, technical, organizational and physical security safeguards that are required in compliance with all applicable Information Privacy and Security Laws.

(b) To Seller's Knowledge, during the last three (3) years, and solely to the extent required under applicable Information Privacy and Security Laws, Seller has had in place written data processing agreements with any key vendors acting as processors in material compliance with applicable Information Privacy and Security Laws in the case of processors.

(c) With respect to the Business, to the Knowledge of Seller, during the last three (3) years, there have been no material Personal Data breaches or material cybersecurity incidents (collectively, "**Breaches**") subject to any Information Privacy and Security Laws. With respect to the Business, to the Knowledge of Seller, Seller has not experienced a loss, or an unauthorized disclosure, use, or breach of data protection, privacy or security, of any data that required notice to any Person (including any Governmental Authorities or parties to any Contract) under any applicable Information Privacy and Security Laws within the last three (3) years. There is no pending Action by any Person (including any Governmental Authority or parties to any Contract) relating to Seller's information privacy or data security practices with respect to the Business, and to the Knowledge of Seller, no Person has threatened any such Action or made any complaint, investigation, or inquiry relating to such practices within the last (3) years. To Seller's Knowledge, Seller has not received any notice, request or other communication from any supervisory authority (as defined in the GDPR), or has been subject to any investigation or proceedings (whether of a criminal, civil or administrative nature) by any competent legal or regulatory authority, in each case relating to its processing of Personal Data with respect to the Business within the last (3) years.

3.7 **Permits**. Seller is in possession of all Permits necessary for Seller to own, lease and use the Transferred Assets as currently owned, leased or used and to carry on and operate the

Business, except where the failure to possess such Permit, individually or in the aggregate, has not had, and would not reasonably be expected to be material to the Business, taken as a whole. Schedule 3.7 sets forth a true, correct and complete list of all material Permits used by Seller with respect to the Transferred Assets and the Assumed Liabilities. To the Knowledge of Seller, there is no fact or circumstance relating to the Permits or Seller that would cause a Governmental Authority to deny or refrain from issuing any Permit approval.

3.8 **Compliance with Laws**. Seller is in compliance with Applicable Law with respect to the Transferred Assets and the Assumed Liabilities, except where any non-compliance, individually or in the aggregate, has not had, and would not reasonably be expected to have, a Material Adverse Effect. Seller has not received any written notice from any Governmental Authority relating to violations or alleged violations of, failure to comply with or defaults under, any Applicable Law, Order or Permit, in each case, with respect to the Transferred Assets and the Assumed Liabilities, except where any non-compliance or default, individually or in the aggregate, has not had, and would not reasonably be expected to have, a Material Adverse Effect.

3.9 **Real Property; Personal Property**.

(a) Seller does not own any real property.

(b) Schedule 3.9(b) sets forth each parcel of real property leased by Seller and each Lease with respect thereto (the "**Leased Real Estate**"), including all material written amendments or modifications to such Leases currently in effect. Seller has delivered to Purchaser correct and complete copies of all such Leases, including all material written amendments or modifications thereto currently in effect.

3.10 **Assets; Sufficiency of and Title to the Transferred Assets**. Other than the Excluded Assets, to the Knowledge of Seller, Seller has good and valid title to, or has good and valid leasehold interests in or otherwise has the valid right to possess and use, all tangible personal property that is included in the Transferred Assets, free and clear of all Liens other than Permitted Liens. Such owned and leased tangible personal property is in good working order, reasonable wear and tear excepted. The Transferred Assets (a) constitute all of the assets, tangible and intangible, of any nature whatsoever, necessary to operate the Business and (b) include all of the operating assets of Seller with respect to the Business, in the case of clause (b) except for the Excluded Assets and any assets disposed of in the ordinary course of business prior to the Closing.

3.11 **Taxes**. As of the Agreement Date, Seller has timely filed all income and other material Tax Returns with the appropriate Taxing Authority that it was required to file under applicable Law that are related to the Transferred Assets, and all such Tax Returns are true, correct, and complete in all material respects. Seller has timely paid all Taxes related to the Transferred Assets that are due and payable, except for Taxes that arise prior to the Petition Date or are being contested in good faith through appropriate proceedings and for which it maintains adequate reserves. No audits or administrative or judicial proceedings are currently being conducted or have been threatened in writing with respect to a material amount of Taxes of Seller. There are no Tax liens on any of the Transferred Assets, other than statutory liens for Taxes not yet due and payable.

3.12 **Material Contracts**.

(a) Schedule 3.12(a) sets forth a true, correct and complete list of the following types of Contracts (each a "**Material Contract**") in effect as of the Agreement Date that are related to the Transferred Assets or the Business generally and to which Seller is a party or is bound:

(i) any joint venture, partnership, limited liability company or other similar Contract, other than the Organizational Documents of Seller;

(ii) any Contract involving the sale or transfer of any portion of Seller's assets that is or was material to the Business or the business of Seller as previously conducted;

(iii) any Lease relating to the Leased Real Estate;

(iv) any Contract with the ten (10) largest (A) customers of the Business, taken as a whole by revenue for the year ended December 31, 2024, and (B) vendors of the Business, taken as a whole by cost for the year ended December 31, 2024;

(v) any Contract that imposes on Seller or any of its Affiliates (including Purchaser and its Affiliates following the Closing) (other than those contained in confidentiality agreements or similar Contracts) (A) any restriction on soliciting customers or employees or any non-competition restrictions, (B) any restriction on entering into any line of business, or from freely providing services or supplying products to any customer or potential customer, or in any part of the world, (C) a "most favored nation" pricing provision or exclusive marketing or distribution rights relating to any products or territory or minimum purchase obligations or exclusive purchase obligations with respect to any goods or services binding Seller or its Affiliates in favor of the counterparty, (D) any right of first refusal or right of first offer or similar right or limitations on the ability of Seller (or any of its subsidiaries) to own, operate, sell, transfer, pledge or otherwise dispose of any material amount of its assets or business granted to the counterparty to any Contract, or (E) other than restrictions that will cease to be effective on and after the Closing, any restriction on either the payment of dividends or distributions or the incurrence of Liens on the property or assets of Seller (or any of its subsidiaries);

(vi) any Contract (or series of related Contracts) involving payment obligations by or to Seller in excess of $500,000 in any annual period;

(vii) any Contracts with any current Service Provider that provides for annual base compensation in excess of $250,000 or provide for any severance Liabilities;

(viii) any Contract to which Seller is a party (A) pursuant to which Seller is granted a right to use or ownership of any third-party Intellectual Property that is or was material to the Business, other than non-exclusive licenses for off-the-shelf software or software that is subject to click-through or shrink wrap agreements entered into by Seller in the ordinary course of business, or (B) pursuant to which Seller grants a third party the right to use or ownership of any Intellectual Property that is or was material to the Business, other than any Contract with any end user of Seller's products or services which is entered into in the ordinary course of business or any marketing agreement which contains an incidental trademark license to use Seller's Trademarks in the scope of providing such

services, in each case, with an indication of whether such Contract is exclusive or non-exclusive;

(ix) any Contract that is a settlement, conciliation or similar agreement with any Governmental Authority or pursuant to which Seller will have any material outstanding obligation after the date of this Agreement that relates to the Business;

(x) any Contract with any Affiliate or current or former officer or director of Seller (other than employment- or services-related Contracts); and

(xi) any collective bargaining agreement or other Contract with any labor unions, labor organizations, works council or other employee representative (each a "**Labor Agreement**").

(b) With respect to each Contract set forth on Schedule 3.12(a), (i) such Contract is in full force and effect and constitutes the legal, valid and binding obligation of Seller and, to the Knowledge of Seller, the counterparty thereto, enforceable against Seller and, to the Knowledge of Seller, the counterparty thereto in accordance with its terms and conditions, subject to the Enforceability Exceptions and (ii) neither Seller nor, to the Knowledge of Seller, the counterparty thereto is in material breach or default thereof that would permit or give rise to a right of termination, modification or acceleration thereunder, and (iii) neither Seller nor, to the Knowledge of Seller, any counterparty thereto, has commenced any Action against any other party to such Contract or given or received any written notice of any breach or default under such Contract that has not been withdrawn or dismissed, except, in the cases of clauses (i), (ii) and (iii), for breaches or defaults (A) caused by or resulting from the Bankruptcy Case or (B) which are not, and would not reasonably be expected to be, individually or in the aggregate, material to the Business, taken as a whole.

3.13 **Employee Benefits**.

(a) Schedule 3.13 sets forth a true, correct and complete list of all material Employee Plans. With respect to each material Employee Plan, Seller has made available to Purchaser true, correct and complete copies of (i) the current plan document, including any amendments thereto, (ii) the most recent summary plan description (including any material modification), (iii) any material written communication to or from any Governmental Authority, (iv) the most recently filed IRS Form 5500, (v) the most recent actuarial report, financial statement and trustee report and (vi) the most recent determination or opinion letter from the IRS.

(b) Each Employee Plan has been operated and administered in all material respects in accordance with its terms and Applicable Law and administrative or governmental rules and regulations, including ERISA and the Code. There are no Actions (other than routine claims for benefits) pending, or to the Knowledge of Seller, threatened, with respect to any Employee Plan or any fiduciary or sponsor of an Employee Plan with respect to their duties under such Employee Plan or the assets of any trust under any such Employee Plan. There are no pending or, to the Knowledge of Seller, threatened audits, investigations or Actions by any Governmental Authority involving any Employee Plan. Seller and each of its ERISA Affiliates has made or will accrue prior to the Closing Date all payments and contributions (including insurance premiums)

due and payable as of the Closing Date to each Employee Plan as required to be made under the terms of such Employee Plan.

(c) Each Employee Plan intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination or opinion letter as to such qualification from the IRS.

(d) Neither Seller nor any of its ERISA Affiliates maintains, sponsors or contributes to (or has been obligated to contribute to) or has in the past sponsored, maintained or had any obligation to contribute, to any plan that is or was: (i) subject to Title IV of ERISA; (ii) a "multiemployer plan" (as such term is defined in Section 3(37) of ERISA); (iii) a multiple employer plan within the meaning of Section 4063 or Section 4064 of ERISA; or (iv) a "multiple employer welfare arrangement," as defined in Section 3(40) of ERISA, nor have they incurred any Liability, including withdrawal Liability, with respect to any such Company Employee Plan. No liability under Title IV of ERISA has been or is reasonably expected to be incurred by the Seller or any of its ERISA Affiliates.

(e) No Employee Plan provides any post-employment health or welfare benefits to any Business Employee except to the extent required to be provided under COBRA.

(f) Neither the execution nor delivery of this Agreement nor the consummation of the Transactions, whether alone or together with any other event, will (i) entitle any Business Employee to any material payment or benefit; (ii) increase the amount or value of any compensation, benefit or other obligation payable or required to be provided to any Business Employee; (iii) accelerate the time of payment or vesting, or increase the amount of compensation due any Business Employee or accelerate the time of any funding (whether to a trust or otherwise) of compensation or benefits under any Employee Plan or (iv) result in the payment of any amounts that would not be deductible for federal income tax purposes by reason of Section 280G of the Code or would be subject to excise tax under Section 4999 of the Code. No Employee Plan provides for the reimbursement of any penalty or excise tax under Section 409A or 4999 of the Code.

3.14 **Labor Matters**.

(a) Schedule 3.14(a) sets forth a true, complete and correct list of all Business Employees, including, for each such Business Employee: (i) name or employee identification number, (ii) job position or title, (iii) location of employment, (iv) base annual salary or wage rate (as applicable), (v) exempt or non-exempt status, (vi) incentive cash compensation (as applicable), (vii) full-time or part-time status, (viii) employing entity, (ix) active or inactive status, (x) visa status (if applicable), and (xi) and accrued unused vacation amounts.

(b) Seller is neither party to, nor bound by, any Labor Agreement. No Business Employees are represented by any labor union, trade union, works council, labor organization or other employee representative body with respect to their employment with Seller. There are no material pending or, to the Knowledge of Seller, threatened Actions concerning labor matters with respect to the Business.

(c) During the past three (3) years, there have been no actual unfair labor practice charges, material labor grievances, material labor arbitrations, work stoppages, slowdowns, strikes, lockouts, picketing, handbilling or other material labor disputes, or to the Knowledge of Seller, threatened against Seller with respect to, or otherwise affecting, the Business.

(d) With respect to the Business, no labor union, trade union, works, council, labor organization, other employee-representative body, or group of employees of Seller has made a demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of the Seller, threatened to be brought or filed with the National Labor Relations Board or any other labor relations tribunal or authority and there have not been any such proceedings within the past three (3) years. To the Knowledge of Seller, in the past three (3) years, there have been no labor union organizing activities with respect to any Business Employees.

(e) With respect to the Business and Business Employees, Seller is in compliance in all material respects with all Applicable Law respecting labor, employment and employment practices. In the last three (3) years, to the Knowledge of Seller, no allegations of sexual harassment, or other discrimination, retaliation or policy violation allegations have been made against any individual who is an officer or director of Seller as of the Agreement Date.

(f) Except as would not result in material liability for the Business: (i) Seller has fully and timely paid all wages, salaries, wage premiums, commissions, bonuses, severance and termination payments, fees, and other compensation that have come due and payable to its current or former Service Providers under Applicable Law, Contract or company policy; and (ii) each individual who is providing or within the past three (3) years has provided services for Seller and is or was classified and treated as an independent contractor, consultant, leased employee, or other non-employee service provider is and has been properly classified and treated as such for all applicable purposes.

(g) To the Knowledge of Seller, with respect to the Business, no Business Employee is in any respect in violation of any term of any employment agreement, nondisclosure agreement, non-competition agreement, common law nondisclosure obligation, fiduciary duty, nonsolicitation agreement, restrictive covenant or similar obligation: (i) owed to Seller or (ii) owed to any third party with respect to the right of any such Business Employee to be performing services for the Business or (B) restricting the use of trade secrets or proprietary information in connection with the Business.

3.15 **Environmental Matters**.

(a) Seller is in compliance with all Environmental Laws with respect to the Transferred Assets and the Leased Real Property, except in any such case where the failure to be in compliance would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. To the Knowledge of Seller, Seller has not received any written notice or report regarding any material violation of Environmental Laws or any material Liabilities relating to the Transferred Assets or the Leased Real Property arising under Environmental Laws, other than any such notice or report that has now been resolved. There are no material Orders issued to Seller outstanding, or any Proceedings pending or, to the Knowledge of Seller,

threatened, relating to compliance with or Liability under any Environmental Laws affecting the Transferred Assets or any Leased Real Property.

(b) Seller has made available to Purchaser (i) all material Permits held by Seller issued pursuant to any Environmental Laws for the Business or the operations of the Transferred Assets, (ii) all material documents held by Seller with respect to any outstanding Orders or any pending or threatened Proceedings involving the Business or the Transferred Assets under or relating to any Environmental Laws and (iii) all material environmental reports, studies, analyses, investigations, audits and reviews in Seller's possession with respect to the Transferred Assets and the Leased Real Property.

3.16 **Absence of Material Developments**. Since the Petition Date, there has occurred no fact, event, condition, change or circumstance which has had or would reasonably be expected to have a Material Adverse Effect.

3.17 **Brokers and Finders**. Except for Raymond James & Associates, Inc., Seller has not, directly or indirectly, entered into any agreement with any Person that would obligate Seller to pay any commission, brokerage fee or "finder's fee" in connection with the Transactions.

3.18 **No Other Representations or Warranties**. Except for the representations and warranties contained in this Article 3, neither Seller nor any other Person on behalf of Seller makes any other express or implied representation or warranty with respect to itself, the Business, the Transferred Assets or the Assumed Liabilities, or with respect to any other information provided to Purchaser or its representatives, and Seller disclaims any other representations or warranties, whether made by or on behalf of Seller or any other Person. Seller will not, and no other Persons will, have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser, or Purchaser's use of, any such information, including any information, documents, projections, forecasts or other material made available to Purchaser or its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever (electronic or otherwise) or otherwise in expectation of the Transactions.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as of the Agreement Date and as of the Closing Date (or, as to those representations and warranties that address matters as of particular dates, as of such dates), as follows:

4.1 **Organization, Good Standing and Other Matters**. Purchaser is duly organized, validly existing and in good standing under the Applicable Law of its jurisdiction of organization and has all requisite corporate power or other entity power and authority to own its properties and to carry on its business as now being conducted. Purchaser is duly qualified or licensed to conduct its business as currently conducted and is in good standing in each jurisdiction in which the location of the property owned, leased or operated by it or the nature of its business makes such qualification necessary, except where the failure to be so qualified or licensed would not,

individually or in the aggregate, materially impair or delay Purchaser's ability to consummate the Transactions.

4.2 **Authority and Enforceability**. Purchaser has all requisite corporate power or other entity power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party, and the consummation of the Transactions, have been duly authorized and approved by its board of directors (or equivalent governing body) and no other action on the part of Purchaser or its limited partners is necessary to authorize the execution, delivery and performance of this Agreement and the Related Documents by Purchaser and the consummation of the Transactions. This Agreement has been, and each Related Document will be at or prior to Closing, duly executed and delivered by Purchaser and, assuming the due execution and delivery by the other parties hereto or thereto, constitutes a valid and binding obligation of Purchaser enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

4.3 **No Conflict: Required Filings and Consents**. Except (a) such filings as may be required in connection with the Transfer Taxes described in Section 2.10 and (b) as set forth on Schedule 4.3, the execution and delivery of this Agreement and of the Related Documents and the consummation of the Transactions by Purchaser will not (i) violate the provisions of its Organizational Documents, (ii) violate any Applicable Law or Order to which it is subject or by which any of its properties or assets are bound or (iii) require it to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date; excluding from the foregoing clauses (ii) and (iii) Consents, approvals, notices and filings the absence of which, and violations, breaches, defaults, rights of acceleration, cancellation or termination, and Liens, the existence of which would not, individually or in the aggregate, (A) have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or (B) otherwise prevent, hinder or delay the consummation of the Transactions.

4.4 **Financing**. Purchaser has, and at the Closing will have, (a) sufficient internal funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) available to make any payments required hereunder and pay any expenses incurred or required to be paid by Purchaser in connection with the Transactions and (b) the resources and capabilities (financial or otherwise) to perform its obligations hereunder and under the Related Documents. Purchaser has not incurred any obligation, commitment, restriction or Liability of any kind, which would materially impair or adversely affect such resources and capabilities.

4.5 **Solvency**. Purchaser is not entering into this Agreement with the intent to hinder, delay or defraud either present or future creditors. Immediately after giving effect to all of the Transactions, including the making of the payments contemplated by Section 2.9, and assuming satisfaction of the conditions to Purchaser's obligation to consummate the Transactions as set forth herein, the accuracy of the representations and warranties of Purchaser set forth herein and the performance by Purchaser of its obligations hereunder in all material respects, Purchaser will be Solvent.

4.6 **Litigation**. There is no Action pending or, to Purchaser's Knowledge, formally threatened in writing against Purchaser or involving any of its properties or assets that would be reasonably be expected to (a) have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or (b) otherwise prevent, hinder or delay the consummation of the Transactions.

4.7 **Brokers and Finders**. None of Purchaser or its Affiliates have, directly or indirectly, entered into any agreement with any Person that would obligate Seller to pay any commission, brokerage fee or "finder's fee" in connection with the Transactions.

4.8 **Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties**.

(a) Purchaser acknowledges that it and its representatives have received access to such books and records, facilities, equipment, contracts and other assets of the Business which it and its representatives have desired or requested to review. Purchaser acknowledges and agrees that (i) it has made its own inquiry and investigation into, and, based thereon, has formed an independent judgment concerning Seller, the Business, the Transferred Assets and the Assumed Liabilities and (ii) the Business, the Transferred Assets and the Assumed Liabilities are being transferred and acquired on a "where is" and, as to condition, "as is" and "with all faults" basis.

(b) Except for the specific representations and warranties expressly made by Seller in Article 3 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 9 of this Agreement, Purchaser acknowledges and agrees that (i) Seller is not making and has not made any representation or warranty, expressed or implied, at law or in equity, in respect of the Business, the Transferred Assets, the Assumed Liabilities, or any of its operations, prospects or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any Liabilities, the prospects of the Business, the effectiveness or the success of any operations, or the accuracy or completeness of any confidential information memoranda, documents, projections, material or other information (financial or otherwise) regarding the Business furnished to Purchaser or its representatives or made available to Purchaser and its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever, and (ii) no officer, director, manager, stockholder, agent, Affiliate, advisor, representative or employee of Seller has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in Article 3 and subject to the limited remedies herein provided.

(c) Other than the specific representations and warranties expressly set forth in Article 3 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 9 of this Agreement, Purchaser specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that Seller and Seller's Affiliates have specifically disclaimed and do hereby specifically disclaim, and shall not have or be subject to any Liability for reliance on any such other representation or warranty made by any Person. Purchaser specifically waives any obligation or duty by Seller or Seller's Affiliates to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties expressly set forth in Article 3

and disclaims reliance on any information not specifically required to be provided or disclosed pursuant to the specific representations and warranties set forth in Article 3.

(d) Purchaser is acquiring the Business, the Transferred Assets and the Assumed Liabilities subject only to the specific representations and warranties expressly set forth in Article 3 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 9 of this Agreement.

4.9 **No Other Representations or Warranties.** Except for the representations and warranties contained in this Article 4, neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Seller or its representatives, and Purchaser disclaims any other representations or warranties, whether made by Purchaser or any other Person.

## ARTICLE 5
## BANKRUPTCY COURT MATTERS

5.1 **Competing Transaction**. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids in respect of all or any part of the Transferred Assets (whether in combination with other assets of Seller or otherwise) in accordance with the terms of the Bid Procedures Order (each, a "**Competing Bid**"). From the Agreement Date (and any prior time) and until the Closing, Seller is permitted to, and to cause its representatives to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates and representatives) in connection with any reorganization, sale or other disposition of the Transferred Assets. In addition, Seller shall have the authority to respond to any inquiries or offers to reorganize, purchase all or any part of the Transferred Assets (whether in combination with other assets of Seller or otherwise) and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bid Procedures Order or other Applicable Law, including supplying information relating to the Business and the assets of Seller to prospective plan sponsors or purchasers.

5.2 **Bankruptcy Court Filings**.

(a) Subject to its right to pursue a Competing Bid in accordance with the Bid Procedures Order, Seller shall diligently pursue the entry by the Bankruptcy Court of the Sale Order, which Sale Order shall provide for the transfer of the Transferred Assets and the Assumed Liabilities to Purchaser free from all successor or transferee Liability to the fullest extent permitted by Section 363 of the Bankruptcy Code. Seller shall comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the Bankruptcy Court in obtaining the entry of the Sale Order. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(b) From and after the Agreement Date and until the Closing Date, to the extent reasonably practicable, Seller shall deliver to Purchaser drafts of any material pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted in connection with this Agreement for Purchaser's prior review and comment at least two (2) business days prior to the filing or submission thereof, and such filings shall be acceptable to Purchaser to the extent they relate to the Transferred Assets, the Assumed Liabilities, or any of Purchaser's obligations hereunder. Each of Seller and Purchaser shall appear formally or informally in the Bankruptcy Court if reasonably requested by the other party or required by the Bankruptcy Court in connection with the Transactions and keep the other party reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request promptly furnishing the other party with copies of notices or other communications received by such party from the Bankruptcy Court or any third party or any Governmental Authority with respect to the transactions contemplated by this Agreement.

(c) Seller and Purchaser agree that, in the event that Purchaser is not the winning bidder at an auction undertaken pursuant to the Bid Procedures Order (the "**Auction**"), and (i) Purchaser submits the Back-Up Bid at the Auction or (ii) the terms of this Agreement are deemed to constitute a Back-Up Bid, then Purchaser shall be obligated to promptly consummate the Transactions upon the terms and conditions as set forth herein, including the payment of the Purchase Price as the same may be increased by Purchaser at the Auction; provided that, Seller gives written notice to Purchaser on or before the Back-up Termination Date, stating that Seller (A) failed to consummate the sale of the Transferred Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder.

5.3 **Assumption of Assigned Contracts**.

(a) On or before the date that is five (5) Business Days following the date on which the Bid Procedures Order is entered by the Bankruptcy Court, Seller shall file (or cause to be filed) a notice of potential assumption (the "**Assumption Notice**") with the Bankruptcy Court and serve such notice on each counterparty to an Assigned Contract listed thereon. The Assumption Notice shall identify all Assigned Contracts that Seller and Purchaser believe may be assumed and assigned in connection with the sale of the Transferred Assets and set forth a good faith estimate of the amount of Cure Costs applicable to each such Assigned Contract (and if no Cure Cost is estimated to be applicable with respect to any particular Assigned Contract, the amount of such Cure Cost designated for such Assigned Contract shall be "$0.00"). In accordance with the Bid Procedures Order, Seller reserves the right to supplement such list of Assigned Contracts and provide additional notice of assumption, and to remove an Assigned Contract from the list of Assigned Contracts, up to five (5) Business Days prior to the hearing by the Bankruptcy Court with respect to the Sale Motion; provided, however, that Seller may only remove an Assigned Contract from such list of Assigned Contracts with Purchaser's prior written consent; provided further, that Purchaser may instruct Seller to add Contracts to such list of Assigned Contracts and provide additional notice of assumption prior to Closing in the event Seller or Purchaser discovers a Contract that was not included on such list of Assigned Contracts prior to the hearing by the Bankruptcy Court with respect to the Sale Motion.

(b) On or before the date that is three (3) Business Days before the Closing Date or as soon as reasonably practicable prior to the Closing Date with respect to any Contracts added

to the Assumption Notice within three (3) Business Days prior to the Closing Date (the "**Designation Deadline**"), Purchaser shall provide to Seller a list of those Assigned Contracts that it elects to have assumed and assigned to Purchaser on the Closing Date (the "**Designated Contracts**"). Purchaser shall be entitled to remove certain Assigned Contracts from the list of Designated Contracts at any time prior to the Designation Deadline by providing Seller written notice of such removal. In the event that Purchaser removes any of such Assigned Contracts from such list, Seller will provide the relevant counterparty written notice that the applicable Assigned Contract is no longer identified as a Designated Contract. For the avoidance of doubt, only those executory Assigned Contracts that remain identified as Designated Contracts as of the Closing Date will constitute Assigned Contracts and will be assumed by Seller and assigned to Purchaser pursuant to the Sale Order. Seller shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Assigned Contracts and to determine the amount of the Cure Costs; provided, that nothing herein shall preclude Seller from filing one or more motions to reject any Contracts that are not Assigned Contracts; provided, that to the extent reasonably practicable, Seller shall deliver to Purchaser drafts of any such motion for Purchaser's prior review and comment at least two (2) business days prior to the filing or submission thereof.

(c) Notwithstanding any provision in this Agreement to the contrary, a Contract shall not be a Designated Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is (i) deemed rejected under Section 365 of the Bankruptcy Code, (ii) the subject of an objection to assignment or assumption or requires the consent of any Governmental Authority or other third party (other than, and in addition to, the Bankruptcy Court) in order to permit the assumption and assignment by Seller to Purchaser of such Contract pursuant to Section 365 of the Bankruptcy Code, and such objection has not been resolved or such consent has not been obtained prior to the thirtieth day following the Closing Date (as such period may be extended by mutual agreement of Seller and Purchaser), or (iii) is terminated by any party thereto other than Seller, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as a Designated Contract hereunder and is not continued or otherwise extended upon assumption. In no event shall the failure to assign to Purchaser any Contract in accordance with subsections (i) through (iii) above reduce the Purchase Price payable to Seller or constitute a failure to satisfy the conditions precedent of Seller under Section 8.3.

(d) Subject to the terms of Section 2.5, Section 2.8, Section 5.3(a) and Section 5.3(b), Purchaser, with the assistance of Seller, shall make provision for the payment of the Determined Cure Costs in cash at Closing in accordance with the Sale Order.

(e) Notwithstanding any provision in this Agreement to the contrary, from and after the date of the Assumption Notice through the Closing Date, Seller will not reject or take any action (or fail to take any action that would result in rejection by operation of Applicable Law) to reject, withdraw, repudiate, disclaim or assign to an entity other than Purchaser any Assigned Contract unless (i) Purchaser has provided its prior written consent or (ii) Purchaser has removed such Assigned Contract from the list of Designated Contracts.

## ARTICLE 6
## PRE-CLOSING COVENANTS

6.1 **Conduct of Business**. Except (i) as set forth on Schedule 6.1, (ii) as may be approved by Purchaser (which approval will not be unreasonably withheld, delayed or conditioned), or (iii) as is otherwise required by this Agreement, Applicable Law or by order of the Bankruptcy Court, from the Agreement Date through the earlier of the Closing Date or the termination of this Agreement in accordance with its terms:

(a) Seller shall carry on the Business in all material respects in the ordinary course of business as it has been conducted since the Petition Date, including using commercially reasonable efforts to (i) preserve and maintain, in all material respects, its relationships with its customers, suppliers, distributors, partners, lessors, licensors, licensees, agents, officers, employees, contractors and other Persons with which they have business relationships relating to the Business; (ii) preserve and maintain in all material respects the Transferred Assets, ordinary wear and tear excepted; (iii) defend and protect the Transferred Assets from infringement or usurpation; (iv) maintain the Books and Records in all material respects in the ordinary course of business; and (v) comply in all material respects with all Applicable Law related to the ownership and use of the Transferred Assets; and

(b) Seller shall not, and shall cause its Affiliates not to:

(i) sell, license, abandon or otherwise dispose of any Transferred Assets other than, in each case, in the ordinary course of business or for the purpose of disposing of obsolete or worthless assets;

(ii) acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of any business or any corporation, partnership or other business organization or otherwise acquire any assets (except inventory), that as of the Closing would constitute Transferred Assets, except for the acquisition of assets in the ordinary course of business;

(iii) voluntarily pursue or seek, or fail to oppose any third party in pursuing or seeking, a conversion of the Bankruptcy Cases to cases under Chapter 7 of the Bankruptcy Code, the appointment of a trustee under Chapter 11 or Chapter 7 of the Bankruptcy Code and/or the appointment of an examiner with expanded powers;

(iv) enter into any transaction relating to the acquisition of fixed assets that will constitute Transferred Assets in excess of $50,000;

(v) amend or otherwise modify its Organizational Documents;

(vi) except in the ordinary course of business, enter into, amend, waive, terminate or otherwise modify any Contract that would be a Material Contract of the kind described in any of clauses (i) – (xiii) of Section 3.12(a);

(vii) enter into any Contract under which Purchaser would after the Closing be restricted in any material respect with respect to distribution, licensing,

marketing, purchasing or development of products or services if such Contract were an Assigned Contract;

(viii) create, incur or assume any Liens on any of the Transferred Assets (whether now owned or hereafter acquired) (other than any Permitted Liens);

(ix) authorize, or make any commitment with respect to, any single capital expenditure or series of related capital expenditures that is in excess of $50,000 or capital expenditures that are, in the aggregate, in excess of $250,000 for the Business taken as a whole;

(x) other than with respect to the loans made pursuant to the DIP Financing Agreement, incur any indebtedness for borrowed money;

(xi) take any action in breach of the Bid Procedures or the Sale Order;

(xii) other than as required by Applicable Law or pursuant to the terms of any Employee Plan, (A) enter into, establish, adopt, materially amend or terminate any Employee Plan (or any arrangement that would be an Employee Plan if in effect on the date of this Agreement), (B) grant, announce or effectuate any increase or modification in the salaries, bonuses or other compensation and benefits payable or to become payable to any Service Provider, (C) promote, hire, engage, furlough, temporarily layoff or terminate the employment or engagement of (other than for cause) any Service Provider, (D) transfer or reassign out of the Business the employment or engagement of any Service Provider, or (E) transfer or reassign any other employee of Seller such that he or she would be a Business Employee;

(xiii) (i) negotiate, modify, extend or enter into any Labor Agreement or (ii) recognize or certify any labor union, labor organization, works council or group of employees as the bargaining representative for any Business Employees;

(xiv) implement or announce any employee layoffs, plant closings, reductions in force, furloughs, temporary layoffs, salary or wage reductions, work schedule changes or other such actions that could implicate the WARN Act;

(xv) waive or release any noncompetition, nonsolicitation, nondisclosure, noninterference, nondisparagement, or other restrictive covenant obligation of any current or former Service Provider;

(xvi) amend, waive or otherwise modify in any material respect or terminate any Assigned Contract or modify, waive, release or assign any material rights or claims thereunder, in each case whether in connection with any extension, renewal or replacement of such Assigned Contract, or otherwise;

(xvii) (A) reject or terminate any Material Contract or seek Bankruptcy Court approval to do so, or (B) fail to oppose any action by a third party to terminate (including any action by a third party to obtain Bankruptcy Court approval to terminate) any Material Contract;

(xviii) with respect to any Transferred Asset, (A) agree to allow any form of relief from the automatic stay in the Bankruptcy Cases (other than pursuant to the Sale Order, the Interim DIP Order or the Final DIP Order); or (B) fail to oppose any action by a third party to obtain relief from the automatic stay in the Bankruptcy Cases;

(xix) grant or acquire, or dispose of or permit to lapse, any rights to any material Intellectual Property included in the Transferred Assets, or disclose or agree to disclose to any Person, other than representatives of Purchaser, any material trade secret included in the Transferred Assets; in each case except in the ordinary course of business;

(xx) (A) compromise, settle or agree to settle, or consent to judgment in, any one or more Actions, or (B) institute any Action concerning any material Intellectual Property included in the Transferred Assets;

(xxi) make, revoke or change any material election relating to Taxes of the Business or Transferred Assets that would reasonably be expected to have an adverse effect on Purchaser or any of its Affiliates, for any taxable period, or portion thereof, beginning after the Closing Date;

(xxii) change its present accounting methods or principles in any material respect, except as required by GAAP or Applicable Law;

(xxiii) agree to take any of the foregoing actions.

6.2 **Access to Information; Confidentiality**.

(a) From the Agreement Date until the earlier of the Closing Date and the termination of this Agreement, Seller shall grant Purchaser and its representatives (at Purchaser's sole cost and expense) reasonable access, during normal business hours and upon reasonable notice (and in the event of a facility visit request, at least forty-eight (48) hours prior notice), to the personnel, facilities, book and records of Seller related to the Business or the Transferred Assets that are in the possession or under the control of Seller; provided, however, that (i) all requests for access shall be directed such person(s) as Seller may designate in writing from time to time, (ii) such activities do not unreasonably interfere with the ongoing business or operations of Seller, (iii) Seller shall have the right to have one or more of its representatives present at all times during any visits, examinations, discussions or contacts contemplated by this Section 6.2(a), (iv) Purchaser shall have no right to perform invasive or subsurface investigations or conduct any sampling or analysis of environmental media of the nature commonly referred to as a "Phase II Environmental Investigation," such as any soil or groundwater testing, (v) such access or related activities would not cause a violation of any agreement to which Seller is a party, (vi) no Personal Data shall be disclosed or used other than in compliance with Applicable Law and (vii) nothing herein shall require Seller or its representatives to furnish to Purchaser or provide Purchaser with access to information that is, in the reasonable opinion of Seller's counsel, subject to an attorney-client or an attorney work-product privilege.

(b) Any information provided to or obtained by Purchaser or its representatives, including pursuant to this Section 6.2 is subject to the terms of, and the restrictions contained in, the Confidentiality Agreement. Purchaser agrees to be bound by and comply with the provisions

set forth in the Confidentiality Agreement as if such provisions were set forth herein, and such provisions are hereby incorporated herein by reference. Effective upon (and only upon) the Closing, the Confidentiality Agreement shall automatically terminate and none of the parties thereto shall have any further Liability or obligation thereunder except with respect to any confidential information provided to or obtained by Purchaser or its representatives concerning Seller, which information shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date. If this Agreement is terminated prior to Closing for any reason, the terms of the Confidentiality Agreement shall remain in full force and effect.

6.3 **Efforts to Consummate.** Except as otherwise provided in this Agreement, each of the Parties agrees to use its commercially reasonable efforts to cause the Closing to occur as soon as possible after the Agreement Date, including satisfying the conditions precedent set forth in Article 8 applicable to such party including (a) defending against any Actions, judicial or administrative, challenging this Agreement or the consummation of the Transactions, (b) seeking to have any preliminary injunction, temporary restraining order, stay or other legal restraint or prohibition entered or imposed by any court or other Governmental Authority that is not yet final and nonappealable vacated or reversed, and (c) executing any additional instruments reasonably requested by another Party (without cost or expense to the executing party) necessary to carry out the Transactions and to fully carry out the purposes of this Agreement; provided, however, that, for purposes of "commercially reasonable efforts" standard as required by this Section 6.3 or Section 6.4, neither Seller nor its Affiliates or representatives shall be required to offer or grant any accommodation or concession (financial or otherwise) to any third party or to otherwise expend any money or suffer any detriment, to expend any money to remedy any breach of any representation or warranty hereunder, to commence any Action, to waive or surrender any right, to modify any agreement (including any Assigned Contract) or to provide financing to Purchaser for the consummation of the Transactions.

6.4 **Notices and Consents.** Reasonably promptly following the execution of this Agreement, Seller will give, or cause to be given, applicable notices to third parties and thereafter will use reasonable best efforts to obtain the third-party consents set forth on Schedule 6.4.

6.5 **Employee Matters**.

(a) No later than ten (10) days prior to the Closing Date, Purchaser shall deliver to Seller a list of Business Employees to whom Purchaser does not intend to offer (or cause its applicable Affiliate to offer) at-will employment effective as of the Closing Date in Purchaser's sole and absolute discretion on terms and conditions consistent with this Section 6.5 ("**Excluded Employees**"), and Purchaser shall make an offer of employment effective as of the effective date on terms and conditions consistent with this Section 6.5 (which offers may, in Purchaser's sole discretion, be made in the form of an "opt-out" transfer letter to the extent permitted under Applicable Law) to each Business Employee who is not an Excluded Employee. Each such Business Employee shall be an "**Offer Employee**." Each Business Employee who is offered and accepts (or does not opt out of, as applicable) such offers of employment with Purchaser (or its applicable Affiliate) based on the initial terms and conditions set by Purchaser (in its sole and absolute discretion) and further actually commences employment with Purchaser (or its applicable Affiliate) as of the Closing Date will become a "**Transferred Employee**," with such employment with Purchaser (or its applicable Affiliate) to commence at 10:01 AM (New York, New York time)

on the Closing Date. Seller shall terminate, or shall cause to be terminated, effective as of immediately prior to 10:01 AM (New York, New York time) on the Closing Date, the employment of all Transferred Employees. Seller will reasonably cooperate with any reasonable request by Purchaser in order to facilitate the offers of employment and delivery of such offers.

(b) Neither Purchaser nor any of its Affiliates shall have any Liability for any pay, benefits, or similar claims of any (i) employee or other service provider who is not a Transferred Employee or (ii) other than as expressly set forth herein, Transferred Employees earned or accrued prior to the Closing Date, which Liabilities shall remain the sole responsibility of Seller and its Affiliates, as applicable. As soon as reasonably practicable following Purchaser's request, and in any event no later than five (5) Business Days prior to the Closing Date, Seller shall provide Purchaser with a written schedule of each "employment loss" (as defined in the WARN Act) experienced by a Service Provider of Seller during the ninety (90)-day period prior to the Closing Date (including the location of employment of such employee, and the reason for the employment loss) and such other information as Purchaser may reasonably request to determine whether any actions taken by Seller prior to, upon, or after the Closing Date, or any actions taken by Purchaser or its Affiliates upon or after the Closing Date, is reasonably likely to require the delivery of notice or payment in lieu of notice (under the WARN Act or otherwise) to any individuals (it being understood that any notices or filings required under the WARN Act with respect to any "employment loss" with Seller or its Affiliates shall remain the sole obligation of Seller). Seller and Purchaser intend that the consummation of the Transactions shall not alone constitute a severance or termination of employment of any Service Provider prior to or upon the Closing for purposes of any severance or termination benefit plan, program, policy, agreement or arrangement of Seller, and that Transferred Employees shall have continuous and uninterrupted employment immediately before and immediately after the Closing.

(c) Seller and Purchaser hereby agree to follow the standard procedure relating to employment Tax reporting as provided in Section 4 of Rev. Proc. 2004-53, I.R.B. 2004-35. Accordingly, Seller shall have employment Tax reporting responsibilities for the wages and other compensation paid by or on behalf of Seller to employees and Purchaser shall have employment tax reporting responsibilities for the wages and other compensation paid by or on behalf of Purchaser (or its applicable Affiliate) to Transferred Employees.

(d) Seller shall be liable for all insurance claims, including workers' compensation, short- and long-term disability, medical, prescription drug, dental, vision, life insurance, accidental death and dismemberment ("**Welfare Claims**") incurred (i) at any time by their Service Providers and their eligible dependents who are not Transferred Employees, or (ii) prior to the Closing Date by the Transferred Employees and their eligible dependents. With respect to Welfare Claims incurred on or after the Closing Date by the Transferred Employees and their eligible dependents, Purchaser shall be solely responsible. For these purposes, a Welfare Claim shall be deemed to be incurred: (A) in the case of workers' compensation and short-term disability benefits, at the time of the injury, sickness, or other event giving rise to the claim for such benefits; (B) in the case of medical, prescription, drug, dental, or vision benefits, at the time the professional services, equipment, or prescription drugs covered by the applicable plan are obtained; (C) in the case of life insurance benefits, upon death; and (D) in the case of accidental death and dismemberment benefits, at the time of the accident. In the case of workers' compensation claims arising out of injuries with an identifiable date of occurrence sustained prior to the Closing Date,

including injuries sustained on or after the Closing Date that are aggravations, exacerbations, or re-injuries of medical conditions or diagnoses resulting from injuries that were sustained before the Closing Date or arising out of injuries or occupational diseases without an identifiable date of occurrence or exposure, originating from within Seller's facilities and which are alleged to have been sustained or contracted on or prior to the Closing Date, such workers' compensation claims shall be deemed to be incurred prior to the Closing Date.

(e) Seller shall be solely responsible for compliance with the requirements of Section 4980B of the IRC and Part 6 of Subtitle I of ERISA, including provision of continuation coverage (within the meaning of COBRA), with respect to all Service Providers, and their respective eligible spouses and dependents, for whom a "qualifying event" (within the meaning of COBRA) occurs at any time on or prior to the Closing Date (including qualifying events that occur in connection with the Transactions). Purchaser shall be responsible for compliance with such health care continuation requirements with respect to all Transferred Employees and their respective eligible spouses and dependents for whom a "qualifying event" (within the meaning of COBRA) occurs after the Closing Date.

(f) To the extent that a Transferred Employee is entitled under Applicable Law to be paid for any vacation days accrued or earned but not yet taken by such Transferred Employee as of the Closing Date, notwithstanding anything to the contrary contained herein, Purchaser shall assume such obligation to honor such accrued vacation days or paid time off from and after the Closing Date.

(g) The Parties shall reasonably cooperate in good faith to assign to Purchaser (or its designee) all Assumed Employee Plans, including all related pre-payments, deposits, and refunds thereunder and any assets, trusts, or insurance policies maintained pursuant thereto or in connection therewith, in each case, effective as of the Closing. If Purchaser's (or its designee's) assumption of one or more Assumed Employee Plans is not practicable, the Parties shall reasonably cooperate in good faith to permit the transfer of the applicable assets of the applicable Employee Plan(s) related to the Transferred Employees and that are intended to be Assumed Employee Plans to the corresponding Purchaser employee benefit plan(s) in accordance with the intent of this Agreement. The Parties shall cooperate in good faith to enter into such amendments to this Agreement as are necessary to effectuate the actions contemplated pursuant to this Section 6.5(g).

(h) If requested by Purchaser in a writing delivered to Seller following the date hereof and no later than thirty (30) days following the Agreement Date, Seller shall adopt resolutions to terminate, effective as of no later than the day before the Closing Date, any Employee Plan that is a defined contribution plan that includes a qualified cash or deferred arrangement within the meaning of Section 401(k) of the IRC (a "**Seller 401(k) Plan**"). Seller shall provide Purchaser with a copy of the resolutions and any plan amendments, notices, and other documents prepared to effectuate the termination of Seller 401(k) Plans in advance and give Purchaser a reasonable opportunity to comment on such documents in advance (which comments shall be considered in good faith), and prior to the Closing Date, Seller shall provide Purchaser with the final documentation evidencing that Seller 401(k) Plans have been terminated effective as of no later than the day before the Closing Date.

(i) Following the Agreement Date, Seller and Purchaser shall reasonably cooperate in all matters reasonably necessary to effect the transactions contemplated by this Section 6.5, including (i) exchanging information and data relating to workers' compensation, employee benefits, and employee benefit plan coverages and any information that is reasonably necessary to affect their respective Tax withholding, accounting, and reporting obligations under Applicable Law, (ii) obtaining any governmental approvals required hereunder, (iii) responding to reasonable questions posed by employees, labor unions, employee representatives, or any other Persons, (iv) providing offers of employment to the employees selected by Purchaser in accordance with Section 6.5(a), and (v) transferring to Purchaser, no later than the Closing Date, all employee records, including all current employment eligibility verification form and related records, documents, and papers, of the Transferred Employees.

(j) The Parties shall reasonably cooperate in good faith with respect to any communications to employees and other service providers regarding the Transactions. Seller will provide Purchaser with a reasonable opportunity to review and comment on any communications intended for the employees and other service providers that it desires or has to send to Service Providers prior to the Closing Date. Purchaser will provide Seller with a reasonable opportunity to review and comment on any communications intended for the Service Providers (including regarding its offers of employment) that it desires or has to send to Service Providers prior to the Closing Date or to terminate the services of any service provider of Seller or any of its Affiliates.

(k) During the period prior to the Closing, Seller shall use reasonable best efforts to make individual natural person contractors related to the Business and engaged by Seller available to Purchaser or any of its Affiliates for the purpose of allowing Purchaser or its applicable Affiliate to interview each such contractor and determine the nature and extent of each such person's continuation with Purchaser or any of its Affiliates, if any. Seller shall provide to Purchaser contact information for third-party service providers providing contingent personnel to the Business and reasonably cooperate in identifying and transferring such contingent work force to the extent requested by Purchaser.

(l) Seller shall use reasonable best efforts to ensure that any Business Employee to whom Purchaser intends to make an offer of employment who requires a visa or other work permit in order to work as an employee of Purchaser or any of its Affiliates and provide services to the Business in his or her current position may continue to work in such position as an employee immediately following the Closing Date. In the event such Business Employee does not have the requisite work permit in place as of the Closing, the Seller Parties shall (notwithstanding anything in this Agreement to the contrary) continue to employ such Business Employee as of and following the Closing, and make such Business Employee's services available to the Business until such work permit is obtained and such Business Employee is legally permitted to commence employment with Purchaser or its applicable Affiliate.

(m) The Parties acknowledge and agree that all provisions contained in this Section 6.5 are included for the sole benefit of the Parties, and that nothing in this Agreement, whether express or implied, shall create any third-party beneficiary or other rights (i) in any other Person, including any employee, former employee, or other service provider of Seller (including the Business Employees or Transferred Employees), any participant in any employee benefit plan maintained by any of the Parties, or any dependent or beneficiary thereof, or (ii) to continued

employment or engagement with any of the Parties or any of their respective Affiliates for any specific period. Nothing contained in this Section 6.5 is intended to be or shall be considered to be an amendment or adoption of any Employee Plan or any other plan, program, Contract, arrangement, or policy of the Parties or any of their respective Affiliates. In addition, nothing contained in this Section 6.5 shall interfere with the Parties' or any of their respective Affiliates' right to amend, modify, or terminate any Employee Plan in accordance with its provisions or to terminate the employment or engagement of any Service Providers of Seller (including the Business Employees) or, following the Closing, of the Transferred Employees, subject to compliance with Section 6.5(b).

6.6 **Free and Clear**. Except as otherwise expressly set forth in this Agreement, the proposed Sale Order shall be drafted to provide, without limitation, that, (a) on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Liens, against or created by Seller, any of its Affiliates, or the bankruptcy estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Transferred Assets and (b) Purchaser is not a successor to Seller or the bankruptcy estate by reason of any theory of law or equity, and Purchaser shall not assume or in any way be responsible for any Liability of Seller, any of its Affiliates and/or the bankruptcy estate, except as expressly provided in this Agreement. On the Closing Date, pursuant to the Sale Order, the Transferred Assets shall be transferred to Purchaser free and clear of all obligations, Liabilities and Liens (other than Permitted Liens) to the fullest extent permitted by Section 363 of the Bankruptcy Code.

6.7 **Update of Schedules**. From time to time prior to the Closing, Seller may supplement or amend the Schedules with respect to any matter hereafter arising or discovered which if existing or known by Seller at the Agreement Date would have been required to be set forth or described in such Schedules and also with respect to events or conditions arising after the Agreement Date and prior to Closing. Any such supplemental or amended disclosure shall not be deemed to have cured any such breach of representation or warranty for purposes of determining whether or not the conditions set forth in Section 8.2(a) have been satisfied.

## ARTICLE 7
## POST-CLOSING COVENANTS

7.1 **Access to Information; Books and Records**.

(a) From and after the Closing, and without prejudice to the obligations of Purchaser pursuant to Section 7.4(g), Purchaser and its Affiliates shall (i) afford Seller and its representatives (at Seller's sole cost and expense) reasonable access, during normal business hours, upon reasonable advance notice (and in the event of a facility visit request, at least forty-eight (48) hours prior notice) and under reasonable circumstances, to the books and records of Purchaser and the Business shall permit Seller and its representatives to examine and copy such books and records to the extent reasonably requested by such party and (ii) cause their representatives to furnish all information reasonably requested by Seller or its representatives in connection with the administration of the Bankruptcy Case, any claims or interests asserted by parties in interest against Seller in the Bankruptcy Case, financial or regulatory reporting whether in the Bankruptcy Case or otherwise, audit, third party litigation, preparing or filing of any Tax Return or the defense of

any Tax claim or assessment or any other business purpose; provided, however, that (i) all requests for access shall be directed to such person(s) as Purchaser may designate in writing from time to time, (ii) such activities do not unreasonably interfere with the ongoing business or operations of Purchaser, (iii) Purchaser shall have the right to have one or more of its representatives present at all times during any visits, examinations, discussions or contacts contemplated by this Section 7.1(a), (iv) such access or related activities would not cause a violation of any agreement to which Purchaser is a party, and (v) no Personal Data shall be disclosed or used other than in compliance with Applicable Law; provided, further, that nothing in this Section 7.1 shall require Purchaser or its Affiliates to furnish to Seller or its representatives any material that is (i) subject to an attorney-client or solicitor-client privilege or an attorney or solicitor work-product privilege or which may not be disclosed pursuant to Applicable Law or (ii) or not related to the Transferred Assets or the Business. For a period of six (6) years following the Closing Date, or such longer period as may be required by Applicable Law or necessitated by applicable statutes of limitations, Purchaser shall, and shall cause its Affiliates to, maintain all such books and records in the jurisdiction in which such books and records were located prior to the Closing Date and shall not destroy, alter or otherwise dispose of any such books and records.

(b) From and after the Closing, Seller and its Affiliates shall (i) afford Purchaser and its representatives (at Purchaser's sole cost and expense) reasonable access, during normal business hours, upon reasonable advance notice and under reasonable circumstances, to the books and records and personnel of Seller and its Affiliates and shall permit Purchaser and its representatives to examine and copy such books and records to the extent reasonably requested by such party and (ii) cause their representatives to furnish all information owned or controlled by Seller of its Affiliates that is reasonably accessible and reasonably requested by Purchaser or its representatives in connection with financial or regulatory reporting, audit, third party litigation, preparing or filing of any Tax Return or the defense of any Tax claim or assessment or any other business purpose; provided, however, that nothing in this Section 7.1 shall require Seller or its Affiliates to furnish to Purchaser or its representatives any material that is subject to an attorney-client or solicitor-client privilege or an attorney or solicitor work-product privilege or which may not be disclosed pursuant to Applicable Law.

7.2 **Seller Confidentiality**. Seller acknowledges that from and after the Closing, all non-public information relating to the Transferred Assets and the Assumed Liabilities will be valuable and proprietary to Purchaser and its Affiliates. Following the Closing, Seller shall, and shall cause its Affiliates and direct its representatives to, maintain as confidential and not use or disclose, any confidential, proprietary or non-public information or materials (i) relating to the Business (excluding to the extent solely relating to the Excluded Assets, and in such case solely to such extent), the Transferred Assets, or the Assumed Liabilities or (ii) provided by Purchaser or any of its representatives to Seller. In the event Seller or any of its Affiliates or representatives is required by Applicable Law to disclose any such information or materials, Seller shall to the extent practicable and not prohibited by Applicable Law, promptly notify Purchaser in writing of such required disclosure, which notification shall include a reasonable description of the nature of the legal requirement and the extent of the required disclosure, and such Person shall reasonably cooperate with Purchaser, to obtain a protective order and otherwise preserve the confidentiality of such information or materials consistent with Applicable Law. At any time that such protective order or remedy has not been obtained, Seller or its Affiliate or representative may disclose only that portion of such information or materials which such Person is required by Applicable Law to

disclose. Information and materials subject to the confidentiality obligations in this Section 7.2 do not include any information or materials which (A) at the time of disclosure is or thereafter becomes generally available to or known by the public (other than as a result of the disclosure of such information or materials by Seller or its Affiliates or representatives in breach of this Section 7.2) or (B) becomes available to Seller or its Affiliates and representatives on a non-confidential basis from a Person (other than Purchaser or any of its Affiliates) who is not bound by a confidentiality agreement with Purchaser or any of its Affiliates.

7.3 **Post-Closing Receipt and Possession of Assets**.

(a) After the Closing Date, Seller shall transfer promptly to Purchaser from time to time (but in any event on a monthly basis) any payments constituting Transferred Assets received by Seller. After the Closing Date, Purchaser shall transfer promptly to Seller, from time to time (but in any event on a monthly basis), any payments constituting Excluded Assets, received by Purchaser after the Closing.

(b) In the event that, after the Closing Date, Purchaser receives or otherwise is in possession of any Excluded Asset, Purchaser shall promptly notify Seller of its receipt or possession of such other Excluded Asset and transfer, at Purchaser's expense, such Excluded Asset to Seller. In the event that, after the Closing Date, Seller receives or otherwise is in possession of any other Transferred Asset, Seller shall promptly notify Purchaser of its receipt or possession of such other Transferred Asset and transfer, at Purchaser's expense (unless Seller was required to transfer such Transferred Asset to Purchaser at Closing, in which case, and without limitation of any other remedies available to Purchaser, such transfer will be at Seller's expense), such Transferred Asset to Purchaser.

7.4 **Tax Matters**.

(a) Seller shall be responsible for preparing or causing to be prepared all Asset Tax Returns for itself for taxable periods ending on or before the Closing Date (each, a "**Pre-Closing Tax Period**") that are required to be filed after the Closing. After the Closing, Purchaser will assist and cooperate with Seller in preparing such Asset Tax Returns and timely filing or causing such Asset Tax Returns to be timely filed.

(b) Purchaser shall prepare and timely file or cause to be prepared and timely filed (taking into account all extensions properly obtained) all Tax Returns that are required to be filed for any taxable period that begins on or before the Closing Date and ends after the Closing Date (a "**Straddle Period**") and shall timely pay (subject to Purchaser's right to reimbursement of Seller Taxes), or cause to be timely paid, the amount of any Taxes due thereon. Purchaser shall prepare such Tax Returns in a manner consistent with past practice to the extent relevant and consistent with Applicable Law and shall provide Seller with completed drafts of such Tax Returns for Seller's review and reasonable comment at least thirty (30) days prior to the due date for filing thereof, taking into account extensions (or, if such due date is within thirty (30) days following the Closing Date, as promptly as practicable following the Closing Date) and shall make such revisions to such Tax Returns as are reasonably requested by Seller, provided such requests are consistent with the prior practice of Seller (to the extent relevant) and comply with Applicable Law.

(c) Seller shall be liable for any Asset Taxes with respect to a Pre-Closing Tax Period and the portion of any Straddle Period ending on the Closing Date ("**Seller Taxes**"). For purposes of this Agreement, in the case of any Straddle Period, (a) the amount of any Asset Taxes based on or measured by income or receipts, sales or use, employment, or withholding allocated to the portion of such Straddle Period ending on the Closing Date shall be determined based on an interim closing of the books as of the end of the day on the Closing Date and (b) any other Asset Taxes shall be allocated to the portion of such Straddle Period ending on the Closing Date by prorating the amount of such Tax for the entire premium or taxable period per diem.

(d) Purchaser and its Affiliates shall not make or change any Tax election, amend, refile or otherwise modify (or grant an extension of any statute of limitation with respect to) any Tax Return, or take any other action that could cause or result in an increase in any Tax Liability or reduce any Tax Benefit in respect of any Pre-Closing Tax Period or Straddle Period relating to Seller or the Business without the prior written consent of Seller.

(e) Purchaser shall promptly notify Seller in writing upon receipt by Purchaser or any of its Affiliates of notice of any pending or threatened federal, state, local or foreign Tax audits, proceedings or assessments relating to Pre-Closing Tax Period, Straddle Period or otherwise relating to a Tax for which Seller may be liable or any Tax refund which is an Excluded Asset (a "**Seller Tax Claim**").

(f) Seller shall have the sole right to control the defense or resolution of any Seller Tax Claim that relates solely to a Pre-Closing Tax Period (a "**Seller Controlled Defense**"), and to employ counsel of its choice at Seller's expense; provided, however, that Purchaser and its representatives shall be permitted, at their expense, to observe and participate in any defense or resolution of such Seller Controlled Defense. The Purchaser shall have the sole right to control the defense or resolution of any Seller Tax Claim that is not a Seller Controlled Defense (a "**Purchaser Controlled Defense**"), and to employ counsel of its choice at the Purchaser's expense; provided, however, that Seller and its representatives shall be permitted, at their expense, to observe and participate in any defense or resolution of such Purchaser Controlled Defense. Neither Purchaser nor any of its Affiliates shall be entitled to settle, either administratively or after the commencement of litigation, any Seller Tax Claim without the prior written consent of Seller, which shall not be unreasonably conditioned, denied or delayed. Notwithstanding anything to the contrary contained herein, without the prior written consent of Purchaser, which shall not be unreasonably conditioned, denied or delayed, Seller shall not agree or consent to compromise or settle, either administratively or after the commencement of litigation, any issue or claim in a Tax audit or administrative or court proceeding it controls hereunder to the extent that any such compromise, settlement, consent or agreement may affect the Tax Liability of Purchaser or any of its Affiliates for which Seller is not responsible hereunder. The provisions of this Section 7.4(f) shall control over any contrary provisions of Section 10.1.

(g) After the Closing, each of Seller and Purchaser shall (and Purchaser shall cause its Affiliates to):

(i) timely sign and deliver such certificates or forms as may be necessary or appropriate to establish an exemption from (or otherwise reduce), or file Tax Returns or other reports with respect to, Transfer Taxes;

(ii) cooperate fully in preparing for and defending any audits or proceedings of or disputes with Governmental Authorities regarding any Tax Returns required to be filed by, or Taxes related to the Transferred Assets due from, Seller for any Pre-Closing Tax Period or Straddle Period;

(iii) maintain and preserve until the expiration of the applicable statutes of limitations, and make available to the other parties as reasonably requested and to any Governmental Authority as reasonably required, all information, records and documents relating to Taxes related to the Transferred Assets for any Pre-Closing Tax Period or Straddle Period, and make employees available to the other parties as reasonably requested during business hours to supplement or explain such information, records and documents; and

(iv) furnish the other parties with copies of all correspondence received from any Governmental Authority in connection with any Tax audit, proceeding, assessment or information request relating to Taxes related to the Transferred Assets for a Pre-Closing Tax Period or Straddle Period, and furnish the other parties with copies of all records and documents relating to Taxes related to the Transferred Assets for a Pre-Closing Tax Period or Straddle Period that are proposed to be destroyed (and not otherwise in the possession of such other party).

(h) Purchaser shall pay, or cause to be paid, to Seller the amount of any refunds of Taxes related to the Transferred Assets from a Pre-Closing Tax Period or the portion of a Straddle Period ending on the Closing Date or that are Excluded Assets to Seller within five (5) days of receipt of the refund in cash (or through offset against other cash Taxes payable). Seller shall pay to the Purchaser the amount of any refunds or credits of Taxes that are Transferred Assets (including but not limited to Seller's claims for ERC under the CARES Act).

## ARTICLE 8
## CONDITIONS PRECEDENT

8.1 **Conditions to Each Party's Obligation**. The respective obligations of the Parties to effect the Transactions are subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by Seller and Purchaser), at or prior to the Closing, of the following conditions:

(a) No Injunctions or Restraints. No Order or Applicable Law preventing the consummation of the Transactions shall be in effect.

(b) No DIP Financing Agreement Default. No Default or Event of Default (as each is defined in the DIP Financing Agreement) under the DIP Financing Agreement shall have occurred and be continuing.

(c) Entry of Orders. The Bankruptcy Court shall have entered the Bid Procedures Order and the Sale Order in a form reasonably acceptable to Purchaser.

8.2 **Conditions to Obligation of Purchaser**. The obligations of Purchaser to effect the Transactions is subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by Purchaser), at or prior to the Closing, of the following conditions:

(a) Representations and Warranties. Each of the representations and warranties of Seller set forth in Article 3 shall be true and correct in all respects (without giving effect to any qualifications or limitations as to "materiality", "Material Adverse Effect" or words of similar import set forth therein) as of the Closing as though made at and as of such time (other than such representations and warranties as are made as of an earlier date, which shall be so true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not have, individually or in the aggregate, a Material Adverse Effect.

(b) Performance of Covenants and Obligations. Seller shall have performed or complied in all material respects with all obligations and covenants required to have been performed or complied with by it under this Agreement at or prior to the Closing.

(c) Closing Deliverables. Seller shall have delivered to Purchaser the closing deliveries required to be delivered by Seller pursuant to Section 2.8(a), Section 2.8(b) and Section 2.8(d).

(d) Assigned Contract Consents and Notices. Seller shall have obtained consents for the assignment of, and sent notices as required by, the Assigned Contracts set forth on Schedule 8.2(d), in each case, in a form reasonably acceptable to Purchaser.

(e) No Material Adverse Effect. There shall not have occurred a Material Adverse Effect that is continuing.

8.3 **Conditions to Obligations of Seller**. The obligation of Seller to effect the Transactions is subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by Seller), at or prior to the Closing, of the following conditions:

(a) Representations and Warranties. Each of the representations and warranties of Purchaser set forth in Article 4 shall be true and correct in all material respects (without giving effect to any qualifications or limitations as to "materiality" or words of similar import set forth therein) as of the Closing as though made at and as of such time (other than such representations and warranties as are made as of an earlier date, which shall be so true and correct as of such date).

(b) Performance of Covenants and Obligations of Purchaser. Purchaser shall have performed or complied in all material respects with all obligations and covenants required to have been performed or complied with by it under this Agreement at or prior to the Closing.

(c) Closing Deliverables. Purchaser shall have delivered to Seller the closing deliveries required to be delivered by Purchaser pursuant to Section 2.8(a), Section 2.8(b) and Section 2.8(c).

8.4 **Waiver of Condition; Frustration of Conditions**. All conditions to the Closing shall be deemed to have been satisfied or waived from and after the Closing. Neither Purchaser nor Seller may rely on the failure of any condition set forth in this Article 8, as applicable, to be satisfied if such failure was caused by such party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the Transactions.

8.5 **Deliver of a Notice of Readiness to Close**. At any time after the Seller's satisfaction of its conditions to Closing in accordance with the terms of Section 8.1 and Section 8.3 of this Agreement, the Seller may deliver a notice to the Purchaser (a "**Notice of Readiness to Close**"). The Purchaser shall have five (5) Business Days from delivery of a Notice of Readiness to Close to satisfy its conditions to Closing in accordance with the terms of Section 8.1 and Section 8.2 of this Agreement and consummate the Transactions. If Purchaser does not satisfy its conditions to Closing and consummate the Transaction within five (5) Business Days, Purchaser shall be entitled to specific performance in accordance with Section 10.14.

## ARTICLE 9
## TERMINATION

9.1 **Events of Termination**. Notwithstanding anything to the contrary, this Agreement may be terminated, and the Transactions may be abandoned at any time prior to the Closing:

(a) by mutual written consent of Purchaser and Seller;

(b) (i) automatically, upon the consummation of a sale, transfer or other disposition (or series of sales, transfers or other dispositions), whether direct or indirect, of all or substantially all of the Transferred Assets to a Person other than Purchaser (each, an "**Alternate Transaction**"), (ii) if, at close of the Auction, Purchaser's bid has not been selected as either the winning bid or the Back-Up Bid or (iii) if, at the close of the Auction, Purchaser's bid was selected as the Back-Up Bid, upon the consummation of a Competing Bid or Alternate Transaction;

(c) by Purchaser or Seller by written notice to Purchaser or Seller from the other, if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(d) by Purchaser, by written notice from Purchaser to Seller, if Seller (i) withdraws the motion for the Sale Order, or publicly announces its intention to withdraw such motion, (ii) moves to voluntarily dismiss the Bankruptcy Cases, (iii) moves for conversion of the Bankruptcy Cases to Chapter 7 of the Bankruptcy Code, or (iv) moves for appointment of an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code or a trustee in the Bankruptcy Cases;

(e) by Purchaser, upon a termination of the DIP Financing Agreement or upon a modification of any DIP Order in any material respect without the consent of the requisite DIP Lenders;

(f) by Purchaser, if for any reason Purchaser is not permitted by the Bankruptcy Court, pursuant to Bankruptcy Code Section 363(k), to credit bid the DIP Loans and/or the Pre-Petition Loans;

(g) by Purchaser, by written notice from Purchaser to Seller, if there has been a breach or inaccuracy of a covenant, representation or warranty made by Seller in this Agreement, such that the conditions in Section 8.1 or Section 8.2 are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by Seller prior to the earlier of (i) twenty (20) Business Days after receipt of written notice from Purchaser

requesting such breach be cured or (ii) the Outside Date; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(d) shall not be available to Purchaser if the failure of Purchaser to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in Section 8.1 or Section 8.3 are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement;

(h) by Seller, by written notice from Seller to Purchaser, if there has been a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement, such that the conditions in Section 8.1 or Section 8.3 are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by Purchaser prior to the earlier of (i) twenty (20) Business Days after receipt of written notice from Seller requesting such breach be cured or (ii) the Outside Date; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(h) shall not be available to Seller if the failure of Seller to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in Section 8.1 or Section 8.2 are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by the Seller in this Agreement;

(i) by Purchaser or Seller, by written notice from Purchaser or Seller to the other, if any Governmental Authority of competent jurisdiction shall have issued an Order, enacted any Applicable Law or taken any other action restraining, enjoining or otherwise prohibiting the consummation of the Transactions and, in the case of Orders and other actions, such Order or other action shall have become Final Orders; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(i) shall not be available to the party seeking to terminate if any action of such party or any failure of such party to act has contributed to such Order or other action and such action or failure constitutes a breach of this Agreement;

(j) by Purchaser or Seller, by written notice from Purchaser or Seller to the other, if the Closing has not occurred on or prior to July 18, 2025 (the "**Outside Date**"); provided, that the Parties may jointly agree to extend the Outside Date; provided, further, however, that the party exercising the right to terminate this Agreement pursuant to this Section 9.1(j) shall not have been responsible for such failure of the Closing to occur through a breach or inaccuracy of a covenant, representation or warranty contained in this Agreement; or

(k) by Purchaser, if (i) the Bid Procedures Order shall not have been entered by the Bankruptcy Court by 11:59 p.m. (New York Time) on the date that is thirty (30) days after the Petition Date (ii) the Sale Order shall not have been entered by the Bankruptcy Court by 11:59 p.m. (New York Time) on the date that is fifty-eight (58) days after the Petition Date, or (iii) following the entry of the Sale Order, the Sale Order shall (A) fail to be in full force and effect, (B) have been reversed, (C) have been stayed and such stay shall continue to be in effect for more than fourteen (14) days or (D) have been modified or amended in any manner adverse to Purchaser without the prior written consent of Purchaser.

9.2 **Effect of Termination**.

(a) In the event that this Agreement shall be terminated pursuant to Section 9.1, (a) all further obligations of the Parties under this Agreement shall terminate without further Liability or obligation to the other parties hereto; provided, however, that, notwithstanding the foregoing, (a) the Liabilities and obligations under (i) the Confidentiality Agreement, and (ii) Section 6.2(b), this Section 9.2, Section 9.3 and Article 10 shall continue in full force and effect and (b) nothing herein shall relieve any party hereto from Liability from fraud or any willful breach of this Agreement or any Related Document.

(b) Notwithstanding anything to the contrary in this Agreement, in the event of valid termination of this Agreement pursuant to Section 9.1 and except in the case of any fraud or willful breach by Seller, (i) Seller's Liability hereunder for any and all breaches of this Agreement prior to such termination of this Agreement shall be capped at an amount equal to the Termination Fee and Expense Reimbursement, and (ii) no such termination shall relieve Purchaser from any Liability hereunder for any and all breaches of this Agreement prior to such termination of this Agreement (including if this Agreement is terminated by Seller pursuant to Section 9.1(e)) and Seller shall be entitled to all remedies available at law or in equity.

9.3 **Termination Fee and Expense Reimbursement**.

(a) Subject to limitations set forth in the Bid Procedures Order, in consideration of Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, and the identification and quantification of assets to be included in the Transferred Assets, and to compensate Purchaser as a stalking-horse bidder, Seller shall pay in cash to Purchaser, by wire transfer of immediately available funds to the account specified by Purchaser to Seller in writing, an amount equal to the Termination Fee in the event that this Agreement is terminated pursuant to Section 9.1(b) in which case the Termination Fee shall be due and payable simultaneously with any termination of this Agreement ; provided that Purchaser shall not be entitled to the fee described in this Section 9.3(a) to the extent Purchaser is in material breach of this Agreement at the time this Agreement is terminated. The Termination Fee shall be payable solely from the proceeds of an Alternative Transaction. Seller's obligation to pay the Termination Fee pursuant to this Section 9.3(a) shall survive termination of this Agreement and shall constitute an administrative expense of Seller.

(b) Subject to limitations set forth in the Bid Procedures Order, in consideration of Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, and the identification and quantification of assets to be included in the Transferred Assets, if (i) this Agreement is terminated in accordance with the terms set forth in Section 9.1(b) or (ii)(A) this Agreement is terminated in accordance with the terms set forth in Section 9.1(d), Section 9.1(e), Section 9.1(g), Section 9.1(j) or Section 9.1(k) and (B) Seller consummates an Alternative Transaction within six (6) months of such termination, then in either case, Seller shall pay to Purchaser in cash not later than two (2) Business Days following receipt of documentation supporting the request for reimbursement of costs, fees and expenses, the Expense Reimbursement, in an amount not to exceed $1,000,000, by wire transfer of immediately available funds to an account specified by Purchaser to Seller in writing; provided that, Purchaser shall not be entitled to the fee described in this Section 9.3(b) to the extent Purchaser is in material

breach of this Agreement at the time this Agreement is terminated. The Expense Reimbursement shall be payable solely from the proceeds of an Alternative Transaction. Seller's obligation to pay the Expense Reimbursement pursuant to the terms of this Section 9.3(a) shall be subordinate and junior in all respects to the DIP Superpriority Claims, the DIP Obligations, any and all Liens securing the DIP Obligations.

(c) Seller agrees and acknowledges that Purchaser's due diligence, efforts, negotiation, and execution of this Agreement have involved substantial investment of management time and have required significant commitment of financial, legal, and other resources by Purchaser, and that such due diligence, efforts, negotiation, and execution have provided value to Seller and, in Seller's reasonable business judgment, is necessary for the preservation of the value of Seller's estate. Seller further agrees and acknowledges that the Termination Fee and the Expense Reimbursement are not a penalty, but rather represent liquidated damages that are reasonable in relation to Purchaser's efforts, Purchaser's lost opportunities from pursuing the Transactions, and the magnitude of the Transactions. The provision of the Termination Fee and the Expense Reimbursement is an integral part of this Agreement, without which Purchaser would not have entered into this Agreement. Subject to the requirements of Section 9.3(a) and Section 9.3(b), (i) the obligations of Seller to pay the Termination Fee and Expense Reimbursement as provided herein shall be entitled to administrative expense status pursuant to Section 503(b)(1) of the Bankruptcy Code, and (ii) Seller shall seek to have such obligations be entitled to superpriority administrative expense status pursuant to Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, senior to all other general administrative expense claims and superpriority administrative expense claims granted such status pursuant to Sections 503(b)(1) and 507(a)(2) (but subordinate and junior in all respects to the Carve-Out (as defined in the DIP Order) and the DIP Superpriority Claims), in the Bankruptcy Case.

(d) Notwithstanding anything to the contrary in this Agreement, other than in the case of fraud or willful breach of this Agreement or any Related Document by Seller, if this Agreement is terminated under circumstances in which the Expense Reimbursement and/or the Termination Fee is payable and Purchaser is paid the Expense Reimbursement and/or Termination Fee pursuant to this Section 9.3, the Expense Reimbursement and/or Termination Fee shall be the sole and exclusive remedy (whether at law, in equity, in contract, in tort or otherwise) of the Purchaser against Seller and any of their current or former respective former, current or future holders of equity, controlling Persons, directors, officers, employees, Affiliates, representatives, agents or any their respective assignees or successors (collectively, "**Company Related Parties**") for any loss or damage suffered as a result of the failure of the transactions contemplated by this Agreement to be consummated or for a breach of, or failure to perform under, this Agreement or any certificate or other document delivered in connection herewith or otherwise, and upon payment of such amounts, none of the Company Related Parties shall have any further liability or obligation relating to or arising out of, or in relation to, this Agreement or the transactions contemplated hereby.

## ARTICLE 10
## GENERAL PROVISIONS

10.1 **Survival of Representations, Warranties and Covenants.** All covenants and agreements contained in this Agreement that by their term are to be performed in whole or in part,

or which prohibit actions, subsequent to Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to Closing, survive the Closing in accordance with their terms until fully performed or satisfied. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder shall not survive Closing and shall therefore terminate, including any Action for damages in respect of any breach or inaccuracy thereof. Notwithstanding the foregoing, the provisions of Section 6.2, Section 9.2, Section 9.3 and this Article 10 shall survive the Closing. Except in the case of fraud or willful breach, Purchaser's sole and exclusive remedy (a) for a breach of any representation or warranty made by Seller herein or in any document delivered pursuant hereto or (b) for a breach of any covenant made by Seller herein or in any document delivered pursuant hereto and required to be performed by Seller on or prior to the Closing, shall, in either case, be limited to (i) Purchaser's right to terminate this Agreement to the extent permitted pursuant to Section 9.1, in which case Seller shall have not any liability except to the extent expressly provided in Section 9.2 or (ii) Purchaser's right to seek a court to order equitable relief pursuant to Section 10.13.

10.2 **Entire Agreement**. This Agreement, including the Exhibits and Schedules hereto, the Confidentiality Agreement and the Related Documents, contain the entire understanding of the Parties with respect to the subject matter contained herein and therein. This Agreement supersedes all prior and contemporaneous agreements, arrangements, contracts, discussions, negotiations, undertakings and understandings (including any letters of intent or term sheets), whether written or oral, among the Parties with respect to such subject matter (other than, for the avoidance of doubt, the Confidentiality Agreement and the Related Documents) or any prior course of dealings. The Parties have voluntarily agreed to define their rights, Liabilities and obligations respecting the Transactions exclusively in contract pursuant to the express terms and conditions of this Agreement, the Confidentiality Agreement and the Related Documents, and the Parties expressly disclaim that they are owed any duties or entitled to any remedies not expressly set forth in this Agreement, the Confidentiality Agreement and the Related Documents. Furthermore, the Parties each hereby acknowledge that this Agreement, the Confidentiality Agreement and the Related Documents embody the justifiable expectations of sophisticated parties derived from arm's-length negotiations, and all parties to this Agreement, the Confidentiality Agreement and the Related Documents specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of an ordinary purchaser and an ordinary seller in an arm's-length transaction. The sole and exclusive remedies for any Related Claims shall be those remedies available at law or in equity for breach of contract only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement); and the Parties hereby agree that neither party hereto shall have any remedies or cause of action (whether in contract or in tort or otherwise) of any statements, communications, disclosures, failures to disclose, representations or warranties not set forth in this Agreement. Notwithstanding the foregoing, nothing contained in this agreement shall limit the rights of Purchaser or any of its Affiliates under the DIP Financing Agreement or Pre-Petition Financing Agreement.

10.3 **Amendment; No Waiver**. This Agreement and the Related Documents may be amended, supplemented or changed, and any provision hereof or thereof can be waived, only by a written instrument making specific reference to this Agreement (and, if applicable, the Related Documents) executed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. The waiver by any party of a breach of any provision

of this Agreement or the Related Documents shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall a single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

10.4 **Severability; Specific Versus General Provisions**. Whenever possible, each provision of this Agreement and the Related Documents shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any term or other provision of this Agreement or the Related Documents is invalid, illegal, or incapable of being enforced by any Applicable Law or public policy, all other terms or provisions of this Agreement and the Related Documents shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, in whole or in part, such term or provision is hereby deemed modified to give effect to the original written intent of the Parties to the greatest extent consistent with being valid and enforceable under Applicable Law. No Party shall assert, and each Party shall cause its Affiliates or related parties not to assert, that this Agreement or any part hereof is invalid, illegal or unenforceable. Notwithstanding anything to the contrary, to the extent that a representation, warranty, covenant or agreement of a Party contained in this Agreement or the Schedules (each, a "**Provision**") addresses a particular issue with specificity (a "**Specific Provision**"), and no breach by such Party exists under such Specific Provision, such Party shall not be deemed to be in breach of any other Provision (with respect to such issue) that addresses such issue with less specificity than the Specific Provision, and if such Specific Provision is qualified or limited by the Knowledge of such Party, or in any other manner, no other Provision shall supersede or limit such qualification in any manner.

10.5 **Expenses and Obligations**. Except as otherwise provided in this Agreement, all costs and expenses incurred by the Parties in connection with the Transactions, including the costs, expenses and disbursements of counsel and accountants, shall be borne solely and entirely by the party that has incurred such expenses.

10.6 **Notices**. All notices, consents, waivers, and other communications under this Agreement or the Related Documents must be in writing and will be deemed to have been duly given (a) if personally delivered, on the date of delivery, (b) if delivered by express courier service of national standing for next day delivery (with charges prepaid), on the Business Day following the date of delivery to such courier service, (c) if delivered by electronic mail (unless the sender receives an automated message that the email has not been delivered) on the date of transmission if on a Business Day before 5:00 p.m. local time of the business address of the recipient party (otherwise on the next succeeding Business Day) and (d) if deposited in the United States mail, first-class postage prepaid, on the date of delivery, in each case to the appropriate addresses or email addresses set forth below (or to such other addresses as a party may designate by notice to the other parties in accordance with this Section 10.6):

If to Purchaser:

Perceptive Credit Holdings III, LP
c/o Perceptive Advisors LLC
51 Astor Place, 10th Floor
New York, NY 10003
Attention: Sandeep Dixit
Email: Sandeep@perceptivelife.com

with a copy to (which will not constitute notice):

Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019
Attention: Mark S. Wojciechowski; Jim Krenn; James A. Newton
Email: mwojciechowski@mofo.com; jkrenn@mofo.com; jnewton@mofo.com

If to Seller:

Synthego Corporation
3696 Haven Avenue, Suite A
Redwood City, CA 94063
Attention: Legal Department
Email: stephanie.adamany@synthego.com

with a copy to (which will not constitute notice):

Fenwick & West LLP
902 Broadway, 18th Floor
New York, NY 10010
Attention: Ethan Skerry; Brendan Montgomery
Email: eskerry@fenwick.com; bmontgomery@fenwick.com

and

Pachulski Stang Ziehl & Jones LLP
One Sansome Street, Suite 3430
San Francisco, CA 94104
Attention: Debra Grassgreen; Maxim Litvak
Email: dgrassgreen@pszjlaw.com; mlitvak@pszjlaw.com

10.7 **Counterparts**. This Agreement may be executed in two or more counterparts (any of which may be delivered by electronic transmission), each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument. The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format, or other agreed format shall be sufficient to bind the Parties to the terms and conditions of this Agreement. Minor variations in the form of the signature page, including footers from earlier

versions of this Agreement or any Related Document, shall be disregarded in determining the party's intent or the effectiveness of such signature.

10.8 **Governing Law.** This Agreement, the Related Documents and all Related Claims shall be governed by the internal laws of the State of Delaware (including its statute of limitations), without giving effect to any choice or conflict of law principles or rules that would cause the application of the Applicable Law of any other jurisdiction.

10.9 **Submission to Jurisdiction; Consent to Service of Process**.

(a) Without limiting any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to interpret and/or enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any Related Document, any breach or default hereunder or thereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10.6; provided, however, that if the Bankruptcy Case has closed, the Parties agree to irrevocably submit to the exclusive jurisdiction of the of the Court of Chancery of the State of Delaware or, to the extent the Court of Chancery of the State of Delaware does not have subject matter jurisdiction, the federal courts of the United States of America and the courts of the State of Delaware, in each case, located within the City of Wilmington in the State of Delaware over all Related Claims, and each party hereto hereby irrevocably agrees that all Related Claims may be heard and determined in such courts. The Parties hereby irrevocably and unconditionally waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any such Related Claim brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Applicable Law.

(b) Each of the Parties hereby consents to process being served by any party to this Agreement in any Related Claim by the delivery of a copy thereof in accordance with the provisions of Section 10.6 (other than by email) along with a notification that service of process is being served in conformance with this Section 10.9(b). Nothing in this Agreement will affect the right of any party to serve process in any other manner permitted by Applicable Law.

10.10 **Waiver of Jury Trial**. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY EXPRESSLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING OR RELATED CLAIM BROUGHT BY OR AGAINST IT, DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS.

10.11 **Rights Cumulative**. All rights and remedies of each of the parties under this Agreement and the Related Documents will be cumulative, and the exercise of one or more rights or remedies will not preclude the exercise of any other right or remedy available under this Agreement, the Related Documents or Applicable Law.

10.12 **Public Announcements**. Except to the extent required by any Applicable Law or Action (including the Bankruptcy Case), Seller shall not, and shall cause its Affiliates and representatives not to, directly or indirectly, issue any press release or public announcement of any kind without the prior written consent of Purchaser; provided, however, that Seller and its Affiliates may make announcements from time to time to their respective employees, customers, suppliers, and other business relations and otherwise as Seller may reasonably determine is necessary to comply with Applicable Law or the requirements of this Agreement or any other agreement to which Seller or any such Affiliate is a party. Purchaser and Seller shall cooperate in good faith to prepare a joint press release to be issued on the Closing Date, the terms of which shall be mutually agreed upon by the Parties.

10.13 **Assignment**. Except as otherwise provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors by operation of law and permitted assigns of the Parties. No assignment of this Agreement or any of the rights, interests or obligations under this Agreement may be made by any party hereto at any time, whether or not by operation of law, without the prior written consent of Seller and Purchaser, and any attempted assignment without the required consent shall be void; provided, however, that (a) Purchaser may assign (i) any of its rights or delegate any of its duties under this Agreement to any of its Affiliates, and (ii) its rights, but not its duties, under this Agreement to any of its financing sources and (b) Seller may assign any of its rights or delegate any of its duties under this Agreement to any successor thereto, including any liquidating trustee or other agent; provided, further, however, that, in each case, such assignment shall not release Purchaser from its obligations under this Agreement and Seller shall have no obligation to pursue remedies against any assignee of Purchaser before proceeding against Purchaser for any breach of Purchaser's obligations hereunder.

10.14 **Specific Enforcement; Remedies**. The Parties agree that irreparable damage (for which monetary relief, even if available, would not be an adequate remedy) would occur in the event that any of the provisions of this Agreement were not performed by the Purchaser hereto in accordance with their specific terms or were otherwise breached. It is accordingly agreed that (i) Seller shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of competent jurisdiction without proof of damages or otherwise and that this shall include the right of Seller to cause Purchaser to fully perform the terms of this Agreement to the fullest extent permissible pursuant to this Agreement and Applicable Law and to thereafter cause this Agreement and the Transactions to be consummated on the terms and subject to the conditions thereto set forth in this Agreement, and (ii) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right Seller would not have entered into this Agreement.

10.15 **Third-Party Beneficiaries**. Except as expressly set forth herein, nothing in this Agreement, express or implied, is intended to confer upon any Person other than the Parties any rights or remedies of any nature whatsoever under or by reason of this Agreement.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**PURCHASER**:

**PERCEPTIVE CREDIT HOLDINGS III, LP**

**By: PERCEPTIVE CREDIT OPPORTUNITIES GP, LLC**, its general partner

By [signature]
Name: Sandeep Dixit
Title: Chief Credit Officer

By Sam Chawla
Name: Sam Chawla
Title: Portfolio Manager

**SELLER:**

SYNTHEGO CORPORATION

By:__________________________________
Name: Allen Soong
Title: Chief Restructuring Officer