# Exhibit A

## Combined Plan and Disclosure Statement

***SOLICITATION VERSION***

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>SYNTHEGO CORPORATION,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 25-10823 (MFW) |

**FIRST AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN OF LIQUIDATION OF SYNTHEGO CORPORATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Debra I. Grassgreen (admitted *pro hac vice*)
Maxim B. Litvak (admitted *pro hac vice*)
Malhar S. Pagay (admitted *pro hac vice*)
James E. O'Neill (DE Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8750
Wilmington, Delaware 19899-8705
Tel: 302-652-4100
Fax: 302-652-4400
Email: dgrassgreen@pszjlaw.com
mlitvak@pszjlaw.com
mpagay@pszjlaw.com
joneill@pszjlaw.com

Counsel to the Debtor and Debtor in Possession

Dated: June 26, 2025

[1] The Debtor's mailing address is 3696 Haven Avenue, Suite A, Redwood City, California, 94063, and the last four digits of the Debtor's federal tax identification number is 9518.

*SOLICITATION VERSION*

## TABLE OF CONTENTS

SECTION 1 INTRODUCTION .......... 1

SECTION 2 SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER PLAN AND IMPORTANT SOLICITATION AND CONFIRMATION DATES AND DEADLINES .......... 3

SECTION 3 DEFINED TERMS .......... 8

3.1 "2023 Convertible Notes Documents" .......... 8
3.2 "2023 Convertible Notes Purchase Agreement" .......... 9
3.3 "2023 Convertible Notes" .......... 9
3.4 "2023 Convertible Notes Claim" .......... 9
3.5 "2024 Non-Convertible Notes" .......... 9
3.6 "2024 Non-Convertible Notes Documents" .......... 9
3.7 "2024 Non-Convertible Notes Purchase Agreement" .......... 9
3.8 "Administrative Claim" .......... 9
3.9 "Administrative Claims Bar Date" .......... 9
3.10 "Allowed" .......... 9
3.11 "Allowed Claim" or "Allowed … Claim" .......... 10
3.12 "Available Cash" .......... 10
3.13 "Avoidance Actions" .......... 10
3.14 "Ballots" .......... 10
3.15 "Bankruptcy Code" .......... 11
3.16 "Bankruptcy Court" .......... 11
3.17 "Bankruptcy Rules" .......... 11
3.18 "Bar Date" .......... 11
3.19 "Bar Date Order" .......... 11
3.20 "Business Day" .......... 11
3.21 "Cash" .......... 11
3.22 "Causes of Action" .......... 11
3.23 "Chapter 11 Case" .......... 11
3.24 "Claim" .......... 11
3.25 "Claimant" .......... 12
3.26 "Claims Agent" .......... 12
3.27 "Claims Objection Deadline" .......... 12
3.28 "Class" .......... 12
3.29 "Collateral" .......... 12
3.30 "Combined Plan and Disclosure Statement" .......... 12
3.31 "Committee" .......... 12
3.32 "Company" .......... 12
3.33 "Confirmation" .......... 12
3.34 "Confirmation Date" .......... 12
3.35 "Confirmation Order" .......... 12
3.36 "Consummation" or "Consummate" .......... 12
3.37 "Contingent Claim" .......... 12
3.38 "Creditor" .......... 12



4899-9481-3244.22 82578.00002

3.39 "Debtor" ..... 12
3.40 "Debtor/Estate Release" ..... 12
3.41 "Debtor/Estate Releasors" ..... 13
3.42 "DIP Agent" ..... 13
3.43 "DIP Documentation" ..... 13
3.44 "DIP Facility" ..... 13
3.45 "DIP Facility Claim" ..... 13
3.46 "DIP Lenders" ..... 13
3.47 "DIP Orders" ..... 13
3.48 "Disallowed Claim" ..... 13
3.49 "Disclosure Statement" ..... 13
3.50 "Disputed" ..... 13
3.51 "Disputed Claim" ..... 13
3.52 "Disputed Claim Reserve" ..... 14
3.53 "Distribution(s)" ..... 14
3.54 "Distribution Dates" ..... 14
3.55 "Distribution Record Date" ..... 14
3.56 "Distribution Waterfall" ..... 14
3.57 "Effective Date" ..... 14
3.58 "Entity" ..... 14
3.59 "Estate" ..... 14
3.60 "Estate-Retained Causes of Action" ..... 14
3.61 "Exculpated Parties" ..... 15
3.62 "Final Decree(s)" ..... 15
3.63 "Final DIP Order" ..... 15
3.64 "Final Distribution" ..... 15
3.65 "Final Order" ..... 15
3.66 "General Claims Bar Date" ..... 15
3.67 "Governmental Unit" ..... 15
3.68 "GUC Fund" ..... 15
3.69 "Impaired" ..... 15
3.70 "Indemnified Parties" ..... 15
3.71 "Initial Distribution Date" ..... 15
3.72 "Insider" ..... 16
3.73 "Insurance Policies" ..... 16
3.74 "Interest" ..... 16
3.75 "Interim DIP Order" ..... 16
3.76 "Lien" ..... 16
3.77 "Litigation" ..... 16
3.78 "Litigation Recovery" ..... 16
3.79 "Notes" ..... 16
3.80 "Overbidder Sale Transaction" ..... 16
3.81 "Perceptive" ..... 16
3.82 "Person" ..... 16
3.83 "Petition Date" ..... 17
3.84 "Plan" ..... 17

3.85 "Plan Documents" ... 17
3.86 "Plan Objection Deadline" ... 17
3.87 "Plan Supplement" ... 17
3.88 "Post-Effective-Date Debtor" ... 17
3.89 "Post-Effective-Date Debtor Representative" ... 17
3.90 "Prepetition Agent" ... 17
3.91 "Prepetition Credit Agreement" ... 17
3.92 "Prepetition Credit Documents" ... 17
3.93 "Prepetition Lenders" ... 17
3.94 "Prepetition Lenders Deficiency Claim" ... 18
3.95 "Prepetition Lenders Secured Claim" ... 18
3.96 "Prepetition Lenders Stub Claim" ... 18
3.97 "Priority Non-Tax Claim" ... 18
3.98 "Priority Tax Claim" ... 18
3.99 "Pro Rata" ... 18
3.100 "Professional" ... 18
3.101 "Professional Fee Claim" ... 18
3.102 "Professional Fee Reserve" ... 18
3.103 "Proof of Claim" ... 18
3.104 "Record Date" ... 18
3.105 "Rejection Bar Date" ... 18
3.106 "Related Persons" ... 19
3.107 "Released Parties" ... 19
3.108 "Releasing Parties" ... 19
3.109 "Remaining Assets" ... 19
3.110 "Sale-Excluded Assets ... 19
3.111 "Sale-Excluded Cash ... 19
3.112 "Sale Order" ... 19
3.113 "Sale Transaction" means the sale of substantially all of the Debtor's assets to the Stalking Horse Bidder or other successful overbidder purchaser selected by the Debtor and approved by the Court in accordance with the Sale Order. ... 19
3.114 "Secured Claim" means a Claim that is secured by a Lien on property in which the Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code. ... 19
3.115 "Stalking Horse Bidder" means Perceptive or its affiliate or designee for purposes of the Sale Transaction. ... 20
3.116 "Stalking Horse Purchase Agreement" means that certain *Asset Purchase Agreement* dated as of May 5, 2025 (as amended or otherwise modified). ... 20
3.117 "Stalking Horse Sale Transaction" ... 20
3.118 "Subordination Agreements" ... 20

3.119 "Subsequent Distribution Date" means any date after the Initial Distribution Date upon which the Post-Effective-Date Debtor makes a distribution to any Holders of Allowed Claims and/or Interests pursuant to the Plan. 20
3.120 "Tax" 20
3.121 "Tax Claim" 20
3.122 "Third Party Release" 20
3.123 "Unimpaired Claim" 20
3.124 "Unsecured Claim" 20
3.125 "U.S. Trustee" 20
3.126 "Voting Instructions" 20
3.127 "Voting Record Date" 21
3.128 "Wind-Down Expenses" 21

SECTION 4 BACKGROUND 21

4.1 General Background. 21
(a) History. 21
(b) Synthego Products and Services. 23
(c) Corporate History. 23
(d) Company Facilities. 24
(e) Litigation. 24
(f) Leadership Team. 24
4.2 Capital Structure and Financing. 26
(a) Prepetition Secured Debt. 26
(b) Unsecured 2023 Convertible Notes. 26
(c) Unsecured 2024 Non-Convertible Notes. 27
(d) Other Unsecured Debt. 27
(e) Equity Investments. 27
4.3 Financial Condition and Events Leading to the Commencement of the Chapter 11 Case. 28

SECTION 5 THE CHAPTER 11 CASE 28

5.1 First Day and Other Early Relief. 29
5.2 DIP Financing/Cash Collateral Relief. 29
5.3 Debtor's Sale Process. 30
5.3 No Creditors' Committee. 31
5.4 Retention of Professionals. 31
5.5 Debtor's Schedules and Statement of Financial Affairs. 31

SECTION 6 CONFIRMATION AND VOTING PROCEDURES 31

6.1 Confirmation Hearing. 31
6.2 Procedures for Objections. 32
6.3 Requirements for Confirmation. 32
6.4 Classification of Claims and Interests. 32
6.5 Impaired Claims or Interests. 34
6.6 Confirmation without Necessary Acceptances; Cramdown. 34
6.7 Feasibility. 35



4899-9481-3244.22 82578.00002

6.8 Best Interests Test and Liquidation Analysis. 36
6.9 Eligibility to Vote on the Combined Plan and Disclosure Statement. 37
6.10 Solicitation Package / Release Opt-Out. 37
6.11 Voting Procedures, Voting Deadline, and Applicable Deadlines. 37
6.12 Acceptance of the Combined Plan and Disclosure Statement. 38

SECTION 7 CERTAIN RISK FACTORS, TAX CONSEQUENCES, AND OTHER DISCLOSURES 38

7.1 Certain Risk Factors to be Considered. 38
7.2 The Combined Plan and Disclosure Statement May Not Be Accepted. 39
7.3 The Combined Plan and Disclosure Statement May Not Be Confirmed. 39
7.4 Distributions to Holders of Allowed Claims Under the Combined Plan and Disclosure Statement May be Inconsistent with Projections. 39
7.5 Objections to Classification of Claims. 40
7.6 Failure to Consummate the Combined Plan and Disclosure Statement. 41
7.7 The Releases May Not Be Approved. 41
7.8 Reductions to Estimated Creditor Recoveries. 41
7.9 Certain U.S. Federal Income Tax Consequences. 41
7.10 Tax Consequences for U.S. Holders of Certain Claims. 42
7.11 Information Reporting and Withholding. 43
7.12 Releases, Exculpations, and Injunctions. 44
7.13 Alternatives to the Combined Plan and Disclosure Statement. 44

SECTION 8 UNCLASSIFIED CLAIMS 45

8.1 Unclassified Claims. 45
8.2 Administrative Claims. 45

SECTION 9 CLASSIFICATION OF CLAIMS AND INTERESTS 47

9.1 Summary of Classification. 47
9.2 Special Provision Governing Unimpaired Claims. 48
9.3 Vacant and Abstaining Classes. 48

SECTION 10 TREATMENT OF CLAIMS AND INTERESTS 48

10.1 Class 1—Priority Non-Tax Claims. 48
10.2 Class 2—Prepetition Lenders Secured Claims and Prepetition Lenders Stub Claim. 49
10.3 Class 3—Other Secured Claims. 49
10.4 Class 4—Unsecured Claims. 50
10.5 Class 5— 2024 Non-Convertible Notes Claims. 50
10.6 Class 6— 2023 Convertible Notes Claims. 51
10.7 Class 7—Interests. 51

SECTION 11 DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS 52

11.1 Distribution Dates. 52
11.2 Subsequent Distributions. 52
11.3 Distribution Record Date. 52
11.4 Manner of Cash Payments Under the Plan. 53

11.5 Time Bar to Cash Payments by Check. 53
11.6 Tax Identification Numbers. 53

SECTION 12 PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND REDISTRIBUTIONS 54

12.1 No Distributions Pending Allowance. 54
12.2 Authority to Object to and Resolve Disputed Claims and Interests. 54
12.3 Objection Deadline. 54
12.4 Estimation of Claims. 54
12.5 Disallowance of Claims. 55
12.6 Reserve Provisions for Disputed Claims. 55
12.7 *De minimis* Distributions, Rounding. 56
12.8 Unclaimed and Undeliverable Distributions. 56
12.9 Books and Records. 56

SECTION 13 TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES 56

13.1 Rejection. 56
13.2 Rejection Claims. 57
13.3 Insurance Policies. 57

SECTION 14 MEANS FOR IMPLEMENTATION OF THE PLAN 57

14.1 [Reserved]. 57
14.2 Continued Existence of the Post-Effective-Date Debtor. 57
14.3 Corporate Action by Debtor. 58
14.4 Vesting of Remaining Assets in the Post-Effective-Date Debtor. 59
14.5 Appointment of the Post-Effective-Date Debtor Representative. 59
14.6 Rights and Powers of the Post-Effective-Date Representative. 59
14.7 Source of Cash; Payment of Post-Effective-Date Debtor Expenses. 60
14.8 Litigation. 60

SECTION 15 EFFECT OF CONFIRMATION 60

15.1 Binding Effect of the Plan. 60
15.2 Property Free and Clear. 61

SECTION 16 EXCULPATIONS, INJUNCTIONS, AND RELEASES 61

16.1 Exculpation. 61
16.2 Releases. 61
16.3 Injunction. 63
16.4 Post-Confirmation Liability of Post-Effective-Date Debtor Representative. 64
16.5 Preservation of Rights of Action. 64
16.6 No Discharge. 65

SECTION 17 CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN 65

17.1 Conditions to Confirmation of the Plan. 65

17.2 Conditions to the Effective Date. 66
17.3 Waiver of Conditions Precedent. 66

SECTION 18 RETENTION OF JURISDICTION 66

SECTION 19 MISCELLANEOUS PROVISIONS 67

19.1 Payment of Statutory Fees / Closing of Chapter 11 Case. 67
19.2 Revocation of the Combined Plan and Disclosure Statement. 67
19.3 Severability of Plan Provisions. 68
19.4 Exhibits. 68
19.5 Notices. 68
19.6 Reservation of Rights. 69
19.7 Defects, Omissions and Amendments. 69
19.8 Filing of Additional Documents. 69
19.9 Successors and Assigns. 69
19.10 Setoffs and Recoupments. 69
19.11 Tax Exemption. 70
19.12 Implementation. 70
19.13 Record Date. 70
19.14 Certain Actions. 70
19.15 Substantial Consummation. 71
19.16 Waiver of Fourteen-Day Stay. 71
19.17 Governing Law. 71
19.18 Entire Agreement. 71

SECTION 20 RECOMMENDATION 71

## DISCLAIMERS

**EACH HOLDER OF A CLAIM AGAINST THE DEBTOR ENTITLED TO VOTE TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT SHOULD READ THE COMBINED PLAN AND DISCLOSURE STATEMENT IN ITS ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT MAY BE MADE EXCEPT PURSUANT TO THE TERMS HEREOF AND SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE. IF YOU ARE ENTITLED TO VOTE TO ACCEPT THE COMBINED PLAN AND DISCLOSURE STATEMENT, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT. THE DEBTOR URGES YOU TO VOTE TO ACCEPT THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

**THE COMBINED PLAN AND DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 3016 AND 3017, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST OR INTERESTS IN THE DEBTOR SHOULD EVALUATE THE COMBINED PLAN AND DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

**THE COMBINED PLAN AND DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT, ANTICIPATED EVENTS IN THE CHAPTER 11 CASE, AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTOR BELIEVES THAT THE STATEMENTS AND DESCRIPTIONS CONTAINED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE TRUE AND ACCURATE, THEY ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT AND APPLICABLE STATUTORY PROVISIONS. THE TERMS OF THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT AND APPLICABLE STATUTES GOVERN IN THE EVENT OF ANY DISCREPANCY WITH THE COMBINED PLAN AND DISCLOSURE STATEMENT. CREDITORS AND OTHER INTERESTED PARTIES SHOULD READ THE COMBINED PLAN AND DISCLOSURE STATEMENT, THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT, AND THE APPLICABLE STATUTES THEMSELVES FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.**

**THE FACTUAL STATEMENTS AND REPRESENTATIONS CONTAINED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE MADE BY THE DEBTOR AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED, AND THE DEBTOR DISCLAIMS ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS AFTER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT. THE DELIVERY OF THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.**

**THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.**

**ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE DEBTOR INVOLVE MATERIAL RISKS AND UNCERTAINTIES AND ARE SUBJECT TO CHANGE BASED ON NUMEROUS FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE DEBTOR'S CONTROL. ACCORDINGLY, THE DEBTOR'S FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS. SUCH FACTORS INCLUDE, BUT ARE NOT LIMITED TO, THOSE DESCRIBED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT. THE DEBTOR DOES NOT INTEND TO UPDATE OR REVISE ITS FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED THEREIN WILL NOT BE REALIZED.**

**ANY PROJECTED RECOVERIES TO CREDITORS SET FORTH IN THIS DISCLOSURE STATEMENT ARE BASED UPON THE ANALYSES PERFORMED BY THE DEBTOR AND ITS ADVISORS. ALTHOUGH THE DEBTOR AND ITS ADVISORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN, THE DEBTOR AND ITS ADVISORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THIS INFORMATION.**

**IN CONNECTION WITH THE DEBTOR'S SOLICITATION OF ACCEPTANCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT PURSUANT TO SECTION 1126(b) OF THE BANKRUPTCY CODE, THE DEBTOR IS FURNISHING A SOLICITATION PACKAGE, CONSISTING OF THE COMBINED PLAN AND DISCLOSURE STATEMENT, THE EXHIBITS HERETO, CONFIRMATION NOTICE, AND A BALLOT, AS APPLICABLE, TO EACH RECORD HOLDER OF CLAIMS ELIGIBLE TO VOTE OR ITS COUNSEL. THE COMBINED PLAN AND DISCLOSURE STATEMENT IS TO BE USED BY EACH SUCH ELIGIBLE HOLDER SOLELY IN CONNECTION WITH ITS EVALUATION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT; USE OF THE COMBINED PLAN AND DISCLOSURE**

**STATEMENT FOR ANY OTHER PURPOSE IS NOT AUTHORIZED. NOTHING STATED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY. THE COMBINED PLAN AND DISCLOSURE STATEMENT MAY NOT BE REPRODUCED OR PROVIDED TO ANYONE OTHER THAN ADVISORS TO THE RECIPIENT WITHOUT THE PRIOR WRITTEN CONSENT OF THE DEBTOR.**

## SECTION 1
## INTRODUCTION

Synthego Corporation (the "Debtor" or "Company"), the debtor and debtor-in-possession in the above-captioned chapter 11 case, hereby proposes the following ***first amended*** combined disclosure statement and plan of liquidation pursuant to sections 1121(a) and 1125(b) of title 11 of the United States Code (the disclosure statement portion hereof, the "Disclosure Statement" and the chapter 11 plan portion hereof, the "Plan," as may be modified and/or amended from time to time, and collectively, the "Combined Plan and Disclosure Statement"). Capitalized terms used in the Combined Plan and Disclosure Statement and not otherwise defined have the meanings ascribed to such terms in Section 3.

During the Chapter 11 Case, the Debtor intends to sell substantially all of its assets through the Sale Transaction in accordance with the Sale Order. Pursuant to the proposed Plan, the Post-Effective-Date Debtor – to be administered by the Post-Effective-Date Debtor Representative - will complete the wind-down of its business, address pending claims, including litigation claims, and make distributions to Creditors as efficiently as possible through the liquidating Plan.

On and after the Effective Date, the Post-Effective-Date Debtor Representative will make distributions in accordance with the Plan, using the Available Cash and, if applicable, the GUC Fund, to creditors, and wind down the Post-Effective-Date Debtor and the Estate consistent with the Plan. Generally, distributions under the Plan to Creditors will be made in accordance with the priority scheme under the Bankruptcy Code (subject to the Subordination Agreements); *provided, however*, if Class 4 (Unsecured Claims) votes to accept the Plan, the Prepetition Lenders (i) will allow for the funding of the GUC Fund for the benefit of the Holders of Class 4 Unsecured Claims (which, if Class 4 Votes to accept the Plan, shall not include the Prepetition Lenders Deficiency Claim), and (ii) in the event of a Stalking Horse Sale Transaction, will be deemed to turn over and contribute to the Holders of Allowed Class 4 Unsecured Claims any distributions that would otherwise be made to the Prepetition Lenders under the Plan on account of the Prepetition Lenders Stub Claim (which is expected to total approximately $1,000,000). If Class 4 votes to reject the Plan, then no GUC Fund will be made available to the Holders of Allowed Class 4 Unsecured Claims and the Prepetition Lenders Deficiency Claim will share pro rata in any distributions to Class 4 Unsecured Claims.

Holders of the Class 4 Unsecured Claims, the 2024 Non-Convertible Notes (Class 5), and the 2023 Convertible Notes (Class 6) will receive Distributions, if any, in accordance with the Distribution Waterfall and the applicable Subordination Agreements. In light of the terms of the Subordination Agreements, no Distributions are expected to the Holders of Class 5 or Class 6 under the Plan. All of the Debtor's rights to dispute and challenge the amount, priority, status and/or nature of the 2024 Non-Convertible Notes and the 2023 Convertible Notes are expressly reserved. There will be no distributions to Holders of Interests under the Plan.

In a Chapter 7 proceeding, absent confirmation of the Plan, general unsecured creditors would likely receive no or smaller distributions on account of their claims.

The Debtor submits that the Combined Plan and Disclosure Statement and/or notice thereof will be distributed to all holders of Claims and Interests in accordance with section 1125(b) of the

Bankruptcy Code; Rules 2002, 3016, and 3017 of the Federal Rules of Bankruptcy Procedure; and the Court's order conditionally approving the Combined Plan and Disclosure Statement [Docket No. 167]. The Combined Plan and Disclosure Statement and the exhibits hereto include a discussion of: (i) the nature of the Debtor's business; (ii) events during the Chapter 11 Case; (iii) the requirements for confirmation of the Plan and procedures for voting to accept or reject the Plan; (iv) additional factors and disclosures to be considered, including risk factors and certain U.S. federal income tax consequences of the Plan; and (v) the terms of the Plan, including the treatment of holders of Claims and Interests under the Plan. The Disclosure Statement was prepared with the intent to provide "adequate information" (as defined in the Bankruptcy Code) to enable holders of Claims against and Interests in the Debtor to make informed judgments about the Plan.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Section 19.3 of the Combined Plan and Disclosure Statement, if any, the Debtor expressly reserves the right to alter, amend, or modify the Combined Plan and Disclosure Statement, including the Plan Supplement, one or more times, before substantial consummation thereof.

***Please read the Combined Plan and Disclosure Statement, the exhibits, other supporting materials, and any appropriate ballot carefully and follow the instructions set forth below and on the appropriate ballot to vote on the Combined Plan and Disclosure Statement. The Debtor believes that the Combined Plan and Disclosure Statement provides the best method of maximizing the recoveries for the holders of Claims against the Debtor. Therefore, the Debtor recommends that all creditors who are entitled to vote should vote in favor of the Combined Plan and Disclosure Statement.***

Unless otherwise specified, all section or exhibit references in the Combined Plan and Disclosure Statement are to the respective section in, or exhibit to, the Combined Plan and Disclosure Statement, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Combined Plan and Disclosure Statement as a whole and not to any particular section, subsection, or clause contained herein. The headings in the Combined Plan and Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; and (c) unless otherwise noted above, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

# SECTION 2
# SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER PLAN AND IMPORTANT SOLICITATION AND CONFIRMATION DATES AND DEADLINES

## 2.1 Summary of Classification and Treatment of Claims and Interests.

All Claims against or Interests in the Debtor, other than Administrative Claims, DIP Facility Claims, and Priority Tax Claims, are classified for purposes of voting and distributions under the Combined Plan and Disclosure Statement. A summary of the classification of these Claims and Interests, the proposed treatment of each Class of Claims or Interests, and the voting status of each Class of Claims or Interests follows.

| Class | Treatment | Status | Entitled to Vote? |
|---|---|---|---|
| Unclassified: Administrative Claims, estimated to total approx. $2,000,000<br><br>**Estimated Recovery: 100%** | Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, each Holder of an Allowed Administrative Claim, other than a Professional Fee Claim (which shall be treated in accordance with Section 8.2(b)), shall receive from Available Cash payable by the Debtor or Post-Effective-Date Debtor, without interest, Cash equal to the Allowed amount of such Claim: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the Holder of such Claim and the Debtor or Post-Effective-Date Debtor, as the case may be; (c) with respect to any Administrative Claims representing obligations incurred in the ordinary course of the Debtor's business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtor's business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), as and when due under applicable law. | Unimpaired | No |
| Unclassified: DIP Facility Claims, estimated to be approx. $25,000,000<br><br>**Estimated Recovery: 100%** | Unless otherwise agreed to by the DIP Lenders, if and to the extent not otherwise fully paid or otherwise satisfied prior to the Effective Date (including through the Sale Transaction), the Allowed DIP Facility Claims will be indefeasibly paid and satisfied in full by the Debtor or Post-Effective-Date Debtor on the Effective Date in accordance with any applicable order(s) entered by the Bankruptcy Court, including, without limitation, the DIP Orders and Sale Order. Upon | Unimpaired | No |

| Class | Treatment | Status | Entitled to Vote? |
|---|---|---|---|
| | indefeasible payment and satisfaction in full in Cash of all Allowed DIP Facility Claims, the DIP Documentation and all Liens and security interests granted to secure the DIP Facility Claims, will be immediately terminated, extinguished and released. Notwithstanding the above, any indemnity provisions contained in the DIP Documentation will survive such termination, release and satisfaction in the manner and to the extent set forth therein. | | |
| Unclassified: Priority Tax Claims, estimated to total approx. $520,000<br><br>**Estimated Recovery: 100%** | Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction of each Allowed Priority Tax Claim, the Debtor or Post-Effective-Date Debtor shall pay each holder of an Allowed Priority Tax Claim, from Available Cash, the full unpaid amount of such Allowed Priority Tax Claim on the latest of the following dates: (i) on or as soon as practicable after the Effective Date, (ii) on or as soon as practicable after the date such Allowed Priority Tax Claim becomes an Allowed Claim, and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law. | Unimpaired | No |
| Class 1: Priority Non-Tax Claims, estimated to total approx. $1,200,000<br><br>**Estimated Recovery: 100%** | The Debtor or Post-Effective-Date Debtor shall pay, from Available Cash, the Allowed amount of each Priority Non-Tax Claim to each Entity holding a Priority Non-Tax Claim as soon as practicable following the later of: (a) the Effective Date and (b) the date such Priority Non-Tax Claim becomes an Allowed Claim (or as otherwise permitted by law). The Debtor or Post-Effective-Date Debtor shall pay each Entity holding a Priority Non-Tax Claim in Cash in full in respect of such Allowed Claim without interest from the Petition Date; *provided however*, that such Entity may be treated on such less favorable terms as may be agreed to in writing by such Entity. | Unimpaired | No |
| Class 2: Prepetition Lenders Secured Claims and Prepetition Lenders Stub Claim, estimated amount $73,937,415, plus interest, fees and all other obligations owing thereunder (a portion of which totaling $10,000,000 is rolled-up | ***If there is a Stalking Horse Sale Transaction,*** (a) the Class 2 Claims, other than the Prepetition Lenders Stub Claim, shall be fully satisfied through Perceptive's credit bid and (b) (i) for the portion of the Prepetition Lenders Stub Claim that is a Secured Claim, the Prepetition Lenders Stub Claim shall receive the proceeds of any Collateral and any Sale-Excluded Cash remaining after Distributions made to Administrative Claims (including the funding of the Professional Fee | Impaired | Yes |

| **Class** | **Treatment** | **Status** | **Entitled to Vote?** |
|---|---|---|---|
| as part of the DIP Facility and a portion of which totaling approximately $1,000,000 is the Prepetition Lenders Stub Claim which is expected to remain)<br><br>**Estimated Recovery: 98.6%** (net of the Prepetition Lenders Stub Claim of $1,000,000) | Reserve), Priority Tax Claims, Priority Non-Tax Claims, and payment of Wind-Down Expenses and (ii) for the portion of the Prepetition Lenders Stub Claim that is the Prepetition Lenders Deficiency Claim, the Prepetition Lenders Stub Claim shall receive a Pro Rata share of Available Cash in accordance with the Distribution Waterfall and the applicable Subordination Agreements; *provided that* if Class 4 votes to accept the Plan, the Holders of Class 2 Claims shall (x) allow the Debtor or Post-Effective Date Debtor to access and pay the GUC Fund to the Holders of Allowed Class 4 Claims, (y) turn over and contribute to the Holders of Allowed Class 4 Claims any amounts to which the Holders of the Prepetition Lenders Stub Claim may be entitled from the Debtor, and (z) not participate in any Distributions to Class 4 Unsecured Claims; OR<br><br>***If there is an Overbidder Sale Transaction***, the Holders of Class 2 Claims shall receive, in full and final satisfaction of the Class 2 Prepetition Lenders Secured Claims, cash from the proceeds of such transaction in an amount equal to the Class 2 Prepetition Lenders Secured Claims; *provided that* if Class 4 votes to accept the Plan, the Holders of Class 2 Claims shall allow the Debtor or Post-Effective Date Debtor to access and pay the GUC Fund to the Holders of Allowed Class 4 Claims. | | |

| Class | Treatment | Status | Entitled to Vote? |
|---|---|---|---|
| Class 3: Other Secured Claims, estimated amount $0<br><br>**Estimated Recovery: 100%** | Except to the extent previously paid in full, at the option of the Debtor or Post-Effective-Date Debtor, one of the following treatments shall be provided: (i) the Holder of such Claim shall retain its Lien on its Collateral until such Collateral is sold, and the proceeds of such sale, less costs and expenses of disposing of such Collateral, shall be paid to such Holder in full satisfaction and release of such Allowed Other Secured Claim, subject to the applicable priorities of such Lien; (ii) on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, or as otherwise agreed between the Holder of such Claim and the Debtor or Post-Effective-Date Debtor, the Holder of such Other Secured Claim will receive a Cash payment equal to the amount of its Allowed Other Secured Claim in full satisfaction and release of such Other Secured Claim; or (iii) the Collateral securing the Creditor's Other Secured Claim shall be abandoned to such Creditor, in full satisfaction and release of such Other Secured Claim. | Unimpaired | No |
| Class 4: Unsecured Claims, estimated amount $4,600,000<br><br>**Estimated Recovery: 4.4%, plus any net value generated from certain litigation** | **If Class 4 votes to accept the Plan,** Holders of Allowed Class 4 Claims shall receive, in exchange for their Allowed Class 4 Claims, a Pro Rata share of (i) the GUC Fund and (ii) the Available Cash in accordance with the Distribution Waterfall; provided, however, in the event of a Stalking Horse Sale Transaction, any Distributions to otherwise be made pursuant to the Plan to the Holders of the Prepetition Lenders Stub Claim shall be deemed turned over and contributed as Distributions to Holders of Allowed Class 4 Claims; OR<br><br>**If Class 4 votes to reject the Plan,** Holders of Allowed Class 4 Claims shall receive on account of such Allowed Class 4 Claims, with the Prepetition Lenders Deficiency Claim, a Pro Rata share of the Available Cash in accordance with the Distribution Waterfall and the applicable Subordination Agreements. | Impaired | Yes |
| Class 5: 2024 Non-Convertible Notes Claims, estimated amount $96,731,108 (contingent, | Holders of Allowed Class 5 Claims shall be entitled to receive a Pro Rata share of the Available Cash in accordance with the Distribution Waterfall and the applicable Subordination Agreements in exchange for their Allowed Class 5 Claims; provided, that in accordance with the applicable | Impaired | Yes |

| Class | Treatment | Status | Entitled to Vote? |
|---|---|---|---|
| unliquidated, or disputed)<br><br>**Estimated Recovery: 0%** | Subordination Agreements, any Distributions that would be made to Holders of Allowed Class 5 Claims in the absence of the Subordination Agreements shall instead be paid to Holders of Allowed Class 2 Claims until Class 2 Claims are paid in full.[2] All of the Debtor's rights to dispute and challenge the amount, priority, status and/or nature of the 2024 Non-Convertible Notes and the 2024 Non-Convertible Notes Claims are expressly reserved. | | |
| Class 6: 2023 Convertible Notes Claims, estimated amount $43,448,921 (contingent, unliquidated, or disputed)<br><br>**Estimated Recovery: 0%** | Holders of Allowed Class 6 Claims shall be entitled to receive a Pro Rata share of the Available Cash in accordance with the Distribution Waterfall and the applicable Subordination Agreements in exchange for their Allowed Class 6 Claims; provided, that in accordance with the applicable Subordination Agreements, any Distributions that would be made to Holders of Allowed Class 6 Claims in the absence of the Subordination Agreements shall instead be paid (i) to Holders of Class 2 Claims until Class 2 Claims are paid in full, and then (ii) to Holders of Class 5 Claims until Class 5 Claims are paid in full.[3] All of the Debtor's rights to dispute and challenge the amount, priority, status and/or nature of the 2023 Convertible Notes and the 2023 Convertible Notes Claims are expressly reserved. | Impaired | Yes |
| Class 7: Interests<br><br>**Estimated Recovery: N/A** | Class 7 Interests shall be entitled to receive their Pro Rata share of any Available Cash, if any, after the payment in full of all Allowed Claims. The Debtor does not believe there will be any such Available Cash after the implementation of the Plan and the payment in full of all Allowed Claims, including all Allowed Administrative Expense Claims, DIP Facility Claims, Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims (as applicable subject to Section 10.3(b) hereof), Prepetition Lenders Secured Claims (to the extent set forth in the Subordination Agreements), the Unsecured Claims, the 2024 Non-Convertible Notes Claims (to the extent set forth in the | Impaired | No (deemed to reject) |

[2] The 2024 Non-Convertible Notes are subordinated to obligations owed by the Company on account of the Prepetition Lenders Secured Claims and the Prepetition Lenders Stub Claim pursuant to the applicable Subordination Agreements, subject to the specific terms thereof.

[3] The 2023 Convertible Notes are subordinated to obligations owed by the Company on account of the Prepetition Lenders Secured Claims, the Prepetition Lenders Stub Claim, and the 2024 Non-Convertible Notes pursuant to the applicable Subordination Agreements, subject to the specific terms thereof.

| Class | Treatment | Status | Entitled to Vote? |
|---|---|---|---|
| | Subordination Agreements), the 2023 Convertible Notes Claims (to the extent set forth in in the Subordination Agreements), and the post-Effective Date fees and expenses of the Post-Effective Date Debtor in accordance with the Plan. All Interests will be deemed cancelled and will cease to exist as of the Effective Date. | | |

2.2 Important Dates and Deadlines

| Event | Proposed Date[4] |
|---|---|
| Voting Record Date | June 27, 2025, except for parties who file claims after such date, but on or before July 3, 2025 |
| Solicitation Commences | Five (5) Business Days after entry of solicitation procedures order |
| Deadline for Creditors to File Rule 3018 Motions | July 8, 2025, at 4:00 p.m. (ET) |
| Deadline for Debtor to Respond to Rule 3018 Motions | July 22, 2025, at 4:00 p.m. (ET) |
| Deadline to file Plan Supplement | July 22, 2025 |
| Voting Deadline | July 29, 2025, at 4:00 p.m. (ET) |
| Combined Plan and Disclosure Statement Objection Deadline | July 29, 2025, at 4:00 p.m. (ET) |
| Deadline to File Confirmation Brief and Other Evidence Supporting the Combined Plan and Disclosure Statement | July 31, 2025, at 4:00 p.m. (ET) |
| Deadline to File Voting Tabulation Affidavit | July 31, 2025, at 4:00 p.m. (ET) |
| Confirmation Hearing | August 5, 2025, at 2:00 p.m. (ET) |

## SECTION 3
## DEFINED TERMS

As used in the Combined Plan and Disclosure Statement, capitalized terms not otherwise defined have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

3.1 "2023 Convertible Notes Documents" means, collectively, the 2023 Convertible Notes Purchase Agreement, as amended from time to time, between the Debtor and the holders of the 2023 Convertible Notes, relating to the 2023 Convertible Notes, the applicable Subordination

[4] All times noted are in prevailing Eastern Time.

Agreements, and all other agreements, documents, and instruments delivered or entered into in connection therewith, as amended, supplemented, or modified from time to time.

3.2 "2023 Convertible Notes Purchase Agreement" means that certain Amended and Restated Note Purchase Agreement, dated as of December 29, 2023 between the Debtor and certain noteholders party thereto, as amended, modified or supplemented from time to time.

3.3 "2023 Convertible Notes" means those certain convertible notes issued under the 2023 Convertible Notes Purchase Agreement.

3.4 "2023 Convertible Notes Claim" means any Claim against the Debtor arising under, derived from, based on, or related to the 2023 Convertible Notes.

3.5 "2024 Non-Convertible Notes" means those certain notes issued under the 2024 Non-Convertible Notes Purchase Agreement.

3.6 "2024 Non-Convertible Notes Documents" means, collectively, the 2024 Non-Convertible Notes Purchase Agreement between the Debtor and the holders of the 2024 Non-Convertible Notes, relating to the 2024 Non-Convertible Notes, the applicable Subordination Agreements, and all other agreements, documents, and instruments delivered or entered into in connection therewith, as amended, supplemented, or modified from time to time.

3.7 "2024 Non-Convertible Notes Purchase Agreement" means that certain Amended and Restated Note Purchase Agreement, dated as of September 4, 2024 between the Debtor and certain noteholders party thereto.

3.8 "Administrative Claim" means a Claim for an expense of administration of the Chapter 11 Case arising under Sections 503(b), 507(b), 503(b)(9) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate; (b) the value of any goods received by the Debtor within 20 days before the Petition Date to the extent that goods were sold to the Debtor in the ordinary course of the Debtor's business; (c) Professional Fee Claims; (d) all fees and charges assessed against the Estate under 28 U.S.C. §§ 1911-1930; (e) all obligations designated as Allowed Administrative Claims pursuant to an order of the Bankruptcy Court; (f) administrative claims that were timely filed prior to the Administrative Claims Bar Date; and (g) any Tax Claims incurred by the Debtor after the Petition Date or relating to a tax year or period which occurs after the Petition Date.

3.9 "Administrative Claims Bar Date" means the applicable last date, at 5:00 p.m. Eastern time, set by the Bankruptcy Court for a Claimant to file a request for payment of any Administrative Claim (excluding Professional Fee Claims) accrued through and including the Effective Date. **The Administrative Claims Bar Date shall be thirty (30) days after the Effective Date, other than for Professional Fee Claims, which shall be subject to the bar date for such Claims set forth in Section 8.2(b) hereof.**

3.10 "Allowed" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by the Debtor on the Schedules as other than disputed, contingent, or unliquidated and, as to which, the Debtor, the Post-Effective-Date Debtor, or other party in interest has not filed an objection on or before the Claims Objection Deadline; (b) a Claim

that is set forth in a timely filed Proof of Claim as to which no objection has been filed and which is not otherwise a Disputed Claim; (c) a Claim that has been allowed by a Final Order; (d) a Claim that is allowed: (i) in any stipulation of amount and nature of Claim executed by the Debtor prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any stipulation of amount and nature of Claim executed by the Post-Effective-Date Debtor on or after the Effective Date; (iii) in any stipulation of amount and nature of any Administrative Claim, Priority Non-Tax Claim, or Priority Tax Claim executed by (y) the Debtor and approved by the Bankruptcy Court, or (z) the Post-Effective-Date Debtor; or (iv) in any contract, instrument, indenture or other agreement entered into or assumed by Debtor in connection with and in accordance with the Plan; (e) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed or Disallowed Claim or (ii) has been allowed by a Final Order, in either case only if a Proof of Claim has been timely filed by the Claimant before the applicable rejection Bar Date for such claim or has otherwise been deemed timely filed under applicable law; or (f) a Claim that is allowed pursuant to the terms of the Plan. For the purpose of determining distributions pursuant to the Plan, allowance under subsections (a) and (b) only is applicable once any of the following occur (1) before the Claims Objection Deadline, the Debtor or the Post-Effective-Date Debtor, as applicable, determine not to object to the Claim, (2) the Claims Objection Deadline passes without an objection being filed, or (3) after the Debtor or the Post-Effective-Date Debtor timely objects to the Claim, the Claim is allowed as provided in subparagraphs (c), (d) or (e) above.

3.11 "Allowed Claim" or "Allowed … Claim" means a Claim that has been Allowed.

3.12 "Available Cash" means any and all Sale-Excluded Cash of the Debtor as of the Effective Date, excluding the GUC Fund and the Professional Fee Reserve, and the net Cash proceeds of any of the Remaining Assets received by the Post-Effective-Date Debtor, after the payment of or reserve for all fees and expenses of the Post-Effective-Date Debtor and the Post-Effective-Date Debtor Representative and its professionals and advisors on and after the Effective Date incurred to administer and implement the Plan. An initial amount of $500,000 from the Sale-Excluded Cash shall be reserved for the payment of fees and expenses of the Post-Effective Date Debtor and the Post-Effective-Date Debtor Representative and its professionals and advisors on and after the Effective Date, but such amount shall not be construed as a cap on the fees and expenses that may be incurred and shall be payable under the Plan to administer and implement the Plan. For the avoidance of doubt, Available Cash shall not include any amounts, whether cash or proceeds of respective collateral, that will be used to pay the Holders of Allowed Class 2 Claims (excluding the Prepetition Lenders Deficiency Claim) and Allowed Class 3 Claims.

3.13 "Avoidance Actions" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies which the Debtor, the Estate, or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

3.14 "Ballots" mean the ballots upon which the Holders of Impaired Claims shall indicate their acceptance or rejection of the Plan in accordance with the Plan and the Voting Instructions.

3.15 "Bankruptcy Code" means title I of the Bankruptcy Reform Act of 1978, as amended from time to time, as set forth in Sections 101 *et seq*. of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code.

3.16 "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Case.

3.17 "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Case, promulgated under 28 U.S.C. § 2075 and the General and Local Rules of the Bankruptcy Court.

3.18 "Bar Date" means, as applicable, the General Claims Bar Date, the Administrative Claims Bar Date, or any other applicable deadline to file Claims referenced in the Plan.

3.19 "Bar Date Order" means any order of the Bankruptcy Court that establishes the General Claims Bar Date and any other deadlines and procedures for filing Proofs of Claim against the Debtor.

3.20 "Business Day" means any day, other than a Saturday, Sunday or legal holiday as defined in Bankruptcy Rule 9006(a).

3.21 "Cash" means cash and cash equivalents, including, but not limited to, bank deposits, wire transfers, checks, and readily marketable securities, instruments, and legal tender of the United States of America or instrumentalities thereof.

3.22 "Causes of Action" means all claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of setoff, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims, including, without limitation, all claims and any avoidance, preference, recovery, subordination or other actions of the Debtor and/or the Estate (unless the context expressly states that such Causes of Action belong to the another Entity) against Creditors, insiders, and/or any other Persons or Entities, based in law or equity, including, without limitation, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the Effective Date.

3.23 "Chapter 11 Case" means the Chapter 11 case commenced when the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on the Petition Date, being administered under Case No. 25-10823 (MFW).

3.24 "Claim" means a claim (as defined in Section 101(5) of the Bankruptcy Code) against the Debtor, including, but not limited to: (a) any right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such performance gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

3.25 "Claimant" means the Holder of a Claim.

3.26 "Claims Agent" means Epiq Corporate Restructuring, LLC, which was appointed as the Debtor's claims, noticing, and balloting agent.

3.27 "Claims Objection Deadline" means, with respect to all Claims including Administrative Claims other than Professional Fee Claims, (a) **180 days after the Effective Date**, or (b) such other period as may be fixed by an order of the Bankruptcy Court for objecting to Claims upon request of the Post-Effective-Date Debtor.

3.28 "Class" means a category of Holders of Claims or Interests, as set forth in Section 9 of the Plan.

3.29 "Collateral" means any property or interest in property of the Debtor's Estate that is subject to a valid and enforceable Lien to secure a Claim.

3.30 "Combined Plan and Disclosure Statement" means this First Amended Combined Plan and Disclosure Statement, as modified and/or amended from time to time.

3.31 "Committee" means any Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Case.

3.32 "Company" has the meaning set forth in the Introduction hereof.

3.33 "Confirmation" means the entry of the Confirmation Order, subject to all conditions specified in Section 17 hereof having been (a) satisfied or (b) waived pursuant to Section 17.

3.34 "Confirmation Date" means the date upon which the Confirmation Order is entered by the Bankruptcy Court on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

3.35 "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

3.36 "Consummation" or "Consummate" means the occurrence of the Effective Date.

3.37 "Contingent Claim" means any Claim for which a Proof of Claim has been filed with the Bankruptcy Court but was not filed in a sum certain and which Claim has not been estimated, fixed, or liquidated by the Bankruptcy Court at a sum certain as of the Effective Date, or a Claim that has accrued but nonetheless remains dependent on the occurrence of a future event that may never occur.

3.38 "Creditor" means any Holder of a Claim against the Debtor as specified in Section 101(10) of the Bankruptcy Code.

3.39 "Debtor" means Synthego Corporation, debtor and debtor-in-possession in the Chapter 11 Case.

3.40 "Debtor/Estate Release" has the meaning set forth in Section 16.2(a) hereof.

3.41 "Debtor/Estate Releasors" has the meaning set forth in Section 16.2(a) hereof.

3.42 "DIP Agent" means Perceptive as the Administrative Agent under the DIP Documentation and any successor(s) thereto.

3.43 "DIP Documentation" means the Senior Secured Debtor-In-Possession Term Loan Credit Agreement dated as of May 5, 2025 between the Debtor, the DIP Lenders and the DIP Agent, and all other related agreements, documents, security agreements, pledge agreements, or other collateral documents in connection with the DIP Facility, as may be amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time.

3.44 "DIP Facility" means that certain senior secured superpriority post-petition credit facility made available to the Debtor by the DIP Lenders pursuant to the DIP Documentation and the DIP Orders.

3.45 "DIP Facility Claim" means any Claim of the DIP Lenders arising from, under or in connection with the DIP Facility.

3.46 "DIP Lenders" means Perceptive and other lenders from time to time party to the DIP Documentation and any successor(s) thereto, in their capacity as postpetition lenders under the DIP Facility.

3.47 "DIP Orders" means, collectively, the Interim DIP Order and Final DIP Order.

3.48 "Disallowed Claim" means a Claim, or any portion thereof, that has been disallowed by a Final Order or by other agreement of a Claimant, any Claim that is listed by the Debtor in the Schedules as zero or as disputed and as to which no Proof of Claim has been timely filed, or any Claim that is deemed disallowed pursuant to the terms of the Plan.

3.49 "Disclosure Statement" means the portion of this First Amended Combined Plan and Disclosure Statement that satisfies the disclosure requirements of section 1125 of the Bankruptcy Code.

3.50 "Disputed" means, with respect to any Claim or Interest, any Claim or Interest: (a) listed on the Schedules as unliquidated, disputed, or contingent and as to which no Proof of Claim has been filed; or (b) as to which the Debtor, the Post-Effective-Date Debtor, or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules or is otherwise disputed by the Debtor or the Post-Effective-Date Debtor in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order.

3.51 "Disputed Claim" means: (i) any Claim or portion of a Claim as to which an objection to the allowance thereof has been interposed as of any deadline fixed under the Plan or by order of the Bankruptcy Court, which objection has not been withdrawn or determined by Final Order; (ii) any Claim that is not a Disallowed Claim that is scheduled by the Debtor in the Schedules as disputed, contingent, or unliquidated and as to which no Proof of Claim has been timely filed; or (iii) any Claim that is not a Disallowed Claim that is not listed in the Schedules and as to which no Proof of Claim has been timely filed. To the extent an objection relates to the

allowance of only a part of a Claim, such Claim shall be a Disputed Claim only to the extent of the objection.

3.52 "Disputed Claim Reserve" has the meaning set forth in Section 12.6 hereof.

3.53 "Distribution(s)" means the distribution(s) of Cash to be made to Holders of Claims and/or Interests in accordance with the Plan.

3.54 "Distribution Dates" means collectively the Initial Distribution Date, any Subsequent Distribution(s) Date, and the date of the Final Distribution.

3.55 "Distribution Record Date" means the close of business on the Business Day immediately preceding the Effective Date.

3.56 "Distribution Waterfall" means the priority of distributions of the Available Cash, which shall be allocated and paid to the Holders of Allowed Claims or other parties (as applicable), until paid in full (or reserved for) from time to time in the following priority (in each case on a Pro Rata basis), following the payment in full of the DIP Facility Claims, Allowed Class 2 Claims (excluding the Prepetition Lenders Deficiency Claim), and Allowed Class 3 Claims in accordance with the terms of Sections 8.2(c), 10.2, and 10.3 hereof, respectively: *first*, on account of Allowed Administrative Claims, Priority Tax Claims, and Allowed Priority Non-Tax Claims; *second*, on account of any and all fees and expenses, including professional fees, incurred by the Post-Effective-Date Debtor and the Post-Effective-Date Debtor Representative in administering and implementing the Plan after the Effective Date; and *third*, on account of the Allowed Class 2 Prepetition Lenders Deficiency Claim, Allowed Class 4 Unsecured Claims, Allowed Class 5 2024 Non-Convertible Notes Claims, and Allowed Class 6 2023 Convertible Notes Claims, subject to the terms of Sections 10.4, 10.5, and 10.6 hereof, respectively, and the applicable Subordination Agreements. For the avoidance of doubt, the Class 5 Claims and Class 6 Claims are subordinated in priority to the Prepetition Lenders Secured Claims and Prepetition Lenders Stub Claim, as set forth in the applicable Subordination Agreements; and the Class 6 Claims are subordinated in priority to Class 5 Claims, as set forth in the applicable Subordination Agreements. All of the Debtor's rights to dispute and challenge the amount, priority, status and/or nature of the 2024 Non-Convertible Notes and the 2023 Convertible Notes are expressly reserved.

3.57 "Effective Date" means the date selected by the Debtor which is a Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect, and (b) all conditions specified in Section 17 hereof have been satisfied, unless waived by the Debtor. Within five (5) business days after the Effective Date, notice of the Effective Date shall be filed with the Bankruptcy Court by the Post-Effective-Date Debtor.

3.58 "Entity" means an entity as defined in Section 101(15) of the Bankruptcy Code.

3.59 "Estate" means the estate of the Debtor in the Chapter 11 Case created pursuant to Section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

3.60 "Estate-Retained Causes of Action" means any Causes of Action that are Excluded Assets under the Sale Transaction other than those Causes of Action that are released and waived by the Debtor and Estate pursuant to the Plan.

3.61 "Exculpated Parties" has the meaning set forth in Section 16.1 hereof.

3.62 "Final Decree(s)" means the decree contemplated under Bankruptcy Rule 3022.

3.63 "Final DIP Order" means the *Final Order (I) Authorizing the Debtor to Obtain Post-Petition Secured Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 129], approving of the DIP Facility on a final basis.

3.64 "Final Distribution" means the last payment to Holders of Allowed Claims and/or Interests in accordance with the provisions of the Plan.

3.65 "Final Order" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction: (i) that has not been reversed, stayed, modified, or amended; (ii) as to which the time to or the right to appeal or seek reconsideration, review, rehearing, or certiorari has expired or been waived (without regard to whether the time to seek relief from a judgment under Bankruptcy Rule 9024 has expired); and (iii) as to which no appeal or petition for reconsideration, review, rehearing, or certiorari is pending.

3.66 "General Claims Bar Date" means the general deadline set pursuant to the Bar Date Order for filing proofs of claim for any Claims against the Debtor that arose prior to the Petition Date.

3.67 "Governmental Unit" means the United States; State; Commonwealth, District, Territory, municipality, foreign state, department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under Chapter 11), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

3.68 "GUC Fund" means, in the event of a Stalking Horse Sale Transaction, the sum of $200,000, to be funded on or as soon as practicable after the Effective Date from the Sale-Excluded Cash, if the Holders of Allowed Class 4 Unsecured Claims vote to accept the Plan. In the event of an Overbidder Sale Transaction and if the Holders of Allowed Class 4 Unsecured Claims vote to accept the Plan, the GUC Fund shall be funded in the amount of $200,000, after the payment in full of the Class 2 Claims, from the remaining proceeds of such transaction; provided, however, that the Holders of Class 2 Claims shall turn over and contribute from any Distributions to which they would otherwise be entitled, an additional amount as is necessary, if any, to ensure that the GUC Fund is funded in an amount not less than $200,000.

3.69 "Impaired" means with respect to a Claim or Class of Claims, a Claim or Class of Claims that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

3.70 "Indemnified Parties" has the meaning set forth in Section 16.4 hereof.

3.71 "Initial Distribution Date" means the Effective Date, or as soon as practicable thereafter when the initial Distribution shall be made to the Holders of Allowed Claims and/or Interests, as determined by the Post-Effective-Date Debtor.

3.72 "Insider" means an insider of the Debtor, as defined in Section 101(31) of the Bankruptcy Code.

3.73 "Insurance Policies" means all insurance policies maintained by the Debtor as of the Petition Date, specifically including, but not limited to, director and officer insurance policies.

3.74 "Interest" means any equity interest in the Debtor, including, but not limited to, all issued, unissued, authorized, or outstanding shares or stock, whether vested or non-vested, together with any warrants, options, or contract rights to purchase or acquire such interests at any time.

3.75 "Interim DIP Order" means the *Interim Order (I) Authorizing the Debtor to Obtain Post-Petition Secured Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief* [Docket No. 42], approving of the DIP Facility on an interim basis.

3.76 "Lien" means any charge against or interest in property (including, but not limited to, any mortgage, lien, pledge, charge, security interest, encumbrance, or other security device of any kind) to secure payment of a debt or performance of an obligation.

3.77 "Litigation" means the interest of the Estate, the Debtor or the Post-Effective-Date Debtor in any and all claims, rights, and Causes of Action that have been or may be commenced by the Debtor or the Post-Effective-Date Debtor, except to the extent concerning any Released Parties. Litigation includes, without limitation not otherwise stated herein, any action: (i) to avoid and recover any transfers of property determined to be preferential, fraudulent, or avoidable pursuant to Sections 544, 545, 547, 548, 549(a), and 550 of the Bankruptcy Code; (ii) for the turnover of property to the Debtor or the Post-Effective-Date Debtor; (iii) for the recovery of property or payment of money that belongs to or can be asserted by the Debtor or the Post-Effective-Date Debtor; (iv) for compensation for damages incurred by the Debtor or the Post-Effective-Date Debtor; and (iv) equitable subordination actions against Creditors.

3.78 "Litigation Recovery" means any Cash or other property received by the Debtor or the Post-Effective-Date Debtor from all or any portion of the Litigation, including, but not limited to, awards of damages, attorneys' fees and expenses, interest, and punitive damages, whether recovered by way of settlement, execution on judgment, or otherwise. If any Litigation is pursued on a contingent-fee basis, the Litigation Recovery will be net of any contingent fee paid to legal counsel.

3.79 "Notes" means the 2024 Non-Convertible Notes and the 2023 Convertible Notes.

3.80 "Overbidder Sale Transaction" means the sale of substantially all of the Debtor's assets to a third party other than the Stalking Horse Bidder pursuant to the Sale Order.

3.81 "Perceptive" means Perceptive Credit Holdings III, LP and any successors thereto.

3.82 "Person" means any individual, corporation, limited liability company, general partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, Governmental Unit, or other Entity.

3.83 "Petition Date" means May 5, 2025, the date on which the Debtor filed its voluntary petition for relief commencing the respective Chapter 11 Case.

3.84 "Plan" means the portion of this First Amended Combined Plan and Disclosure Statement that constitutes the chapter 11 plan for the Debtor.

3.85 "Plan Documents" means the Plan, the Disclosure Statement, the Plan Supplement, or other documents or pleadings filed by the Debtor relating to the Plan.

3.86 "Plan Objection Deadline" means the deadline established by the Bankruptcy Court for filing and serving objections to Confirmation of the Plan.

3.87 "Plan Supplement" means the pleading or pleadings identified in the Plan or Disclosure Statement for filing with the Bankruptcy Court, which shall include certain exhibits and schedules to the Plan, as well as documents, agreements, and instruments evidencing and effectuating the Plan.

3.88 "Post-Effective-Date Debtor" means the Debtor from and after the Effective Date.

3.89 "Post-Effective-Date Debtor Representative" means the person or any successor thereto appointed by the Debtor under the Plan (subject to the written consent of the Prepetition Agent), who shall, on and after the Effective Date, serve as the sole manager, director, officer and representative (as applicable) of the Post-Effective-Date Debtor to exercise the rights, powers, and authority of the Post-Effective-Date Debtor under applicable provisions of this Plan and bankruptcy and non-bankruptcy law (including, without limitation, objecting to and making Distributions to creditors on account of Claims other than Unsecured Claims). The initial Post-Effective-Date Debtor Representative will be disclosed in the Plan Supplement.

3.90 "Prepetition Agent" means Perceptive and any successor(s) thereto, in its capacity as administrative agent under the Prepetition Credit Agreement.

3.91 "Prepetition Credit Agreement" means that certain Credit Agreement and Guaranty, dated as of January 24, 2022, by and among the Debtor, the Prepetition Lenders from time to time party thereto and the Prepetition Agent, as amended, supplemented or otherwise modified from time to time, as amended, modified, supplemented or restated.

3.92 "Prepetition Credit Documents" means the Prepetition Credit Agreement and any guaranty, security agreement, subordination agreement, intercreditor agreement and any other document, instrument, agreement, certificate or other amendment, waiver or modification of the foregoing, delivered to or for the benefit of the Prepetition Agent or any Prepetition Lenders in connection with or related to the Prepetition Credit Agreement, in each case, as amended or otherwise modified.

3.93 "Prepetition Lenders" means the Lenders as defined in the Prepetition Credit Agreement and any successor(s) thereto, in their capacity as prepetition lenders under the Prepetition Credit Agreement.

3.94 "Prepetition Lenders Deficiency Claim" means any unsecured deficiency Claim, if any, of the Prepetition Lenders in relation to the Prepetition Lenders Secured Claims.

3.95 "Prepetition Lenders Secured Claim" means any Secured Claim of the Prepetition Lenders against the Debtor arising under the Prepetition Credit Agreement, subject to the DIP Orders and the Sale Order.

3.96 "Prepetition Lenders Stub Claim" means that portion of the Class 2 Prepetition Lenders Secured Claims that has not been bid in connection with Perceptive's stalking horse credit bid, totaling approximately $1,000,000.

3.97 "Priority Non-Tax Claim" means any Claim, other than an Administrative Claim or a Priority Tax Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

3.98 "Priority Tax Claim" means a Claim of a Governmental Unit of the kind specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code.

3.99 "Pro Rata" means proportionately so that, with respect to a Claim, the ratio of: (a) (i) the amount of property distributed on account of a particular Claim to (ii) the Allowed amount of the Claim, is the same as the ratio of (b) (i) the amount of property distributed on account of all Allowed Claims in the Class or Classes entitled to share in the applicable distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

3.100 "Professional" means an Entity (a) employed pursuant to a Final Order in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 329, 330, and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

3.101 "Professional Fee Claim" means those fees and expenses claimed by Professionals pursuant to Sections 330, 331, 363, or 503 of the Bankruptcy Code or otherwise, and accrued and unpaid as of the Effective Date, and any and all fees, charges and expenses of Paladin on account of its provision of Allen Soong to serve as Chief Restructuring Officer (CRO) of the Debtor, and additional personnel to support the CRO.

3.102 "Professional Fee Reserve" means an account held by counsel to the Debtor for the payment of Professional Fee Claims.

3.103 "Proof of Claim" means a proof of claim filed pursuant to Section 501 of the Bankruptcy Code or any order of the Bankruptcy Court, together with supporting documents.

3.104 "Record Date" has the meaning set forth in Section 19.13 hereof.

3.105 "Rejection Bar Date" means the last date for any Entity whose claims arise out of the Bankruptcy Court approved rejection of an executory contract or unexpired lease to file a proof of claim for damages related to such rejection. The Rejection Bar Date for such Claims will be, (i) with respect to executory contracts and unexpired leases rejected pursuant to a Court order other

than the Confirmation Order, the date provided by an order approving the rejection, if any, and, (ii) with respect to executory contracts and unexpired leases rejected pursuant to the Confirmation Order (or for which no bar date was provided in the applicable Court order), the date that is thirty (30) days after the Effective Date.

3.106 "Related Persons" means, subject to any exclusions expressly set forth in the Plan, with respect to a specific Person, said Person's successors and assigns, and as applicable, its current and former equity holders, shareholders, interest holders, members, partners, managers, employees, agents, officers, directors, professionals, representatives, advisors, attorneys, financial advisors, accountants, and consultants, solely in their respective capacities as such.

3.107 "Released Parties" means, collectively, (a) the Debtor and Post-Effective-Date Debtor; (b) the Prepetition Lenders; (c) the Prepetition Agent; (d) the DIP Lenders; (e) the DIP Agent; (f) all Holders of Claims against the Debtor that are bound by the Third Party Release; and (g) the Related Persons of each of the foregoing Entities in clauses (a) through (f); *provided however*, that all rights of the Debtor and/or Post-Effective-Date Debtor to prosecute any Estate-Retained Causes of Action against those Persons identified in the Plan Supplement as not constituting Released Parties, shall be fully preserved. **For the avoidance of doubt and notwithstanding anything to the contrary in the Plan, the Released Parties do not include any former employees, officers or directors of the Debtor (as of the Petition Date) or any current or former equity holders of the Debtor, solely in their respective capacities as such.**

3.108 "Releasing Parties" has the meaning set forth in Section 16.2(b) hereof.

3.109 "Remaining Assets" means any and all assets of the Debtor as of the Effective Date and the Post-Effective-Date Debtor after the Effective Date, of any nature, including, without limitation, the Available Cash and the GUC Fund, if applicable. For the avoidance of doubt, the Remaining Assets include, without limitation, (i) the Sale-Excluded Cash as of the Effective Date; (ii) the Estate-Retained Causes of Action; (iii) any other Sale-Excluded Assets; (iv) all of the Debtor's books and records not sold or transferred pursuant to the Sale Transaction; (v) the amounts remaining in the Professional Fee Reserve; and (vi) all proceeds of any of the foregoing.

3.110 "Sale-Excluded Assets" means the "Excluded Assets" as defined in the Stalking Horse Purchase Agreement.

3.111 "Sale-Excluded Cash" means the "Excluded Cash" as defined in the Stalking Horse Purchase Agreement.

3.112 "Sale Order" means the order of the Court approving the Sale Transaction.

3.113 "Sale Transaction" means the sale of substantially all of the Debtor's assets to the Stalking Horse Bidder or other successful overbidder purchaser selected by the Debtor and approved by the Court in accordance with the Sale Order.

3.114 "Secured Claim" means a Claim that is secured by a Lien on property in which the Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to

section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

3.115 "Stalking Horse Bidder" means Perceptive or its affiliate or designee for purposes of the Sale Transaction.

3.116 "Stalking Horse Purchase Agreement" means that certain *Asset Purchase Agreement* dated as of May 5, 2025 (as amended or otherwise modified).

3.117 "Stalking Horse Sale Transaction" means the sale of substantially all of the Debtor's assets to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement.

3.118 "Subordination Agreements" means (i) that certain Amended and Restated Subordination Agreement, dated as of December 29, 2023, among the Debtor, the Prepetition Agent, and each noteholder party thereto; (ii) that certain Junior Lender Subordination Agreement, dated as of March 20, 2024, among the Debtor and each noteholder party thereto; and (iii) that certain Senior Lender Subordination Agreement, dated as of March 20, 2024, among the Debtor, the Prepetition Agent, and each noteholder party thereto.

3.119 "Subsequent Distribution Date" means any date after the Initial Distribution Date upon which the Post-Effective-Date Debtor makes a distribution to any Holders of Allowed Claims and/or Interests pursuant to the Plan.

3.120 "Tax" means any tax, charge, fee, levy, impost, or other assessment by any federal, state, local, or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, *ad valorem*, estimated, severance, stamp, occupation, and withholding tax. "Tax" shall include any interest or additions attributable to, imposed on, or with respect to such assessments.

3.121 "Tax Claim" means all or that portion of an Allowed Claim held by a Governmental Unit for a Tax assessed or assessable against the Debtor.

3.122 "Third Party Release" has the meaning set forth in Section 16.2(b) hereof.

3.123 "Unimpaired Claim" means an unimpaired Claim within the meaning of Section 1124 of the Bankruptcy Code.

3.124 "Unsecured Claim" means any Claim against the Debtor or Estate that is not a Secured Claim, a DIP Facility Claim, an Administrative Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Prepetition Lenders Secured Claim, a Prepetition Lenders Stub Claim, a 2024 Non-Convertible Notes Claim, or a 2023 Convertible Notes Claim.

3.125 "U.S. Trustee" means the Office of the United States Trustee for the District of Delaware.

3.126 "Voting Instructions" means the instructions for voting on the Plan contained on the Ballots.

3.127 "Voting Record Date" means the date as of which the identity of Holders of Claims is set for purposes of determining the Entities entitled to receive and vote on the Plan.

3.128 "Wind-Down Expenses" has the meaning ascribed to such term in the Stalking Horse Purchase Agreement.

## SECTION 4
## BACKGROUND

4.1 General Background.

Synthego is a leading provider of end-to-end CRISPR tools and solutions. CRISPR (Clustered Regularly Interspaced Short Palindromic Repeats) is a revolutionary technology that allows scientists to edit genes with precision, making it significant for advancements in medicine, agriculture, and industrial applications. Synthego supplies biopharmaceutical companies and research/academic institutions with certain tools that are essential to produce CRISPR technology, such as guide RNAs (gRNAs). Synthego supports and facilitates every step of a customer's CRISPR workflow in the development of cell and gene therapies, from design to edit to analysis for use in applications from discovery to clinical use. The Company is recognized as the highest quality producer of gRNAs and the only American company providing both research and therapeutic grade gRNA. Synthego was founded in 2012 and is headquartered in Silicon Valley. As of the Petition Date, the Company has approximately 150 employees.

Synthego's flagship product is gRNA. gRNA acts like a GPS for the CRISPR system, directing it to the exact spot in the DNA that needs to be edited. Synthego manufactures and sells gRNA for early-stage research use only as well as for human clinical trials. The Company has chemists, biologists and regulatory specialists available for consultation with clients in order to assist with and streamline the FDA regulatory process. In addition to gRNAs, the Company is expanding into certain enzyme offerings as well as producing and licensing novel nucleases like Cas9, Cas12 and eSpOT-ON.

The Company has collaborated with over 50 academic institutions and biopharmaceutical companies, including 8 of the world's 10 largest biotechnology companies, and 24 of the top 25 global biology universities across over 32 countries around the world. Synthego's products have resulted in over 190 publications in journals such as Nature and Cell.

Since the recognition of CRISPR as a gene-editing tool through the award of the Nobel Prize in Chemistry in 2020, its use in the development of gene therapies has grown exponentially: as of 2024, around 800 CRISPR-based medicines were in various stages of development, 1 million synthetic guide RNAs were being manufactured annually for research purposes, and 4 million CRISPR edits were being made each year.

(a) History.

Synthego was founded in 2012 by Paul and Michael Dabrowski, early employees at SpaceX. With $250,000 in seed funding, the brothers initially sought to apply engineering principles to the field of biology, and then more specifically CRISPR, to drive benefits to

researchers seeking to improve human health. As the Company's vision quickly progressed, it then completed a Series A funding round for $8.29 million.

A Series B funding round of $42 million in 2016 helped support Synthego being first-to-market with Synthetic Guide RNA (sgRNA), enabling a new CRISPR solution that reduced costs and wait times for scientists by 80%. A Series C funding round of $110 million in 2018 enabled expanding the core vision of providing access to CRISPR technology.

In 2018, Synthego launched Engineered Cells and Arrayed Screening Libraries, followed in 2019 by CRISPR Edited iPS Cells (Induced Pluripotent Stem Cells). To help speed the adoption of CRISPR in-market, additional bioinformatics tools were launched, specifically to help customers design their guides as well as analyze results. These research-grade solutions provided an array of benefits to scientific researchers conducting CRISPR-based research, helping optimize gene editing, guide selection and to ensure reliable results.

A Series D funding round of $100 million was completed in 2019 as the Company pursued initial growth into GMP[5] production. In May 2020, Synthego produced its first GMP gRNA molecule within what is now known as "GMP Factory 1," the first step towards gRNA being utilized in drug trials and eventual human trials. This innovation expanded Synthego's product reach beyond initial research into true human therapeutic development. Looking to future growth, an additional $196 million Series E funding round was completed in 2021-2022. By 2023, Synthego launched a state-of-the-art GMP facility called "GMP Factory 2," providing greater capacity and control for the extensive quality requirements of GMP manufacturing.

From August 2023 through January of 2024, the Company obtained additional funding through the issuance of subordinated Convertible Notes in the aggregate amount of $35 million. The Company utilized these proceeds for working capital, sales, marketing, and other ongoing operational expenses. In March 2024, Synthego sold its Engineered Cells and Arrayed Screening Library assets to Telegraph Hill Partners, forming a new company called EditCo. Synthego retained its core gRNA manufacturing capabilities and growing expertise in helping customers navigate the regulatory landscape of therapeutic trials.

With this split of organizations in 2024, Synthego retained Craig Christianson as Chief Executive Officer to bring a renewed focus on commercialization. The Company then issued Non-Convertible Notes (Subordinated Promissory Notes) in the aggregate amount of $97 million to support ongoing operations after the split of the Engineered Cells business from March 2024 through February 2025. These proceeds were used for working capital, sales, marketing, and other ongoing operational expenses as the Company worked to improve efficiencies and grow revenue within the leaner organizational structure. The Company secured new licenses to support novel nucleases offering scientists new avenues with affordable sublicensing options to bring therapeutics to market alongside gRNA. Additionally, Synthego has partnered to include two new enzymes to assist scientists developing longer RNA strands than traditional synthetic gRNA production currently supports.

[5] GMP is a common industry term referring to Good Manufacturing Practices




(b) Synthego Products and Services.

Synthego offers both off-the-shelf and customizable products, services and intellectual property for therapeutics developers at all stages of the development process, supporting screening, target validation, lead identification, process qualification, pre-clinical development and clinical and regulatory approvals.

The Company offers three categories of products for CRISPR editing:

(i) Its flagship product, gRNA, which is manufactured in-house. The gRNA product can be either off-the-shelf for pre-clinical use or customized for clinical purposes;

(ii) CRISPR nucleases: Cas9, Cas12 (U.S. license from HuideGene) and eSpOT-ON (global exclusive license from AstraZeneca). The eSpOT-ON nuclease can be sublicensed from research to commercialization. CRISPR nucleases are manufactured by third parties (Biotechrabbit and Kactus Bio); and

(iii) CRISPR enzymes: T7 RNA polymerase and RNase inhibitors.

(c) Corporate History.

To date, of the approximately 1000 cell and gene therapy companies worldwide, around 25% have engaged with Synthego. The Company's customer base is large and diverse, consisting of large pharmaceutical and biotechnology companies (25%), small- and medium-sized biotech companies (50%), and academic medical centers (25%).

(d) Company Facilities.

Synthego has three leased manufacturing facilities across two factories producing RUO[6]-grade RNA and large amounts of clinical-grade RNA. First, the Company operates an over 18,000 square foot, state-of-the-art, GMP-compliant, 24/7 operational manufacturing facility for sgRNA at 955 Charter Street, Redwood City, California ("GMP Factory 2"). The GMP Factory 2 facility features temperature-controlled storage for raw materials, unidirectional flow of labs and staff processes to eliminate cross-contamination risks, dedicated synthesis suites and purification labs and suite reservation capacity for multi-gram scale projects. The Company also conducts RUO and INDe[7] product manufacturing at a 9,600 square foot facility located at 3696 Haven Avenue, Suite A, also in Redwood City (GMP Factory 1), as well as a 11,300 square foot facility containing instruments to support the INDe manufacturing line in Suite C at the same address.

(e) Litigation.

As of the Petition Date, the Company is involved in one piece of major litigation. On October 5, 2021, Synthego filed a complaint in the United States District Court for the Northern District of California against Agilent Technologies, Inc. ("Agilent"), for a declaratory judgement of non-infringement (Case No.: 3:21-cv-07801, the "Synthego DJ Action") of U.S. Patent No. 10,900,034 and U.S. Patent No. 10,337,001 (collectively, the "Agilent Patents").

Agilent filed a complaint (Case number DDE-1-99-cv-de206-1) against Synthego alleging patent infringement of the Agilent Patents in the United States District Court for the District of Delaware (the "Agilent Action"). The Synthego DJ Action and Agilent Action have been joined and are currently stayed.

Synthego filed a petition with the Patent Trial and Appeal Board (the "PTAB") for inter partes review (the "IPR") to review the patentability of all claims in the Agilent Patents. The PTAB ruled in favor of Synthego's petition seeking to invalidate the 001 and 034 patents and that decision in on appeal. Oral arguments were held before a three-judge panel at the Federal Circuit on March 7, 2024, and the Company presently is awaiting a decision.

(f) Leadership Team.

As of the Petition Date, the Company's leadership team includes:

(i) Allen Soong (Chief Restructuring Officer): Mr. Soong, a partner of Paladin Management Group, LLC, has more than 25 years of experience in providing turnaround services to companies in a variety of industries, and has frequently been appointed as interim management and chief restructuring officer of these

[6] RUO is a common industry term used to refer to applications or molecules that are for Research Use Only.

[7] IND is a common industry term used to refer to an Initial Drug Application. "INDe" refers to IND-enabling preclinical research and studies that are relevant to obtaining the necessary data for an IND.

businesses. Mr. Soong was appointed as the Debtor's Chief Restructuring Officer as of May 5, 2025.

(ii) Craig Christianson (President and CEO): Mr. Christianson has a track record of spearheading global commercial strategies, business development and operations to build global life sciences and other businesses. He joined the Company from Water Street Healthcare Partners, preceded by 12 years with global biotechnology company Promega Corporation where he led commercial operations.

(iii) Jason Miller (Chief Commercial Officer): Mr. Miller's experience includes 17 years at Promega Corporation.

(iv) Stephanie Adamany (Chief Legal Officer): Ms. Adamany has two decades of legal experience focused on corporate, patent, trademark, and copyright, with an emphasis on IP transactions patent litigation, prosecution, and governance matters.

(v) Marjan Varedi (Chief Operations Officer): Prior to Synthego, Ms. Varedi was leading Quality Assurance and Validation as Sr. Director at Revance, where she managed and hosted FDA pre-license inspection, Biologics License Application approval, and commercial launch of a new product.

(vi) Sameer Moorji (Vice President, Global Sales): Mr. Moorji has over ten years of experience leading high-performance sales teams. He recently headed a new business unit at Promega Corporation.

(vii) Greg Huegerich (Vice President, Marketing): Mr. Huegerich has experience in web and digital channels, including with Promega in the life sciences market.

(viii) Stephen Dudek (Vice President, Technology): Mr. Dudek leads teams of development chemists, process engineers, analytical chemists, and data scientists in deploying several complex chemical production lines.

The Company's current Board of Directors includes Craig Christianson and the following independent directors who also comprise the Restructuring Committee of the Board: (a) Craig Barbarosh; (b) Robert Warshauer; and (c) John T. Young. On April 25, 2025, the Company's Board of Directors established the Restructuring Committee to assume all of the power and authority of the Board that may be delegated to a committee in respect of a financial restructuring, including a potential chapter 11 case, debtor in possession financing facility, sale of the Company's assets, confirmation of a chapter 11 plan and appointment of a Chief Restructuring Officer of the Company.

Previously, on March 20, 2025, Mr. Christianson executed a Promissory Note, evincing a loan provided to him by the Company's senior secured lender, Perceptive, in the amount of $1.5 million, in order to retain his continued service as CEO of the Company. This note bears interest at a rate of 5.43% per year and matures upon the earliest of (a) September 20, 2026, (b) Mr. Christianson's resignation other than for a Good Reason (as defined in the note), and (c) Mr. Christianson's termination for Cause (as defined in the note). As a result of this transaction, Mr. Christianson has recused, and will continue to recuse, himself from all matters considered by the

Company's Board of Directors involving Perceptive and the Debtor's sale process. The Restructuring Committee, which is composed of experienced restructuring advisors, will handle those matters and will supervise and direct the Debtor's Chief Restructuring Officer on all matters related to the restructuring.

4.2 Capital Structure and Financing.

(a) Prepetition Secured Debt.

Pursuant to the Prepetition Credit Agreement, among the Debtor, as borrower, the Prepetition Lenders, and the Prepetition Agent, the Debtor incurred secured indebtedness to the Prepetition Lenders. As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Credit Agreement was not less than $73,937,415, plus interest, fees and all other obligations owing thereunder. The Prepetition Lenders are also the DIP Lenders in this case, and they are also the stalking horse bidder for the Debtor's assets.

Prior to the Petition Date, the Company granted to the Prepetition Agent, for the benefit of the Prepetition Lenders, first-priority liens on substantially all of the Company's assets, including, but not limited to, all accounts, chattel paper, commercial tort claims, deposit accounts, books and documents, equipment, general intangibles, inventory, investment property, letter-of-credit rights, goods, intellectual property, money, and all products and proceeds of the foregoing, senior to all other prepetition liens except as expressly set forth in the Prepetition Credit Documents.

Subsequent to obtaining the Prepetition Facility, the Company entered into various subordination agreements in connection with the Company's incurrence of additional indebtedness, specifically: (a) that certain Amended and Restated Subordination Agreement, dated as of December 29, 2023, among the Debtor, the Prepetition Agent, and each noteholder party thereto; (b) that certain Junior Lender Subordination Agreement, dated as of March 20, 2024, among the Debtor and each noteholder party thereto; and (c) that certain Senior Lender Subordination Agreement, dated as of March 20, 2024, among the Debtor, the Prepetition Agent, and each noteholder party thereto. Pursuant to the Subordination Agreements, the 2023 Subordinated Convertible Notes and 2024 Senior Notes are subordinated to the obligations owed by the Company to the Prepetition Lenders and the 2023 Subordinated Convertible Notes are subordinated to the obligations owed by the Company to the 2024 Senior Notes.

(b) Unsecured 2023 Convertible Notes.

In August 2023, the Company raised $23.4 million in additional working capital through the sale and issuance of certain subordinated convertible promissory notes, pursuant to which the Company entered into that certain Note Purchase Agreement, dated as of August 22, 2023. In December 2023, the Company sought to raise an additional $26.6 million in working capital through the sale of certain subordinated convertible promissory notes (the 2023 Convertible Notes) and entered into that certain Amended and Restated Note Purchase Agreement (which amended and restated a prior note purchase agreement). Pursuant to this capital raise, the Company entered into a Subordination Agreement, pursuant to which the lenders thereunder agreed that the obligations under the 2023 Convertible Notes would be subordinate to the obligations under the

Prepetition Credit Agreement. Through subsequent conversions and accruals, the total outstanding balance owed on the 2023 Convertible Notes is approximately $43 million as of the Petition Date, which amount is contingent, unliquidated, or disputed. The holders of the 2023 Convertible Notes are subject to the terms of the Subordination Agreements, which provide for the subordination of their claims until the full payment and discharge of the 2024 Non-Convertible Notes (as defined below) and the obligations under the Prepetition Credit Agreement.

(c) Unsecured 2024 Non-Convertible Notes.

Perceptive and other noteholders are party to that certain Note Purchase Agreement, dated as of March 20, 2024, pursuant to which such parties acquired certain unsecured, non-interest bearing, non-convertible, senior subordinated promissory notes (the 2024 Non-Convertible Notes). The foregoing purchase agreement was amended as of September 4, 2024, in order to permit additional closings of similar notes in connection with a "rights offering" to the holders of preferred stock of the Company and was amended again on February 4, 2025, in order to permit such additional closings. The amount owed by the Company to Perceptive under the 2024 Non-Convertible Notes is around $20 million and the amounts owed to the remaining holders of these notes is approximately $77 million, for an outstanding total of approximately $97 million as of the Petition Date, which amount is contingent, unliquidated, or disputed. The 2024 Non-Convertible Notes are senior to the obligations owed by the Company to the holders of the 2023 Convertible Notes, but junior to the obligations under the Prepetition Credit Agreement pursuant to the terms of the Subordination Agreements.

(d) Other Unsecured Debt.

As of the Petition Date, the Company estimates that it owes trade and other unsecured creditors approximately $4.6 million, which such claims are classified in Class 4 (Unsecured Claims) under the Plan. The Unsecured Claims, for purposes of the Plan, do not include the 2024 Non-Convertible Notes Claims (classified in Class 5) or 2023 Convertible Notes Claims (classified in Class 6). The Prepetition Lenders Deficiency Claim (classified in Class 2) is also part of the other unsecured debt.

(e) Equity Investments.

In addition to the debt raises discussed above, the Company raised approximately $392 million in multiple rounds of equity funding, the most recent Series E being contemporaneous with the Prepetition Facility:

| Equity Financing Summary: Inception to Date | | |
|---|---|---|
| **Funding Round** | **Period** | **Amount ($ Millions)** |
| *Seed / Series A* | 2012-2015 | $ 9 |
| *Series B* | 2016 | 42 |
| *Series C* | 2018 | 110 |
| *Series D* | 2019 | 100 |
| *Series E* | 2021-2022 | 131 |
| ***TOTAL*** | **2012-2022** | **$ 392** |

4.3 Financial Condition and Events Leading to the Commencement of the Chapter 11 Case.

From 2020 through 2023, the Company enjoyed rapid revenue growth from sales of its cutting-edge gene editing tools and solutions to major research and biopharmaceutical companies around the world. This growth was outpaced by the cost and investment required to support continued advancement of its technologies, however, leading to declining margins and growing operating losses. In response, the Company raised additional capital to continue its important work, but by the end of 2023, the Company was still not generating positive cash flow and the interest burden had expanded in excess of ten times what it was in 2020-2021.

By Spring 2024, after the arrival of Mr. Christianson and the sale of the Company's engineered cell business division (EditCo), Synthego was able to reduce its operating losses by around a third, but by February 2025 remained unable to generate sufficient cash flow to service its debt. Accordingly, the Company, in consultation with its legal and financial advisors, determined that the commencement of this Chapter 11 Case was necessary to preserve enterprise value, protect business operations and effectuate a sale of the Company.

As set forth in greater detail in the *Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Financing and Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief]* [Docket No. 11], the Prepetition Lenders are willing to continue to support the Company's restructuring efforts through the provision of senior secured, superpriority debtor in possession financing, and additionally, Perceptive has provided a "stalking horse" bid for substantially all of the Company's assets.

## SECTION 5
## THE CHAPTER 11 CASE

The following is a brief description of certain material events that have occurred during the Chapter 11 Case.

5.1 First Day and Other Early Relief.

In order to facilitate the Chapter 11 Case, minimize disruption to the Debtor's affairs, and preserve the value of the Estate, the Debtor filed motions with the Bankruptcy Court on or shortly after the Petition Date seeking certain relief, including, without limitation:

(a) authority to honor and pay certain prepetition workforce compensation and expenses and other related obligations, subject to certain caps, which was granted pursuant to an interim order entered on May 8, 2025 [motion, Docket No. 9; interim order, Docket No. 35];

(b) authority to pay (or use tax credits to offset) certain sales, use, franchise and other taxes, as well as other governmental taxes, fees and assessments, in the ordinary course of business[, which was granted pursuant to an interim order entered on May 8, 2025] [motion, Docket No. 8; interim order, Docket No. 39];

(c) authority to continue using the Debtor's existing cash management system and the provision of other related relief, which was granted pursuant to an interim order entered on May 8, 2025 [motion, Docket No. 6; interim order, Docket No. 33];

(d) authority to pay certain prepetition obligations to customers and otherwise continue, renew, replace, modify, implement, or terminate the Debtor's customer programs in the ordinary course of business, which was granted by the Court on May 8, 2025 [motion, Docket No. 7; interim order, Docket No. 34];

(e) approval of adequate assurance procedures for utility providers, which was granted pursuant to an interim order entered on May 8, 2025 [motion, Docket No. 10; interim order, Docket No. 36]; and

(f) the appointment of Epiq Corporate Restructuring, LLC as the claims and noticing agent in the Chapter 11 Case [application, Docket No. 5; order, Docket No. 32].

5.2 DIP Financing/Cash Collateral Relief.

As set forth in the Debtor's motion for approval of the DIP Facility (the "DIP Financing Motion") [Docket No. 11], absent immediate access to Cash Collateral and the funding available under the DIP Facility, the Debtor would be unable to sustain operations, pay its employees or vendors, or achieve a successful sale and plan through the chapter 11 process. Accordingly, as of the Petition Date, the Debtor had an urgent and immediate need for entry of the Interim DIP Order. After extensive good faith and arms' length negotiations, the Debtor and the DIP Lenders / Prepetition Lenders ultimately agreed on the terms of the DIP Facility and consensual use of Cash Collateral. Paladin also contacted various other third party funding sources about the possibility of providing debtor in possession financing to the Debtor.

Ultimately, given the Prepetition Lenders' senior collateral position in substantially all assets of the Debtor and unwillingness to consent to any priming in favor of any third party, the DIP Lenders / Prepetition Lenders were the only parties willing to lend money to the Debtor on a postpetition basis. The DIP Lenders / Prepetition Lenders also have agreed to be the stalking horse

bidder for substantially all of the Debtor's assets and have set a floor for the value of such assets as part of their pending credit bid.

The DIP Facility, as revised, consists of senior secured superpriority term loans in an aggregate principal amount of $25,000,000, consisting of: (a) $15,000,000 in new money multiple draw term loans and (b) $10,000,000 in rolled-up Prepetition Obligations (as defined in the DIP Orders), subject to certain challenge rights as set forth in the DIP Orders. Subject to the Carve Out (as defined in the Final DIP Order), the DIP Agent was granted perfected post-petition security interests in and liens on all real, personal, and mixed property (including equity interests), whether now existing or hereafter arising and wherever located, tangible and intangible, of the Debtor's estate, including any Avoidance Actions and commercial tort claims, and the Debtor's rights under sections 506(c) and 550 of the Bankruptcy Code and the proceeds thereof. Further, the DIP Lenders were granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed super-priority administrative expense claims for all DIP Obligations, subject only to the Carve Out.

The Court entered an order granting the DIP Financing Motion on an interim basis subject to the terms therein on May 9, 2025 [Docket No. 42]. On May 23, 2025, the Debtor filed a motion to amend the DIP Financing Motion to provide for an increase in the new money portion of the DIP facility from $12,500,000 to $15,000,000 [Docket No. 73]. The DIP Financing Motion was approved by the Court on a final basis subject to the terms of the Final DIP Order on June 3, 2025 [Docket No. 129].

5.3 Debtor's Sale Process.

By its bid procedures and sale approval motion [Docket No. 12] (the "Sale Motion"), the Debtor seeks to sell substantially all of its assets, other than certain Excluded Assets, during the Chapter 11 Case outside of the Plan. The Debtor's sale process is being managed by its investment banker, Raymond James & Associates, Inc. ("Raymond James"). Raymond James was retained by the Debtor on April 7, 2025 to, among other things, assist the Debtor in marketing its assets. To that end, prior to the Petition Date, Raymond James worked closely with the Debtor's management to analyze the Debtor's assets' current financial position, prepare marketing and diligence materials, and populate a digital data room for prospective purchasers interested in purchasing all or any portion of the Debtor's assets.

Beginning on or about April 23, 2025, Raymond James targeted over 100 parties consisting of both strategic and financial buyers. Raymond James worked closely with the Debtor to align on these outreach targets, which includes those that have familiarity with the Debtor. Raymond James has aggressively engaged with potentially interested parties, including the diligence process, with a data room for interested parties.

Following multiple discussions among the Debtor, the Prepetition Lenders, and their respective professionals, the Debtor entered into the Stalking Horse Purchase Agreement with the stalking horse purchaser, the Prepetition Lenders. The Stalking Horse Purchase Agreement contemplates the sale of substantially all of the Debtor's Transferred Assets (as defined in the Stalking Horse Purchase Agreement) in exchange for consideration equal to (i) a credit bid pursuant to Section 363(k) of the Bankruptcy Code of the amounts owed under the DIP Facility, plus the obligations under the Prepetition Credit Agreement (minus $1 million), (ii) the

assumption of certain liabilities, and (iii) waiver and relinquishment of any rights in the Sale-Excluded Cash for the benefit of the Debtor's estate. The stalking horse bid was subject to overbid at an auction pursuant to certain proposed overbid procedures and protections, but no qualified overbids were received by the bid deadline of June 24, 2025, at 5:00 p.m. Eastern time. The Debtor believes that its marketing and sale process will preserve going concern value and maximize recoveries for all stakeholders. The Court approved the Debtor's proposed bid procedures by order dated May 29, 2025 [Docket No. 97]. The Debtor's Sale Motion was approved by the Court on June 26, 2025 [Docket No. 169].

5.3 No Creditors' Committee.

On May 16, 2025, the U.S. Trustee filed with the Court a statement that no committee of unsecured creditors has been appointed in the Chapter 11 Case, because there was insufficient response to the U.S. Trustee's communications/contact for service on a committee [Docket No. 68].

5.4 Retention of Professionals.

The Debtor filed applications or motions, as applicable, to employ certain professionals, including Pachulski Stang Ziehl & Jones LLP as bankruptcy counsel in the Chapter 11 Case (approved by Court order [Docket No. 100]); Raymond James & Associates, Inc. as its investment banker; and Fenwick & West LLP as special corporate counsel.

The Debtor also filed a motion to retain and employ Paladin Management Group, LLC ("Paladin") to provide the Debtor with a Chief Restructuring Officer ("CRO"), and certain additional Paladin personnel [Docket No. 61].

5.5 Debtor's Schedules and Statement of Financial Affairs.

The Debtor filed with the Court its Schedules and Statement of Financial Affairs on June 2, 2025 [Docket Nos. 120, 121].

## SECTION 6
## CONFIRMATION AND VOTING PROCEDURES

6.1 Confirmation Hearing.

On June 26, 2025, the Court entered an order conditionally approving the Combined Plan and Disclosure Statement (the "Conditional Approval and Procedures Order") for solicitation purposes only and authorizing the Debtor to solicit the Combined Plan and Disclosure Statement. The Confirmation Hearing has been scheduled for **August 5, 2025, at 2:00 p.m. (prevailing Eastern Time)** to consider (a) final approval of the Combined Plan and Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) confirmation of the Combined Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Debtor without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Court.

6.2 Procedures for Objections.

Any objection to final approval of the Combined Plan and Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or confirmation of the Combined Plan and Disclosure Statement must be made in writing and filed with the Court by no later than **July 29, 2025, at 4:00 p.m. (prevailing Eastern Time)**. **Unless an objection is timely filed and served, it may not be considered by the Court at the Confirmation Hearing.**

6.3 Requirements for Confirmation.

The Court will confirm the Combined Plan and Disclosure Statement only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among the requirements for confirmation in the Chapter 11 Case is that the Combined Plan and Disclosure Statement be: (i) accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Combined Plan and Disclosure Statement "does not discriminate unfairly" against, and is "fair and equitable" with respect to, such Class; and (ii) feasible. The Court must also find that:

(a) the Combined Plan and Disclosure Statement has classified Claims and Interests in a permissible manner;

(b) the Combined Plan and Disclosure Statement complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and

(c) the Combined Plan and Disclosure Statement has been proposed in good faith.

The Debtor believes that the Combined Plan and Disclosure Statement complies, or will comply, with all such requirements.

6.4 Classification of Claims and Interests.

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a Debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Combined Plan and Disclosure Statement divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified).

Section 1122 of the Bankruptcy Code requires the Combined Plan and Disclosure Statement to place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such class. The Combined Plan and Disclosure Statement creates separate Classes to deal respectively with Priority Non-Tax Claims, various Secured Claims, Unsecured Claims, and Interests. The Debtor believes that the Combined Plan and Disclosure Statement's classifications place substantially similar Claims or Interests in the same Class and, thus, meet the requirements of section 1122 of the Bankruptcy Code.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable

treatment of its claim or interest. The Debtor believes that the Combined Plan and Disclosure Statement complies with such standard. If the Court finds otherwise, however, it could deny confirmation of the Combined Plan and Disclosure Statement if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Combined Plan and Disclosure Statement.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Combined Plan and Disclosure Statement only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtor believes that the Combined Plan and Disclosure Statement has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a holder of a Claim or Interest may challenge the Debtor's classification of Claims or Interests and that the Court may find that a different classification is required for the Combined Plan and Disclosure Statement to be confirmed. If such a situation develops, the Debtor intends, in accordance with the terms of the Combined Plan and Disclosure Statement, to make such permissible modifications to the Combined Plan and Disclosure Statement as may be necessary to permit its confirmation. Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Combined Plan and Disclosure Statement.

**EXCEPT AS SET FORTH IN THE COMBINED PLAN AND DISCLOSURE STATEMENT, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE COMBINED PLAN AND DISCLOSURE STATEMENT'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The amount of any Impaired Claim that ultimately is Allowed by the Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by creditors. The projected recoveries are based on information available to the Debtor as of the date hereof and reflect the Debtor's views as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized herein. The Debtor believes that the consideration, if any, provided under the Combined Plan and Disclosure Statement to holders of Allowed Claims reflects an appropriate resolution of their Allowed Claims taking into account the differing nature and priority of such Claims and Interests. The Court must find, however, that a number of statutory tests are met before it may confirm the Combined Plan and Disclosure Statement. Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Combined Plan and Disclosure Statement, or do not vote to accept the Combined Plan and Disclosure Statement, but who will be bound by the provisions of the Combined Plan and Disclosure Statement if it is confirmed by the Court.

6.5 Impaired Claims or Interests.

Pursuant to section 1126 of the Bankruptcy Code, only the holders of Claims in Classes Impaired by the Combined Plan and Disclosure Statement and receiving a payment or Distribution under the Combined Plan and Disclosure Statement may vote to accept or reject the Combined Plan and Disclosure Statement. Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims may be Impaired if the Combined Plan and Disclosure Statement alters the legal, equitable, or contractual rights of the holders of such Claims or Interests treated in such Class. The holders of Claims not Impaired by the Combined Plan and Disclosure Statement are deemed to accept the Combined Plan and Disclosure Statement and do not have the right to vote on the Combined Plan and Disclosure Statement. The holders of Claims or Interests in any Class which will not receive any payment or Distribution or retain any property pursuant to the Combined Plan and Disclosure Statement are deemed to reject the Combined Plan and Disclosure Statement and do not have the right to vote. Finally, the holders of Claims or Interests whose Claims or Interests are not classified under the Combined Plan and Disclosure Statement are not entitled to vote on the Combined Plan and Disclosure Statement.

Under the Combined Plan and Disclosure Statement, Holders of Claims in Class 1 (Priority Non-Tax Claims) and Class 3 (Other Secured Claims) are Unimpaired and, therefore, not entitled to vote on the Combined Plan and Disclosure Statement and are deemed to accept the Combined Plan and Disclosure Statement. Holders of Claims in Class 2 (Prepetition Lenders Secured Claims and Prepetition Lenders Stub Claim), Class 4 (Unsecured Claims), Class 5 (2024 Non-Convertible Notes Claims), and Class 6 (2023 Convertible Notes Claims) are Impaired and entitled to vote on the Plan. Holders of Interests in Class 7 will not receive any payment or Distribution or retain any property pursuant to the Combined Plan and Disclosure Statement and, therefore, are deemed to reject the Combined Plan and Disclosure Statement and do not have the right to vote.

**ACCORDINGLY, BALLOTS FOR ACCEPTANCE OR REJECTION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE BEING PROVIDED TO HOLDERS OF CLAIMS IN CLASSES 2, 4, 5 AND 6.**

6.6 Confirmation without Necessary Acceptances; Cramdown.

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of

claims, determined without including any acceptance of the plan by any insider holding a claim in that class, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests. Here, because holders of Claims in Class 6 and Interests in Class 7 are deemed to reject the Combined Plan and Disclosure Statement, the Debtor will seek confirmation of the Combined Plan and Disclosure Statement from the Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtor believes that such requirements are satisfied, as no holder of a Claim or Interest junior to those in Classes 6 and 7 is entitled to receive any property under the Combined Plan and Disclosure Statement.

The concept of "unfair discrimination" is not defined in the Bankruptcy Code, but has been suggested in recent case law to arise when a difference in a plan's treatment of two classes of equal priority results in a materially lower percentage recovery for the non-accepting class. Based upon its understanding of existing case law, the Debtor does not believe that the Plan unfairly discriminates against any Class of Claims.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity holders, as follows:

a. <u>Secured Creditors</u>. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

b. <u>Unsecured Creditors</u>. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

c. <u>Interests</u>. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtor believes that the distributions provided under the Combined Plan and Disclosure Statement satisfy the absolute priority rule, where required.

6.7 <u>Feasibility.</u>

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the

Debtor or any successor to the Debtor (unless such liquidation or reorganization is proposed in the Combined Plan and Disclosure Statement). Because the Combined Plan and Disclosure Statement proposes a liquidation of all of the Debtor's remaining assets, for purposes of this test, the Debtor has analyzed the ability of the Post-Effective-Date Debtor to meet its obligations under the Combined Plan and Disclosure Statement. Specifically, the Debtor will have access to the Sale-Excluded Cash, which the Debtor projects will be sufficient for the Debtor to fulfill its obligations under the Plan. Therefore, the Debtor believes that the liquidation pursuant to the Combined Plan and Disclosure Statement will meet the feasibility requirements of the Bankruptcy Code.

6.8 Best Interests Test and Liquidation Analysis.

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires the Court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its Chapter 11 Case were converted to a case under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

If the Chapter 11 Case were converted to a Chapter 7 proceeding, first and foremost, the Estate and its general unsecured creditors would not have the benefit of the GUC Fund and the deemed turnover and contribution of distributions otherwise payable to the Prepetition Lenders on account of any Class 4 Unsecured Claims (subject to the terms of the Plan) – value that would otherwise be paid to the Prepetition Lenders. Thus, general unsecured creditors would likely receive no recovery in a Chapter 7 proceeding. Further, the Estate would incur the costs of payment of a statutorily allowed commission to the Chapter 7 trustee, as well as the costs of counsel and other professionals retained by the trustee. The Debtor believes that such amounts would exceed the amount of expenses that will be incurred in implementing the Plan and winding up the affairs of the Debtor in the Chapter 11 Case. The Debtor contemplates an orderly administration and winding down of the Estate by parties that are already familiar with the Debtor, its remaining assets and affairs, and its creditors and liabilities. Such familiarity will allow the Post-Effective-Date Debtor to complete liquidation of the remaining assets (including prosecution of the applicable Causes of Action), and distribute the net proceeds to creditors more efficiently and expeditiously than a Chapter 7 trustee. Additionally, the Estate would suffer additional delays,

as a Chapter 7 trustee and his/her counsel took time to develop a necessary learning curve in order to complete the administration of the Estate (including the prosecution of the applicable Causes of Action). Also, a new time period for the filing of claims would commence under Bankruptcy Rule 1019(2), possibly resulting in the filing of additional Claims against the Estate.

The Debtor's Liquidation Analysis is attached hereto as **Exhibit A**. The Liquidation Analysis reflects that creditors will receive substantially higher recoveries under the Plan than they would in a chapter 7 case.

Based upon the foregoing, the Debtor believes that creditors will receive at least as much or more under the Plan than they would receive if the Chapter 11 Case were converted to Chapter 7 case.

6.9 Eligibility to Vote on the Combined Plan and Disclosure Statement.

Unless otherwise ordered by the Court, only holders of Allowed Claims in Classes 2, 4, 5 and 6 may vote on the Plan. Further, subject to the tabulation procedures that were approved by the Conditional Approval and Procedures Order, in order to vote on the Combined Plan and Disclosure Statement, you must hold an Allowed Claim in Class 2, 4, 5 or 6, or be the holder of a Claim that has been temporarily Allowed for voting purposes only pursuant to the approved tabulation procedures or under Bankruptcy Rule 3018(a).

6.10 Solicitation Package / Release Opt-Out.

All holders of Allowed Claims in Classes 2, 4, 5 and 6 will receive a Solicitation Package. The Solicitation Packages will contain: (i) the Combined Plan and Disclosure Statement; (ii) the Conditional Approval Order and Procedures Order; (iii) notice of the Confirmation Hearing; (iv) a form of Ballot, including voting instructions and a box to check for voters to opt out of being a Releasing Party in connection with the Third Party Release contained in Section 16.2 and (v) such other materials as the Court may direct or approve or that the Debtor deems appropriate.

All other Creditors and parties in interest not entitled to vote on the Combined Plan and Disclosure Statement will receive only a copy of the notice of Confirmation Hearing and an optional opt-out form to not be a Releasing Party under the Plan (if applicable).

Copies of the Combined Plan and Disclosure Statement shall be available on the Claims and Balloting Agent's website at https://dm.epiq11.com/case/synthego/info.

6.11 Voting Procedures, Voting Deadline, and Applicable Deadlines.

The Voting Record Date for determining which holders of Claims in Classes 2, 4, 5 and 6 may vote on the Combined Plan and Disclosure Statement is June 27, 2025, except for parties who submit claims after such date, but on or before July 3, 2025.

In order for your Ballot to count, you must (1) complete, date, and properly execute the Ballot and (2) properly deliver the Ballot to the Claims and Balloting Agent by either (a) mailing the Ballot to the Claims and Balloting Agent at the following address: Synthego Corporation c/o Epiq Ballot Processing, 10300 SW Allen Boulevard, Beaverton, Oregon 97005; or (b) uploading

the Ballot on the Claims and Balloting Agent's online balloting platform per the instructions in the Ballot. Instructions for casting a Ballot also will be available on the Claims and Balloting Agent's website.

Ballots must be submitted electronically, or the Claims and Balloting Agent must actually receive physical, original Ballots by mail or overnight delivery, on or before the Voting Deadline, which is **July 29, 2025 at 4:00 p.m. (prevailing Eastern Time)**. Subject to the tabulation procedures approved by the Conditional Approval and Procedures Order, you may not change your vote once a Ballot is submitted electronically or the Claims and Balloting Agent receives your original paper Ballot unless such withdrawal or change is in accordance with Bankruptcy Rule 3018(a). Subject to the tabulation procedures approved by the Conditional Approval and Procedures Order, any Ballot that is timely and properly submitted electronically or received physically will be counted and will be deemed to be cast as an acceptance, rejection or abstention, as the case may be, of the Combined Plan and Disclosure Statement.

**IF YOU ARE ENTITLED TO VOTE ON THE COMBINED PLAN AND DISCLOSURE STATEMENT, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT YOU RECEIVE. PLEASE BE SURE TO COMPLETE ALL BALLOT ITEMS PROPERLY AND LEGIBLY. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE COMBINED PLAN AND DISCLOSURE STATEMENT AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE COMBINED PLAN AND DISCLOSURE STATEMENT OR PROCEDURES FOR VOTING ON THE COMBINED PLAN AND DISCLOSURE STATEMENT, PLEASE CONTACT THE CLAIMS AND BALLOTING AGENT BY (I) TELEPHONE AT (877) 311-5890 (U.S./CANADA) OR (II) EMAIL AT SYNTHEGO@EPIQGLOBAL.COM. THE CLAIMS AND BALLOTING AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

6.12 <u>Acceptance of the Combined Plan and Disclosure Statement.</u>

If you are a holder of a Claim in Class 2, 4, 5 or 6, your acceptance of the Combined Plan and Disclosure Statement is important. In order for the Combined Plan and Disclosure Statement to be accepted by an Impaired Class of Claims, a majority in number (*i.e.*, more than half) and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Combined Plan and Disclosure Statement. At least one Impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Combined Plan and Disclosure Statement. The Debtor urges that you vote to accept the Combined Plan and Disclosure Statement.

## SECTION 7
## CERTAIN RISK FACTORS, TAX CONSEQUENCES, AND OTHER DISCLOSURES

7.1 <u>Certain Risk Factors to be Considered.</u>

THE COMBINED PLAN AND DISCLOSURE STATEMENT AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO

ARE ENTITLED TO VOTE ON THE COMBINED PLAN AND DISCLOSURE STATEMENT SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE COMBINED PLAN AND DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE COMBINED PLAN AND DISCLOSURE STATEMENT AND ITS IMPLEMENTATION.

7.2 The Combined Plan and Disclosure Statement May Not Be Accepted.

The Debtor can make no assurances that the requisite acceptances of the Combined Plan and Disclosure Statement will be received, and the Debtor may need to obtain acceptances of an alternative plan of liquidation for the Debtor, or otherwise, that may not have the support of the creditors and/or may be required to liquidate the Estate under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to creditors as those proposed in the Combined Plan and Disclosure Statement.

7.3 The Combined Plan and Disclosure Statement May Not Be Confirmed.

Even if the Debtor receives the requisite acceptances, there is no assurance that the Court, which may exercise substantial discretion as a court of equity, will confirm the Combined Plan and Disclosure Statement. Even if the Court determined that the Combined Plan and Disclosure Statement and the balloting procedures and results were appropriate, the Court could still decline to confirm the Combined Plan and Disclosure Statement if it finds that any of the statutory requirements for confirmation had not been met. As is described in greater detail in Section 6.3, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan. While, as more fully set forth Section 6, the Debtor believes that the Combined Plan and Disclosure Statement complies with or will comply with all such requirements, there can be no guarantee that the Court will agree.

Moreover, there can be no assurance that modifications to the Combined Plan and Disclosure Statement will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes. If the Combined Plan and Disclosure Statement is not confirmed, it is unclear what distributions holders of Claims ultimately would receive with respect to their Claims in a subsequent plan of liquidation. If an alternative could not be agreed to, it is possible that the Debtor would have to liquidate its remaining assets in chapter 7, in which case it is likely that the holders of Allowed Claims would receive substantially less favorable treatment than they would receive under the Combined Plan and Disclosure Statement.

7.4 Distributions to Holders of Allowed Claims Under the Combined Plan and Disclosure Statement May be Inconsistent with Projections.

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution. There can be no assurance that the

estimated Claim amounts set forth in the Combined Plan and Disclosure Statement are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtor's estimates. If the total amount of Allowed Claims in a Class is higher than the Debtor's estimates, or the funds available for distribution to such Class are lower than the Debtor's estimates, the percentage recovery to holders of Allowed Claims in such Class will be less than projected.

### 7.5 Objections to Classification of Claims.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. As is described in greater detail in Section 6.4, the Debtor believes that the classification of Claims and Interests under the Combined Plan and Disclosure Statement complies with the requirements set forth in the Bankruptcy Code. Nevertheless, there can be no assurance the Court will reach the same conclusion.

To the extent that the Court finds that a different classification is required for the Combined Plan and Disclosure Statement to be confirmed, the Debtor would seek to (i) modify the Combined Plan and Disclosure Statement to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such holder was initially a member, or any other Class under the Combined Plan and Disclosure Statement, by changing the composition of such Class and the vote required for approval of the Combined Plan and Disclosure Statement. There can be no assurance that the Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Combined Plan and Disclosure Statement based upon such reclassification. Except to the extent that modification of classification in the Combined Plan and Disclosure Statement requires re-solicitation, the Debtor will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Court that acceptance of the Combined Plan and Disclosure Statement by any holder of Claims pursuant to this solicitation will constitute a consent to the Combined Plan and Disclosure Statement's treatment of such holder, regardless of the Class as to which such holder is ultimately deemed to be a member. The Debtor believes that under the Bankruptcy Rules, it would be required to resolicit votes for or against the Combined Plan and Disclosure Statement only when a modification adversely affects the treatment of the Claim or Interest of any holder.

The Bankruptcy Code also requires that the Combined Plan and Disclosure Statement provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtor believes that the Combined Plan and Disclosure Statement complies with the requirement of equal treatment. To the extent that the Court finds that the Combined Plan and Disclosure Statement does not satisfy such requirement, the Court could deny confirmation of the Combined Plan and Disclosure Statement. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Combined Plan and Disclosure Statement

and could increase the risk that the Combined Plan and Disclosure Statement will not be consummated.

7.6 Failure to Consummate the Combined Plan and Disclosure Statement.

Although the Debtor believes that the Effective Date will occur and may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

7.7 The Releases May Not Be Approved.

There can be no assurance that the releases, as provided in Section 16.2, will be granted. Failure of the Court to grant such relief may result in a plan that differs from the Combined Plan and Disclosure Statement or the Plan not being confirmed.

7.8 Reductions to Estimated Creditor Recoveries.

The Allowed amount of Claims in any Class could be greater than projected, which, in turn, could cause the amount of distributions to creditors in such Class to be reduced substantially. The amount of cash realized from the monetization of the Debtor's remaining assets could be less than anticipated, which could cause the amount of distributions to creditors to be reduced substantially.

7.9 Certain U.S. Federal Income Tax Consequences.

The following discussion is a summary of certain material U.S. federal income tax consequences of the Combined Plan and Disclosure Statement to certain holders (which solely for purposes of this discussion means the beneficial owner for U.S. federal income tax purposes) of Claims. The following summary does not address the U.S. federal income tax consequences to holders of Claims or Interests not entitled to vote on the Combined Plan and Disclosure Statement. This summary is based on the Internal Revenue Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof and all of which are subject to change or differing interpretations, possibly with retroactive effect. No legal opinions have been requested or obtained from counsel with respect to any of the tax aspects of the Combined Plan and Disclosure Statement and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain holders of Claims in light of their individual circumstances, nor does the discussion deal with tax issues with respect to holders of Claims or Interests subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies; banks or other financial institutions; brokers, dealers, or traders in securities; real estate investment trusts; governmental authorities or agencies; tax-exempt organizations; retirement plans; individual retirement or other tax-deferred accounts; certain expatriates or former long-term residents of the United States; small business investment companies; regulated investment

companies; S corporations, partnerships, or other pass-through entities for U.S. federal income tax purposes and their owners; persons whose functional currency is not the U.S. dollar; persons who use a mark-to-market method of accounting; persons required to report income on an applicable financial statement; persons holding Claims or Interests as part of a straddle, hedge, constructive sale, conversion transaction, or other integrated transaction; and persons who are not U.S. Holders (as defined below)). Furthermore, this discussion assumes that a holder of a Claim holds such claim as a "capital asset" within the meaning of Section 1221 of the Internal Revenue Code (generally property held for investment). This discussion does not address any U.S. federal non-income (including estate or gift), state, local, or foreign taxation, alternative minimum tax, or the Medicare tax on certain net investment income.

If a partnership (or other entity or arrangement classified as a partnership for U.S. federal income tax purposes) is a holder of Claims or Interests, the U.S. federal income tax treatment of a partner in the partnership will generally depend on the status of the partner and the activities of the partnership. A holder of a Claim or Interest that is a partnership and the partners in such partnership should consult their tax advisors with regard to the U.S. federal income tax consequences of the Combined Plan and Disclosure Statement.

"U.S. Holder" is a holder of a Claim that is: (1) an individual citizen or resident of the U.S. for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the U.S. or any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (4) a trust (A) if a court within the U.S. is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person. Non-U.S. Holders should consult their own advisors concerning the tax consequences of the Plan to them.

**THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

7.10 Tax Consequences for U.S. Holders of Certain Claims.

Generally, a holder of a Claim will be treated as disposing of its Claim in a taxable exchange governed by section 1001 of the Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest, a holder of Claim will recognize gain or loss equal to the difference between the "amount realized" (if any) by such holder in exchange for its Claim and such holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a holder's Claim. The tax basis of a holder in a Claim will generally be equal to the holder's cost therefor. To the extent applicable, the character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend

upon the status of the holder, the nature of the Claim in the holder's hands, the purpose and circumstances of its acquisition, the holder's holding period of the Claim, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the holder's hands, any gain or loss realized will generally be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the holder has held such Claim for more than one year. The deductibility of capital losses is subject to limitations.

A creditor who receives consideration in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A creditor who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as interest, regardless of whether such creditor realizes an overall gain or loss as a result of surrendering its Claim. A creditor who previously included in its income accrued but unpaid interest attributable to its Claim should recognize a deductible loss to the extent that such accrued but unpaid interest is not satisfied.

Under the Plan, the holders of certain Claims, including Claims in Classes 4, 5 and 6 will likely receive only a partial distribution of their Allowed Claims. Whether the applicable holder of such Claims will recognize a loss or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the holder and its Claims. Creditors should consult their own tax advisors concerning the proper allocation of consideration received by them under the Plan, as well as the character of any loss claimed by them with respect to accrued but unpaid interest previously included in gross income.

7.11 Information Reporting and Withholding.

In connection with the Combined Plan and Disclosure Statement, the Debtor will comply with all applicable withholding and information reporting requirements imposed by U.S. federal, state, local, and foreign taxing authorities, and all Distributions under the Combined Plan and Disclosure Statement will be subject to those withholding and information reporting requirements. Holders of Claims may be required to provide certain tax information as a condition to receiving Distributions pursuant to the Combined Plan and Disclosure Statement.

In general, information reporting requirements may apply to Distributions pursuant to the Combined Plan and Disclosure Statement. Additionally, under the backup withholding rules, a holder may be subject to backup withholding with respect to Distributions made pursuant to the Combined Plan and Disclosure Statement, unless a U.S. Holder provides the applicable withholding agent with a taxpayer identification number, certified under penalties of perjury, as well as certain other information, or otherwise establish an exemption from backup withholding. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a credit against a U.S. Holder's U.S. federal income tax liability, if any, and may entitle a U.S. Holder to a refund, provided the required information is timely furnished to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders of Claims or Interests are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Combined Plan and Disclosure Statement would be subject to these regulations and require disclosure on the holder's tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT**.

7.12 Releases, Exculpations, and Injunctions.

This Combined Plan and Disclosure Statement contains certain releases, exculpations, and injunction language. Parties are urged to read these provisions carefully to understand how Confirmation and consummation of the Plan will affect any Claim, interest, right, or action with regard to the Debtor and certain third parties.

**THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS AGAINST THE DEBTOR TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW.**

7.13 Alternatives to the Combined Plan and Disclosure Statement.

If the requisite acceptances are not received or the Combined Plan and Disclosure Statement is not confirmed and consummated, the theoretical alternatives to the Combined Plan and Disclosure Statement would be (a) formulation of an alternative chapter 11 plan, (b) conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (c) dismissal of the Chapter 11 Case. The Debtor does not believe that any of these alternatives, even if viable, would afford holders of Claims or Interests a greater recovery than what is provided by the Combined Plan and Disclosure Statement.

If the Combined Plan and Disclosure Statement is not confirmed, then the Debtor or any other party in interest could attempt to formulate a different plan. The additional costs, including, among other amounts, additional professional fees, all of which would constitute Administrative Claims (subject to allowance thereof), however, may be so significant that one or more parties in interest could request that the Chapter 11 Case be converted to chapter 7. At this time, the Debtor do not believe that there are viable alternative plans available to the Debtor.

If the Combined Plan and Disclosure Statement is not confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate and distribute the Debtor's remaining assets in accordance with the priorities established by the Bankruptcy Code. As discussed above and indicated in the Liquidation Analysis, the Debtor believes that the Combined Plan and Disclosure Statement provides a better outcome for holders of Claims than a chapter 7 liquidation would provide.

If the Combined Plan and Disclosure Statement is not confirmed, the Chapter 11 Case also could be dismissed. Among other effects, dismissal would result in the termination of the automatic stay, thus permitting creditors to assert state-law rights and remedies against the Debtor and its assets, likely to the detriment of other creditors. While it is impossible to predict precisely what would happen in the event the Chapter 11 Case is dismissed, it is unlikely that dismissal would result in a ratable distribution of the Debtor's assets among creditors as provided in the Combined Plan and Disclosure Statement. Thus, the vast majority of creditors, including general unsecured creditors, could expect to receive less in the dismissal scenario than they would receive under the Combined Plan and Disclosure Statement.

## SECTION 8
## UNCLASSIFIED CLAIMS

8.1 Unclassified Claims.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims, and Priority Tax Claims have not been classified for purposes of voting or receiving Distributions. Rather, all such Claims are treated separately as unclassified Claims as set forth in this Section, and the holders thereof are not entitled to vote on the Combined Plan and Disclosure Statement.

8.2 Administrative Claims.

(a) Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, each Holder of an Allowed Administrative Claim, other than a Professional Fee Claim, shall receive from Available Cash payable by the Debtor or Post-Effective-Date Debtor, without interest, Cash equal to the Allowed amount of such Claim: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the Holder of such Claim and the Debtor or Post-Effective-Date Debtor, as the case may be; (c) with respect to any Administrative Claims representing obligations incurred in the ordinary course of the Debtor's business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtor's business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), as and when due under applicable law.

(i) Holders of Administrative Claims (including, without limitation, Professionals requesting compensation or reimbursement of such expenses pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code) that do not file such requests by the applicable deadline provided for herein may be subject to objection for untimeliness and may be

prohibited by order of the Bankruptcy Court from asserting such claims against the Debtor, the Post-Effective-Date Debtor, the Estate, or their successors or assigns, or their property. Any objection to Professional Fee Claims shall be filed on or before the objection deadline specified in the application for final compensation or order of the Bankruptcy Court.

(ii) All fees due and payable under 28 U.S.C. § 1930 that have not been paid shall be paid on or before the Effective Date.

(b) Professional Fees.

(i) Professionals requesting compensation or reimbursement of expenses pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code or required to file fee applications by order of the Bankruptcy Court for services rendered prior to the Effective Date must file and serve pursuant to applicable rules and guidelines, an application for final allowance of compensation and reimbursement of expenses **no later than thirty (30) days after the Effective Date**. All such applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court.

(ii) Upon approval of the fee applications by the Bankruptcy Court, the Debtor or Post-Effective-Date Debtor shall pay Professionals all of their respective accrued and Allowed fees and reimbursement of expenses arising prior to the Effective Date, plus reasonable fees for services rendered, and actual and necessary costs incurred, in connection with the filing, service and prosecution of any applications for allowance of Professional Fees pending on the Effective Date or filed and/or served after the Effective Date. Any excess amounts remaining in the Professional Fee Reserve after payment of Allowed Professional Fees shall be distributed to the Holders of Class 2 Claims, and upon payment in full of the Class 2 Claims, in accordance with the Distribution Waterfall and the applicable Subordination Agreements.

(iii) On the Effective Date, the Debtor shall fund, to the extent not already funded, the Professional Fee Reserve in an amount equal to the total estimated amount (based on the applicable professionals' good faith estimates) of accrued and unpaid (a) Professional Fee Claims incurred by a Professional and which have not yet been approved by the Bankruptcy Court; (b) Professional Fee Claims approved by the Bankruptcy Court; and (c) fees, charges and expenses of Paladin on account of its provision of Allen Soong to serve as Chief Restructuring Officer (CRO) of the Debtor, and additional personnel to support the CRO. The Professional Fee Reserve shall be held in trust by Debtor's counsel for the applicable professionals until all allowed fee and expense claims have been paid in full. For the avoidance of doubt, the Professional Fee Reserve does not constitute a cap or limitation upon the obligation to pay Professional Fee Claims pursuant to this Plan.

(c) DIP Facility Claims.

Unless otherwise agreed to by the DIP Lenders, if and to the extent not otherwise fully paid or otherwise satisfied prior to the Effective Date (including, without limitation, from the proceeds of the Sale Transaction), the Allowed DIP Facility Claims will be indefeasibly paid and satisfied in full in Cash by the Debtor or Post-Effective-Date Debtor on the Effective Date in full

satisfaction, settlement, discharge and release of, and in exchange for, such DIP Facility Claims in accordance with any applicable order(s) entered by the Bankruptcy Court, including, without limitation, the DIP Orders and Sale Order. Upon indefeasible payment and satisfaction in full of all Allowed DIP Facility Claims, the DIP Documentation and all Liens and security interests granted to secure the DIP Facility Claims, will be immediately terminated, extinguished and released. Notwithstanding the above, any indemnity provisions contained in the DIP Documentation will survive such termination, release and satisfaction in the manner and to the extent set forth therein.

(d) Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Tax Claim, the Debtor or Post-Effective-Date Debtor shall pay each holder of an Allowed Priority Tax Claim, from Available Cash, the full unpaid amount of such Allowed Priority Tax Claim on the earliest of the following dates: (i) on or as soon as practicable after the Effective Date, (ii) on or as soon as practicable after the date such Allowed Priority Tax Claim becomes an Allowed Claim, and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law.

## SECTION 9
## CLASSIFICATION OF CLAIMS AND INTERESTS

9.1 Summary of Classification.

The provisions of this Section 9 govern Claims against and Interests in the Debtor. Any Class that is vacant will be treated in accordance with Section 9.3.

The following table designates the Classes of Claims against, and Interests in, the Debtor and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept or reject the Combined Plan and Disclosure Statement in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject the Combined Plan and Disclosure Statement. A Claim or portion thereof is classified in a particular Class only to the extent that such Claim or portion thereof qualifies within the description of such Class and is classified in a different Class to the extent that the portion of such Claim qualifies within the description of such different Class.

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | No (presumed to accept) |
| 2 | Prepetition Lenders Secured Claims and Prepetition Lenders Stub Claim | Impaired | Yes |
| 3 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| 4 | Unsecured Claims | Impaired | Yes |
| 5 | 2024 Non-Convertible Notes Claims | Impaired | Yes |

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 6 | 2023 Convertible Notes Claims | Impaired | Yes |
| 7 | Interests | Impaired | No (deemed to reject) |

9.2 Special Provision Governing Unimpaired Claims.

Except as otherwise provided in the Combined Plan and Disclosure Statement, nothing under the Combined Plan and Disclosure Statement shall affect the rights of the Debtor or the Post-Effective-Date Debtor in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

9.3 Vacant and Abstaining Classes.

Any Class of Claims or Interests that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or Interest or a Claim or Interest temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Combined Plan and Disclosure Statement for purposes of voting to accept or reject the Combined Plan and Disclosure Statement and for purposes of determining acceptance or rejection of the Combined Plan and Disclosure Statement by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. If a Class contains Claims or Interests eligible to vote on the Plan and no Holder of Claims or Interests eligible to vote in such Class votes to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

## SECTION 10
## TREATMENT OF CLAIMS AND INTERESTS

10.1 Class 1—Priority Non-Tax Claims.

(a) Classification. Class 1 consists of all Priority Non-Tax Claims.

(b) Treatment. The Debtor or Post-Effective-Date Debtor shall pay, from Available Cash, the Allowed amount of each Priority Non-Tax Claim to each Entity holding a Priority Non-Tax Claim as soon as practicable following the later of: (a) the Effective Date and (b) the date such Priority Non-Tax Claim becomes an Allowed Claim (or as otherwise permitted by law). The Debtor or Post-Effective-Date Debtor shall pay each Entity holding a Priority Non-Tax Claim in Cash in full in respect of such Allowed Claim without interest from the Petition Date; *provided however*, that such Entity may be treated on such less favorable terms as may be agreed to in writing by such Entity.

(c) Impairment and Voting. Class 1 is Unimpaired. Holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code and, accordingly, are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

10.2 Class 2—Prepetition Lenders Secured Claims and Prepetition Lenders Stub Claim.

(a) Classification. Class 2 consists of Prepetition Lenders Secured Claims and Prepetition Lenders Stub Claim against the Debtor.

(b) Treatment.

(i) ***If there is a Stalking Horse Sale Transaction***, (a) the Class 2 Claims, other than the Prepetition Lenders Stub Claim, shall be fully satisfied through Perceptive's credit bid and (b) (i) for the portion of the Prepetition Lenders Stub Claim that is a Secured Claim, the Prepetition Lenders Stub Claim shall receive the proceeds of any Collateral and any Sale-Excluded Cash remaining after Distributions made to Administrative Claims (including the funding of the Professional Fee Reserve), Priority Tax Claims, Priority Non-Tax Claims, and payment of Wind-Down Expenses and (ii) for the portion of the Prepetition Lenders Stub Claim that is the Prepetition Lenders Deficiency Claim, the Prepetition Lenders Stub Claim shall receive a Pro Rata share of Available Cash in accordance with the Distribution Waterfall and the applicable Subordination Agreements; ***provided that*** if Class 4 votes to accept the Plan, the Holders of Class 2 Claims shall (x) allow the Debtor or Post-Effective Date Debtor to access and pay the GUC Fund to the Holders of Allowed Class 4 Claims, (y) turn over and contribute to the Holders of Allowed Class 4 Claims any amounts to which the Holders of the Prepetition Lenders Stub Claim may be entitled from the Debtor, and (z) not participate in any Distributions to Class 4 Unsecured Claims; ***OR***

(ii) ***If there is an Overbidder Sale Transaction***, the Holders of Class 2 Claims shall receive, in full and final satisfaction of the Class 2 Prepetition Lenders Secured Claims, cash from the proceeds of such transaction in an amount equal to the Class 2 Prepetition Lenders Secured Claims; ***provided that*** if Class 4 votes to accept the Plan, the Holders of Class 2 Claims shall allow the Debtor or Post-Effective Date Debtor to access and pay the GUC Fund to the Holders of Allowed Class 4 Claims.

(c) Impairment and Voting. Class 2 is Impaired, and the Holders thereof are entitled to vote on the Plan.

10.3 Class 3—Other Secured Claims.

(a) Classification. Class 3 consists of all Other Secured Claims against the Debtor. For purposes of distributions under the Plan, each Holder of an Other Secured Claim in Class 3 is considered to be in its own separate subclass within Class 3 (*i.e.*, Class 3A, Class 3B, etc.), and each such subclass is deemed to be a separate Class for purposes of the Plan.

(b) Treatment. Except to the extent previously paid in full, to the extent any Other Secured Claims exist, at the option of the Debtor or Post-Effective-Date Debtor, one of the following treatments shall be provided: (i) the Holder of such Claim shall retain its Lien on its Collateral until such Collateral is sold, and the proceeds of such sale, less costs and expenses of disposing of such Collateral, shall be paid to such Holder in full satisfaction and release of such

Allowed Other Secured Claim, subject to the applicable priorities of such Lien; (ii) on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, or as otherwise agreed between the Holder of such Claim and the Debtor or Post-Effective-Date Debtor, the Holder of such Other Secured Claim will receive a Cash payment equal to the amount of its Allowed Other Secured Claim in full satisfaction and release of such Other Secured Claim; or (iii) the Collateral securing the Creditor's Other Secured Claim shall be abandoned to such Creditor, in full satisfaction and release of such Other Secured Claim.

(c) Impairment and Voting. Class 3 is Unimpaired. Holders of Other Secured Claims are conclusively presumed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code and, accordingly, are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

10.4 Class 4—Unsecured Claims.

(a) Classification. Class 4 consists of all Unsecured Claims. Class 4 excludes the Prepetition Lenders Stub Claim, the 2024 Non-Convertible Notes Claims, and the 2023 Convertible Notes Claims.

(b) Treatment.

***(i) If Class 4 votes to accept the Plan***, Holders of Allowed Class 4 Claims shall receive, in exchange for their Allowed Class 4 Claims, a Pro Rata share of (i) the GUC Fund and (ii) the Available Cash in accordance with the Distribution Waterfall; ***provided, however***, in the event of a Stalking Horse Sale Transaction, any Distributions to otherwise be made pursuant to the Plan to the Holders of the Prepetition Lenders Deficiency Claim shall be deemed turned over and contributed as Distributions to Holders of Allowed Class 4 Claims; ***OR***

***(ii) If Class 4 votes to reject the Plan***, Holders of Allowed Class 4 Claims shall receive on account of such Allowed Class 4 Claims, with the Prepetition Lenders Deficiency Claim, a Pro Rata share of the Available Cash in accordance with the Distribution Waterfall.

Unsecured Claims are subject to all statutory, equitable, and contractual subordination claims, rights, and grounds available to the Debtor and Estate, which subordination claims, rights, and grounds are fully enforceable prior to, on, and after the Effective Date.

(c) Impairment and Voting. Class 4 is Impaired, and the Holders thereof are entitled to vote on the Plan. The Prepetition Lenders' votes, if any, on account of any Class 4 Claims will not be counted in determining whether Class 4 has voted to accept or reject the Plan.

10.5 Class 5— 2024 Non-Convertible Notes Claims.

(a) Classification. Class 5 consists of the 2024 Non-Convertible Notes Claims. The 2024 Non-Convertible Notes are subordinated to the obligations owed by the Debtor to the Prepetition Lenders pursuant to the terms of the Subordination Agreements, including with respect

to the subordination of their claims until full payment and discharge of the Prepetition Lenders Secured Claims and the Prepetition Lenders Stub Claim (subject to all applicable terms and conditions set forth in the Subordination Agreements). All of the Debtor's rights to dispute and challenge the amount, priority, status and/or nature of the 2024 Non-Convertible Notes are expressly reserved.

(b) Treatment. Holders of Allowed Class 5 Claims shall be entitled to receive a Pro Rata share of the Available Cash in accordance with the Distribution Waterfall and the applicable Subordination Agreements in exchange for their Allowed Class 5 Claims; provided, that in accordance with the applicable Subordination Agreements, any Distributions that would be made to Holders of Allowed Class 5 Claims in the absence of the Subordination Agreements shall instead be paid to Holders of Allowed Class 2 Claims until Class 2 Claims are paid in full. All of the Debtor's rights to dispute and challenge the amount, priority, status and/or nature of the 2024 Non-Convertible Notes and the 2024 Non-Convertible Notes Claims are expressly reserved. In light of the terms of the Subordination Agreements, no Distributions are expected to the Holders of Class 5 under the Plan.

(c) Impairment and Voting. Class 5 is Impaired, and the Holders thereof are entitled to vote on the Plan.

10.6 Class 6— 2023 Convertible Notes Claims.

(d) Classification. Class 6 consists of the 2023 Convertible Notes Claims. The Holders of the 2023 Convertible Notes are subject to the terms of the Subordination Agreements, including with respect to the subordination of their claims until full payment and discharge of the Prepetition Lenders Secured Claims, the Prepetition Lenders Stub Claim, and the 2024 Non-Convertible Notes (subject to all applicable terms and conditions set forth in the Subordination Agreements). All of the Debtor's rights to dispute and challenge the amount, priority, status and/or nature of the 2023 Non-Convertible Notes Claims are expressly reserved.

(e) Treatment. Holders of Allowed Class 6 Claims shall be entitled to receive a Pro Rata share of the Available Cash in accordance with the Distribution Waterfall and the applicable Subordination Agreements in exchange for their Allowed Class 6 Claims; provided, that in accordance with the applicable Subordination Agreements, any Distributions that would be made to Holders of Allowed Class 6 Claims in the absence of the Subordination Agreements shall instead be paid (i) to Holders of Class 2 Claims until Class 2 Claims are paid in full, and then (ii) to Holders of Class 5 Claims until Class 5 Claims are paid in full. All of the Debtor's rights to dispute and challenge the amount, priority, status and/or nature of the 2023 Convertible Notes and the 2023 Convertible Notes Claims are expressly reserved. In light of the terms of the Subordination Agreements, no Distributions are expected to the Holders of Class 6 under the Plan.

(f) Impairment and Voting. Class 6 is Impaired, and the Holders thereof are entitled to vote on the Plan.

10.7 Class 7—Interests.

(a) Classification. Class 7 consists of all Interests in the Debtor.

(b) Treatment. Class 7 Interests shall be entitled to receive their Pro Rata share of any Available Cash, if any, after the payment in full of all Allowed Claims. The Debtor does not believe there will be any such Available Cash after the implementation of the Plan and the payment in full of all Allowed Claims, including all Allowed Administrative Expense Claims, DIP Facility Claims, Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims (as applicable subject to Section 10.3(b) hereof), Prepetition Lenders Secured Claims (to the extent set forth in the Subordination Agreements), the Unsecured Claims, the 2024 Non-Convertible Notes Claims (to the extent set forth in the Subordination Agreements), the 2023 Convertible Notes Claims (to the extent set forth in in the Subordination Agreements), and the post-Effective Date fees and expenses of the Post-Effective Date Debtor in accordance with the Plan. All Interests will be deemed cancelled and will cease to exist as of the Effective Date.

(c) Impairment and Voting. Holders of Interests in Class 7 are deemed to have rejected the Plan, and are not entitled to vote.

## SECTION 11
## DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS

11.1 Distribution Dates.

The Post-Effective-Date Debtor shall make Distributions to Holders of Claims and, if applicable, Interests. Subject to the terms of the Plan, the Post-Effective-Date Debtor may, in its sole discretion, make a full or partial Pro Rata Distribution to the Holders of Claims and Interests on the Initial Distribution Date or a Subsequent Distribution Date.

11.2 Subsequent Distributions.

Any Distribution not made on the Initial Distribution Date or a Subsequent Distribution Date because the Claim relating to such Distribution had not been Allowed on that Distribution Date shall be held by the Post-Effective-Date Debtor for Distribution on any Subsequent Distribution Date after such Claim is Allowed. No interest shall accrue or be paid on the unpaid amount of any Distribution.

11.3 Distribution Record Date.

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date will be treated as the Holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Distribution Record Date. The Post-Effective-Date Debtor shall have no obligation to recognize any transfer of any Claim occurring after the Distribution Record Date. In making any Distribution with respect to any Claim, the Post-Effective-Date Debtor shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of claim filed with respect thereto or on the Schedules as the Holder thereof as of the close of business on the Distribution Record Date and upon such other evidence or record of transfer or assignment that is known to the Post-Effective-Date Debtor as of the Distribution Record Date.

11.4 Manner of Cash Payments Under the Plan.

Cash payments made pursuant to the Plan shall be in United States dollars by checks drawn on a domestic bank selected by the Post-Effective-Date Debtor or by wire transfer from a domestic bank, at the option of the Post-Effective-Date Debtor. Any and all Distributions and/or written communications pertaining to Distributions shall be made to Creditors and Holders of Interests at each Creditor's or Interest Holder's respective address listed in the Claims Register, as reported pursuant Section 12.7, unless the Post-Effective-Date Debtor receives a written change of address form from a Creditor or Interest Holder consistent with the terms of the Plam.

11.5 Time Bar to Cash Payments by Check.

Distribution checks issued to Holders of Allowed Claims and Interests, as applicable, shall be null and void if not negotiated within **ninety (90) days** after the date of issuance thereof. The Post-Effective-Date Debtor shall not reissue any check except upon directly receiving a request in writing from the Holder of Allowed Claim Interest that was originally issued such check within **one-hundred and eighty (180) days** of the disbursement of the Distribution. If the 180-day period elapses without the Creditor requesting the check be reissued, the unresponsive Holder's Distribution shall be deemed unclaimed property as provided in the Plan. The foregoing notwithstanding, **ninety (90) days** after the final Distribution under section 1194 of the Bankruptcy Code, the Post-Effective-Date Debtor shall stop payment on any check remaining unpaid, the corresponding Distribution shall be deemed unclaimed property, and all unclaimed property shall be redistributed to Holders of Allowed Claims and Interests.

11.6 Tax Identification Numbers.

The Post-Effective-Date Debtor may require any Holder of a Claim or Interest to furnish its taxpayer identification number as assigned by the Internal Revenue Service by submitting a Form W-8, Form W-9, or other form completed in writing to the Post-Effective-Date Debtor and may condition any Distribution to any Holder of a Claim or Interest upon receipt of such completed form. If a Holder of a Claim or Interest does not timely provide the Post-Effective-Date Debtor with its taxpayer identification number in the manner and by the deadline established by the Post-Effective-Date Debtor —to be not less than **forty-five (45) days** from the service of the request to the Holder of the Claim or Interest for its tax identification information—then the Post-Effective-Date Debtor may set aside the Holder's Distribution for a period of **one-hundred-and-eighty (180) days** following service of the request. If the Holder provides the information in the manner requested in the 180-day period, the Post-Effective-Date Debtor shall disburse the set aside Distribution, without interest, to the Holder. However, if the Holder fails to provide the requested information within the 180-day period, then the unresponsive Holder's Distribution shall be irreversibly deemed "unclaimed property" and redistributed to the other Holders of Allowed Claims and Interests, as applicable, in accordance with the Plan.

## SECTION 12
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND REDISTRIBUTIONS

12.1 No Distributions Pending Allowance.

Notwithstanding any other provision of the Plan, the Post-Effective-Date Debtor shall not distribute any Cash or other property on account of any Disputed Claim unless and until such Claim becomes Allowed. Nothing contained herein, however, shall be construed to prohibit or require payment or Distribution on account of any undisputed portion of a Claim.

12.2 Authority to Object to and Resolve Disputed Claims and Interests.

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, subject to the Plan, the Post-Effective-Date Debtor shall have the right to make, file, prosecute, settle, withdraw, or resolve objections to Claims and Interests. The costs of pursuing the objections to Claims and/or Interests shall be borne by the Post-Effective-Date Debtor. From and after the Effective Date, all objections with respect to Disputed Claims and/or Interests shall be litigated to a Final Order except to the extent, the Post-Effective-Date Debtor elects to withdraw any such objection, or the Post-Effective-Date Debtor and the Holder of the Claim or Interest elect to compromise, settle, or otherwise resolve any such objection, in which event they may settle, compromise, or otherwise resolve any Disputed Claim or Disputed Interest without approval of the Bankruptcy Court.

12.3 Objection Deadline.

All objections to Claims and Interests shall be filed and served upon the applicable Holder of the Claim or Interest no later than the Claims Objection Deadline, as such may be extended by order of the Bankruptcy Court.

12.4 Estimation of Claims.

At any time, (a) prior to the Effective Date, the Debtor, and (b) after the Effective Date, the Post-Effective-Date Debtor may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by Section 502(c) of the Bankruptcy Code regardless of whether the Debtor or the Post-Effective-Date Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during Litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the Claim, the Debtor or the Post-Effective-Date Debtor, as applicable, may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdraw, or resolved by any mechanism of the Bankruptcy Court.

12.5 Disallowance of Claims.

Except as otherwise agreed or ordered by the Bankruptcy Court, any and all proofs of claim filed after the Bar Date shall be treated as a Disputed Claim for purposes of Distribution without any further notice or action, and Holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Confirmation Date the Bankruptcy Court has entered an order deeming such Claim to be timely filed.

On the Confirmation Date, any Claim that is scheduled by the Debtor in the Schedules as disputed or listed at zero and as to which no Proof of Claim has been timely filed (or deemed timely filed by Final Order entered by the Bankruptcy Court) shall be deemed a Disallowed Claim.

Any Claims held by Entities from which property is recoverable under Sections 542, 543, 550, or 553 of the Bankruptcy Code or Entities that are transferees of transfers avoidable under Section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, provided that such Cause of Action is retained by the Post-Effective-Date Debtor shall be deemed disallowed pursuant to Section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action the Debtor hold or may hold against any Entity have been resolved or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Estate by that Entity have been turned over or paid to the Debtor or the Post-Effective-Date Debtor.

12.6 Reserve Provisions for Disputed Claims.

Before making any Distribution, the Post-Effective-Date Debtor shall reserve Cash required for distribution on Disputed Claims as if such Claims were Allowed as filed with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the Post-Effective-Date Debtor (the "Disputed Claim Reserve"). On each Distribution date after the Effective Date in which the Post-Effective-Date Debtor makes Distributions to Holders of Allowed Claims and/or Interests, the Post-Effective-Date Debtor shall retain on account of Disputed Claims an amount the Post-Effective-Date Debtor estimates is necessary to fund the Pro Rata share of such Distributions to Holders of Disputed Claims if such Claims were Allowed, with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the Post-Effective-Date Debtor.

The Post-Effective-Date Debtor shall hold property in the Disputed Claim Reserve in trust for the benefit of the Holders of Disputed Claims and/or Interests that are ultimately determined to be Allowed. Each Disputed Claim Reserve shall be closed and extinguished by the Post-Effective-Date Debtor when all Distributions and other dispositions of Cash of other property required to be made hereunder will have been made in accordance with the terms of the Plan. Upon closure of a Disputed Claim Reserve, all Cash or other property held in that Disputed Claim Reserve shall revest in and become unrestricted property of the Post-Effective-Date Debtor. All funds or other property that vest or revest in the Post-Effective-Date Debtor pursuant to this paragraph shall be used to pay by the Post-Effective-Date Debtor in accordance with the Plan.

Except as expressly set forth in the Plan, neither the Debtor nor the Post-Effective-Date Debtor shall have any duty to fund any Disputed Claim Reserve except from the Remaining Assets.

12.7 *De minimis* Distributions, Rounding.

Notwithstanding anything herein to the contrary, the Post-Effective-Date Debtor shall not be required to make: (i) partial Distributions or payments of fractions of dollars or (ii) a Distribution if the amount to be distributed is or has an economic value of less than one hundred fifty dollars ($150). Any funds so withheld and not distributed shall be held in reserve and distributed in subsequent Distributions.

12.8 Unclaimed and Undeliverable Distributions.

If any Distribution to a Holder of a Claim or Interest is returned to the Post-Effective-Date Debtor as undeliverable or is unclaimed, no further Distributions to such Holder shall be made unless and until the Holder claims the missed Distribution by timely notifying the Post-Effective-Date Debtor in writing of its current address along with any other information necessary to make the Distribution to the Holder in accordance with the Plan and applicable law. If the Holder provides the Post-Effective-Date Debtor with its current address and such other information necessary to make the Distribution within **one-hundred and eighty (180) days** of the original disbursement, the missed Distribution shall be made to the Holder as soon as is reasonably practicable, without interest. However, if any Distribution that is undeliverable or otherwise unclaimed is not claimed within **one-hundred-and-eighty (180) days** of the original disbursement, such Distribution shall be deemed "unclaimed property" under Bankruptcy Code section 347(b) and forfeited, and the forfeiter shall consequentially lose his status as a Holder of a Claim or Interest, as applicable. After the 180-day period to claim property has elapsed, the unclaimed property or interests in property shall revert to the Post-Effective-Date Debtor for redistribution to Holders of Claims and/or Interests or other disposition in accordance with the terms of the Plan; the Claim to such unclaimed property or interest in property shall be forever barred, expunged, and deemed Disallowed; and the Holder of said Claim or Interest deemed Disallowed shall be enjoined from receiving any Distributions under this Agreement and from asserting such Disallowed Claim against the Post-Effective-Date Debtor.

The Post-Effective-Date Debtor may, in its sole discretion, attempt to determine the current address of a Holder of a Claim or Interest or otherwise locate such Holder, but nothing in the Plan shall require the Post-Effective-Date Debtor to do so.

12.9 Books and Records.

The Post-Effective-Date Debtor shall retain the Debtor's books and records as of the Effective Date and/or copies thereof, subject to any appropriate restrictions on privileged matters, regardless of original form, manner or media.

## SECTION 13
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

13.1 Rejection.

Except with respect to: (i) executory contracts or unexpired leases that were previously assumed or rejected by order of the Bankruptcy Court, and (ii) executory contracts or unexpired

leases that are the subject of a pending motion to assume or reject, pursuant to Section 365 of the Bankruptcy Code, on the Effective Date, each executory contract and unexpired lease entered into by the Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to Section 365 of the Bankruptcy Code; *provided however,* that nothing in this Section shall cause the rejection, breach, or termination of any contract of insurance benefiting the Debtor and the Estate, the Debtor's officers, managers and directors and/or the Post-Effective-Date Debtor. Nothing in this Section shall be construed as an acknowledgement that a particular contract or agreement is executory or is properly characterized as a lease. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to Section 365 of the Bankruptcy Code, as of the Effective Date. The non-Debtor parties to any rejected personal property leases shall be responsible for taking all steps necessary to retrieve the personal property that is the subject of such executory contracts and leases, and neither the Debtor nor the Post-Effective-Date Debtor shall bear any liability for costs associated with such matters.

13.2 Rejection Claims.

All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases pursuant to Confirmation of the Plan, if any, must be filed with the Claims Agent within thirty (30) days after the earlier of the Effective Date or an order of the Bankruptcy Court approving such rejection. Any Claim arising from the rejection of an executory contract or unexpired lease pursuant to Confirmation of the Plan that is not filed within such times will be subject to objection. All such Claims for which Proofs of Claim are timely and properly filed and ultimately Allowed will be treated as Unsecured Claims.

13.3 Insurance Policies.

Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair or otherwise modify any obligations of the non-Debtor parties to the Insurance Policies. To the extent one or more of the Insurance Policies provide potential coverage related to one or more Causes of Action the Debtor holds or may hold against any Entity, the Debtor shall, to the extent permissible under each Insurance Policy, assign all rights thereunder with respect to such Causes of Action to the Post-Effective-Date Debtor. All net proceeds (including, for the avoidance of doubt, net of any deductibles or retentions) of Insurance Policies received by the Post-Effective-Date Debtor shall be treated as proceeds of such Causes of Action for all purposes under the Plan.

## SECTION 14
## MEANS FOR IMPLEMENTATION OF THE PLAN

14.1 [Reserved].

14.2 Continued Existence of the Post-Effective-Date Debtor.

On and after the Effective Date, subject to the requirements of the Plan, the Debtor will continue to exist as the Post-Effective-Date Debtor and shall retain all of the powers of the applicable corporate entities under applicable non-bankruptcy law, and without prejudice to any right to amend its organizational documents, dissolve, merge or convert into another form of

business entity, or to alter or terminate its existence. On the Effective Date, the employment, retention, appointment and authority of all managers, officers, directors, and employees of the Debtor shall be deemed to terminate. The Post-Effective-Date Debtor Representative shall be deemed to have been admitted as the sole director, officer or manager (as applicable) of the Post-Effective-Date Debtor under applicable non-bankruptcy law and shall be authorized to exercise all of the rights and powers of a sole director, officer or manager (as applicable) of the Post-Effective-Date Debtor as provided by the Plan.

On and after the Effective Date, all Sale-Excluded Cash shall vest in the Post-Effective-Date Debtor free and clear of all Claims, Liens, charges, other encumbrances and Interests, except as expressly provided otherwise in the Plan. Neither the occurrence of the Effective Date, nor the effectiveness of this Plan, nor any provision of applicable non-bankruptcy law shall cause a dissolution of the Debtor or Post-Effective-Date Debtor, which shall continue under the control of the Post-Effective-Date Debtor Representative following the Effective Date subject to the terms of the Plan.

14.3 Corporate Action by Debtor.

On the Effective Date, the matters under the Plan involving or requiring any corporate actions of the Debtor, including but not limited to actions requiring a vote or other approval of the board of directors, managers, members, partners, or other equity holders of the Debtor or the execution of any documentation incident to or in furtherance of the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the managers, members, directors, or officers of the Debtor.

Without limiting the generality of the foregoing, on the Effective Date and automatically and without further action, (i) the Post-Effective-Date Debtor Representative shall be deemed the sole manager, director, officer and representative (as applicable) of the Debtor to exercise the rights, powers, and authority of the Debtor under applicable provisions of this Plan and bankruptcy and non-bankruptcy law, and (ii) all matters provided under this Plan shall be deemed to be authorized and approved without further approval from the Bankruptcy Court. The Confirmation Order shall act as an order modifying the Debtor's organizational documents and operating agreements such that the provisions of this Plan can be effectuated. All corporate governance activities of the Post-Effective-Date Debtor shall be exercised by the Post-Effective-Date Debtor Representative in his or her discretion, subject to the terms of this Plan.

On and after the Effective Date, the Post-Effective-Date Debtor Representative may, in the name of the Debtor or Post-Effective-Date Debtor, take any and all appropriate actions consistent with the Plan without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Post-Effective-Date Debtor Representative may pay all reasonable fees, costs, and expenses of the Post-Effective-Date Debtor (including, without limitation, the compensation for the Post-Effective-Date Debtor Representative and the fees and expenses of the professionals retained by the Post-Effective-Date Debtor Representative) without further notice to Creditors or Holders of Interests or approval of the Bankruptcy Court. All fees and expenses incurred by the professionals retained by the Post-

Effective-Date Debtor, as well as the compensation for the Post-Effective-Date Debtor Representative, following the Effective Date shall be paid by the Post-Effective-Date Debtor Representative from Available Cash. In the event that the Post-Effective-Date Debtor Representative resigns or is unable to fulfill his or her duties under the Plan, a replacement will be appointed by the Bankruptcy Court upon motion by any party in interest.

Without limiting the foregoing, the Post-Effective-Date Debtor Representative will have the right to, among other things, (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the applicable provisions of the Plan; (2) make all Distributions to Creditors in accordance with the Plan; (3) administer the Post-Effective-Date Debtor in accordance with the Plan; (4) establish and administer any necessary reserves for Disputed Claims that may be required; (5) object to the Disputed Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such objections; (6) employ and compensate professionals and other agents, including, without limitation, existing Professionals employed by the Debtor; and (7) take all other actions to wind down the business, operations and affairs of the Debtor and Post-Effective-Date Debtor, including, without limitation, the filing of any requisite tax returns and post-confirmation filings with the Bankruptcy Court relating to the Post-Effective-Date Debtor.

From and after the Effective Date, (i) the Debtor, for all purposes, shall be deemed to have withdrawn its business operations from any states in which it was previously conducting or is registered or licensed to conduct business operations, and the Debtor shall not be required to file any document, pay any sum or take any other action, in order to effectuate such withdrawal, and (ii) the Debtor shall not be liable in any manner to any taxing authority for franchise, business, license or similar taxes accruing on or after the Effective Date.

14.4 Vesting of Remaining Assets in the Post-Effective-Date Debtor.

Upon the Effective Date, title to all Remaining Assets shall vest automatically in the Post-Effective-Date Debtor and shall be retained and administered by the Post-Effective-Date Debtor for the purposes contemplated under the Plan. The Plan shall be considered a motion pursuant to Sections 105, 363 and 365 of the Bankruptcy Code for such relief.

14.5 Appointment of the Post-Effective-Date Debtor Representative.

The identity of the Post-Effective-Date Debtor Representative, who shall be selected by the Debtor subject to the reasonable consent of the Prepetition Lenders, will be disclosed in the Plan Supplement. From and after the Effective Date, professionals may be retained by the Post-Effective-Date Debtor consistent with the Plan, without further need for documentation or Bankruptcy Court approval. All fees and expenses incurred by the professionals retained by the Post-Effective-Date Debtor following the Effective Date shall be paid by the Post-Effective-Date Debtor Representative from the net proceeds of the Remaining Assets in accordance with the Plan.

14.6 Rights and Powers of the Post-Effective-Date Representative.

The Post-Effective-Date Debtor Representative shall be deemed the Estate's representative with respect to the Remaining Assets in accordance with Section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth herein. Without limiting the foregoing, the Post-

Effective-Date Debtor will have the right to, among other things, (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the applicable provisions of the Plan; (2) liquidate the Remaining Assets, including the prosecution, pursuit or other disposition of the Estate-Retained Causes of Action in the Post-Effective-Date Debtor's discretion; (3) make all Distributions to Holders of Claims and/or Interests in accordance with the Plan; (4) establish and administer any necessary reserves for Disputed Claims and/or Interests that may be required; (6) object to Disputed Claims and/or Interests and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such objections; (7) assert or waive any attorney-client privilege on behalf of the Debtor and Estate; and (8) employ and compensate professionals and other agents, including, without limitation, Professionals previously employed by the Debtor, in accordance with the Plan.

Any abatement, interruption, or tolling of the statutes of limitation pertaining to the Remaining Assets in favor of the Debtor or the Estate shall also apply to the benefit of the Post-Effective-Date Debtor.

14.7 Source of Cash; Payment of Post-Effective-Date Debtor Expenses.

Sale-Excluded Cash and the net proceeds of any other Remaining Assets shall be used by the Debtor and Post-Effective-Date Debtor to fund distributions to Holders of Allowed Claims and/or Interests, as applicable, and other payments to be made pursuant to or otherwise consistent with the Plan in connection with the wind-down of the Post-Effective-Date Debtor and Estate.

14.8 Litigation.

Except as otherwise provided herein and except as to Causes of Action assigned to third parties prior to the Effective Date, all Litigation is retained and preserved pursuant to Section 1123(b) of the Bankruptcy Code. From and after the Effective Date, all Litigation will be prosecuted or settled by the Post-Effective-Date Debtor in accordance with the terms of the Plan. To the extent any Litigation is already pending on the Effective Date, the Post-Effective-Date Debtor will continue the prosecution of any such Litigation and shall be substituted as plaintiff, defendant, or in any other capacity for the Debtor pursuant to the Plan and the Confirmation Order on the Effective Date, without need for any further motion practice or notice in any case, action, or matter.

## SECTION 15
## EFFECT OF CONFIRMATION

15.1 Binding Effect of the Plan.

The provisions of the confirmed Plan shall bind the Debtor, the Post-Effective-Date Debtor, any Entity acquiring property under the Plan, and any Creditor or Interest Holder, whether or not such Creditor or Interest Holder has filed a Proof of Claim or Interest in the Chapter 11 Case, whether or not the Claim of such Creditor or the Interest of such Interest Holder is impaired under the Plan, and whether or not such Creditor or Interest Holder has accepted or rejected the Plan. All Claims and Debts shall be fixed and adjusted pursuant to the Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, or Governmental Unit or parish in which any instrument related to under the Plan or related to any

transaction contemplated under the Plan is to be recorded with respect to any taxes of the kind specified in Bankruptcy Code Section 1146(a).

15.2 Property Free and Clear.

Except as otherwise provided in the Plan or the Confirmation Order, all property that shall vest in the Post-Effective-Date Debtor shall be free and clear of all Claims, Interests, Liens, charges, or other encumbrances of Creditors or Interest Holders, other than as set forth herein, in the Plan, and in relevant documents, agreements, and instruments contained in the Plan Supplement. Following the Effective Date, the Post-Effective-Date Debtor may transfer and dispose of any such property free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Rules and without further approval of the Bankruptcy Court or notice to Creditors, except as may otherwise be required under the Plan or the Confirmation Order.

## SECTION 16
## EXCULPATIONS, INJUNCTIONS, AND RELEASES

16.1 Exculpation.

The (i) Debtor, (ii) the Debtor's directors, officers, managers, and employees that served during the Chapter 11 Case, and (iii) each of their respective professionals and advisors retained during the Chapter 11 Case, each solely in their capacities as such (collectively, the "Exculpated Parties"), will neither have nor incur any liability to any entity for any action in good faith taken or omitted to be taken between the Petition Date and Effective Date in connection with or related to the Chapter 11 Case, the sale or other disposition of the Debtor's assets or the formulation, preparation, dissemination, implementation, Confirmation, or Consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan; *provided however*, that this limitation will not affect or modify the obligations created under the Plan, or the rights of any Holder of an Allowed Claim to enforce its rights under the Plan, and shall not release any action (or inaction) constituting willful misconduct, fraud, or gross negligence (in each case subject to determination of such by final order of a court of competent jurisdiction); *provided however,* that any Exculpated Party shall be entitled to rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan, and such reliance shall form a defense to any such claim, Cause of Action, or liability. Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections of Section 1125(e) of the Bankruptcy Code. For the avoidance of doubt, Paladin, together with the personnel provided by it to furnish services to the Debtor during the Chapter 11 Case, including Allen Soong, the Debtor's CRO, and the personnel of Paladin assisting the CRO, are Exculpated Parties.

16.2 Releases.

(a) Debtor/Estate Release of Released Parties.

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after and subject to the occurrence of the Effective Date, the Debtor, the Post-Effective-Date Debtor, and the Estate (collectively, the "Debtor/Estate Releasors") shall release (the "Debtor/Estate Release") each Released Party, and each Released Party is deemed released by the**

**Debtor/Estate Releasors from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtor/Estate Releasors, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor/Estate Releasors would have been legally entitled to assert in its own right, or on behalf of the Holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's liquidation, the Chapter 11 Case, the purchase, sale, transfer of any security, asset, right, or interest of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiation, formulation, or preparation of the Plan or related agreements, instruments, or other documents, any other act or omission, transaction, agreement, event, or other occurrence taking place relating to the Debtor on and before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct, or gross negligence; *provided however*, the foregoing Debtor/Estate Release shall not operate to waive or release any obligations of any party under the Plan or any other document, instrument, or agreement executed to implement the Plan; and further provided that nothing herein shall act as a discharge of the Debtor.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor/Estate Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor/Estate Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) in the best interests of the Debtor and all Holders of Claims and Interests; (c) fair, equitable, and reasonable; (d) given and made after due notice and opportunity for hearing; and (e) a bar to any of the Debtor/Estate Releasors asserting any Claim or Cause of Action released pursuant to the Debtor/Estate Release.**

(b) Third Party Release.

**On and after and subject to the occurrence of the Effective Date, except as otherwise provided in the Plan, each Claimant (collectively, the "<u>Releasing Parties</u>") who affirmatively votes to accept the Plan and who does not elect to "opt-out" by marking the appropriate box on such Releasing Party's respective Ballot, for themselves and their respective successors, assigns, transferees, and such Claimants' officers and directors, agents, members, financial and other advisors, attorneys, employees, partners, affiliates, and representatives (in each case in their capacity as such), shall release (the "<u>Third Party Release</u>") each Released Party, and each of the Released Parties is deemed released from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of any of the Debtor or the Estate, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or**

**hereinafter arising, in law, equity, or otherwise, that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's liquidation, the Chapter 11 Case, the purchase, sale, transfer of any security, asset, right, or interest of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Releasing Party and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiation, formulation, or preparation of the Plan or related agreements, instruments, or other documents, any other act or omission, transaction, agreement, event, or other occurrence taking place relating to the Debtor on and before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence; *provided however*, the foregoing Third Party Release shall not release any Allowed Claims or Interests of any Releasing Party against the Debtor or obligations of any party under the Plan or any other document, instrument, or agreement executed to implement the Plan. Nothing contained in this Section shall prohibit the Holder of a timely filed Proof of Claim or Interest from litigating its right to seek to have such Claim or Interest declared as Allowed and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Holder of a Claim or Interest of any of the obligations of the Debtor or the Post-Effective-Date Debtor under the Plan.**

16.3 Injunction.

**In implementation of the Plan, except as otherwise expressly provided in the Confirmation Order or the Plan, and except in connection with the enforcement of the terms of the Plan or any documents provided for or contemplated in the Plan, all entities who have held, hold or may hold Claims against or Interests in the Debtor, the Post-Effective-Date Debtor, or the Estate that arose prior to the Effective Date are enjoined, during the period from the Effective Date through the date that no Remaining Assets of the Post-Effective-Date Debtor remain, from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtor, the Post-Effective-Date Debtor, or the Estate, with respect to any such Claim or Interest; (b) the enforcement, attachment, collection, or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Debtor, the Post-Effective-Date Debtor, the Estate, or any of the Remaining Assets with respect to any such Claim or Interest; (c) creating, perfecting, or enforcing, directly or indirectly, any Lien or encumbrance of any kind against the Debtor, the Post-Effective-Date Debtor, the Estate, or any of the Remaining Assets with respect to any such Claim or Interest; and (d) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Interest. Nothing contained in this Section shall prohibit the Holder of a timely filed Proof of Claim or an Interest from litigating its right to seek to have such Claim or Interest declared an Allowed Claim or Allowed Interest, as applicable, and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Claimant of any of the obligations of the Debtor or the Post-Effective-Date Debtor under the Plan.**

16.4 Post-Confirmation Liability of Post-Effective-Date Debtor Representative.

The Post-Effective-Date Debtor Representative, together with its consultants, agents, advisors, attorneys, accountants, financial advisors, other representatives and the professionals engaged by the foregoing (collectively, the "Indemnified Parties") shall not be liable for any and all liabilities, losses, damages, claims, Causes of Action, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, to the Holders of Claims or Interests for any action or inaction taken in good faith in connection with the performance or discharge of their duties under the Plan, except the Indemnified Parties will be liable for actions or inactions that are grossly negligent, fraudulent, or which constitute willful misconduct (in each case, liability shall be subject to determination by final order of a court of competent jurisdiction). However, any act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute gross negligence, fraud, or willful misconduct. In addition, the Post-Effective-Date Debtor and the Estate shall, as applicable and to the fullest extent permitted by the laws of the State of Delaware, indemnify and hold harmless the Indemnified Parties from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Post-Effective-Date Debtor and the Estate or the implementation or administration of the Plan if the Indemnified Party acted in good faith and in a manner reasonably believed to be in or not opposed to the best interest of the Post-Effective-Date Debtor and the Estate. All rights of the Persons exculpated and indemnified pursuant hereto shall survive confirmation of the Plan.

16.5 Preservation of Rights of Action.

(a) Vesting of Causes of Action.

Except as otherwise provided in the Plan or Confirmation Order, in accordance with Section 1123(b)(3) of the Bankruptcy Code, any and all Estate-Retained Causes of Action that the Debtor holds or may hold against any Entity, shall vest upon the Effective Date in the Post-Effective-Date Debtor.

Except as otherwise provided in the Confirmation Order, after the Effective Date, the Post-Effective-Date Debtor shall have the exclusive right to institute, prosecute, abandon, settle, or compromise any Causes of Action against any Entity, in accordance with the terms of the Plan, and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in the Chapter 11 Case.

(b) Preservation of All Causes of Action Not Expressly Settled or Released.

Unless a Cause of Action against a holder of a Claim or other Entity is expressly waived, relinquished, released, compromised, or settled in the Plan (including, without limitation, pursuant to the Debtor/Estate Release) and/or or any Final Order (including the Confirmation Order), the Debtor and the Post-Effective-Date Debtor expressly reserve such retained Cause of Action for later adjudication by the Post-Effective-Date Debtor (including, without limitation, Causes of Action not specifically identified or described in the Plan Supplement or elsewhere, or of which

the Debtor may be presently unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time, or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, Collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan, or Confirmation Order, except where such Causes of Action have been released or otherwise resolved by a Final Order (including the Confirmation Order). In addition, the Debtor and the Post-Effective-Date Debtor expressly reserve the right to pursue or adopt claims alleged in any lawsuit in which the Debtor is a defendants or interested party against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Subject to the immediately preceding paragraph, any Entity to which the Debtor has incurred an obligation (whether on account of services, the purchase or sale of goods, or otherwise), or that has received services from the Debtor or a transfer of money or property of the Debtor, or that has received services from the Debtor or a transfer or money or property of the Debtor, or that has transacted business with the Debtor, or that has leased property from the Debtor, should assume and is hereby advised that any such obligation, transfer, or transaction may be reviewed by the Post-Effective-Date Debtor subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether (i) such Entity has filed a proof of claim against the Debtor in the Chapter 11 Case; (ii) the Debtor have objected to any such Entity's proof of claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtor has objected to any such Entity's scheduled Claim; (v) any such Entity's scheduled Claim has been identified by the Debtor as disputed, contingent, or unliquidated; or (vi) the Debtor has identified any potential claim or Cause of Action against such Entity herein or in the Disclosure Statement.

16.6 No Discharge.

Nothing contained in the Combined Plan and Disclosure Statement shall be deemed to constitute a discharge of the Debtor under Bankruptcy Code section 1141(d)(3).

## SECTION 17 CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

17.1 Conditions to Confirmation of the Plan.

Confirmation of the Plan is conditioned upon the satisfaction of each of the following conditions precedent, any one or more of which may be waived by the Debtor: (i) the Bankruptcy Court shall have approved this Combined Disclosure Statement and Plan in form and substance acceptable to each of the Debtor and the Prepetition Agent; (ii) the Sale Transaction shall have been approved and closed and the Sale Order entered by the Court; (iii) the Debtor shall have determined that there will be sufficient Cash on the Effective Date to pay (or with respect to Disputed Claims to reserve for as required pursuant to the Plan) Allowed Administrative Claims, Non-Tax Priority Claims, Priority Tax Claims, DIP Facility Claims, and Other Secured Claims (if applicable) and to fund the Professional Fee Reserve; and (iv) the Confirmation Order to be

presented to the Bankruptcy Court at the Confirmation Hearing shall be acceptable to each of the Debtor and the Prepetition Agent.

17.2 Conditions to the Effective Date.

The occurrence of the Effective Date is conditioned upon the satisfaction of each of the following conditions precedent, any one or more of which may be waived by the Debtor: (i) a Confirmation Order in form and substance acceptable to each of the Debtor and the Prepetition Agent shall have been entered by the Bankruptcy Court and become a Final Order which is not subject to any stay of effectiveness; (ii) the Professional Fee Reserve and, if applicable, the GUC Fund shall have been fully funded as set forth in the Plan, upon the Effective Date; and (iii) all other actions and documents determined by the Debtor to be necessary to implement the Plan shall have been effected and executed.

17.3 Waiver of Conditions Precedent.

To the fullest extent permitted by law, the conditions to the Effective Date set forth in Section 17.2 may be waived or modified in whole or in part at any time by the Debtor, subject to the Prepetition Agent's written consent which shall not be unreasonably withheld.

## SECTION 18
## RETENTION OF JURISDICTION

From and after the Confirmation Date, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including, but not limited to, for the following purposes:

(a) To hear and determine any and all objections to the allowance of a Claim, proceedings to estimate a Claim for any purpose, actions to equitably subordinate a Claim, proceedings seeking approval of any necessary claims reconciliation protocols, or any controversy as to the classification of a Claim in a particular Class under the Plan;

(b) To administer the Plan, the Post-Effective-Date Debtor, the Remaining Assets and the proceeds thereof;

(c) To estimate or liquidate any Disputed Claims;

(d) To hear and determine any and all adversary proceedings, contested matters or applications pending on the Effective Date or otherwise relating to, arising from, or in connection with the Litigation; *provided however*, that the Post-Effective-Date Debtor shall reserve the right to commence actions in all appropriate jurisdictions;

(e) To hear and determine any and all motions and/or objections to fix, estimate, allow and/or disallow any Claims arising therefrom;

(f) To hear and determine any and all applications by Professionals for an award of on account of any Professional Fee Claims;

(g) To enable the Post-Effective-Date Debtor to commence and prosecute any Litigation which may be brought after the Effective Date;

(h) To interpret and/or enforce the provisions of the Plan and the injunction provided for in the Plan and to determine any and all disputes arising under or regarding interpretation of the Plan or any agreement, document, or instrument contemplated by the Plan;

(i) To enter and implement such orders as may be appropriate in the event Confirmation is for any reason stayed, reversed, revoked, modified, or vacated;

(j) To modify any provision of the Plan to the extent permitted by the Bankruptcy Code and to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

(k) To enter such orders as may be necessary or appropriate in furtherance of Confirmation and the successful implementation of the Plan and to determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code;

(l) To enter any orders as required by Rule 23 of the Federal Rules of Civil Procedure, to the extent made applicable to any adversary proceeding pursuant or contested matter pursuant to Bankruptcy Rules 7023 and 9014(c), as applicable; and

(m) To close the Chapter 11 Case when the administration of the Chapter 11 Case has been completed.

## SECTION 19
## MISCELLANEOUS PROVISIONS

19.1 Payment of Statutory Fees / Closing of Chapter 11 Case.

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code ("U.S.T. Fees") for periods prior to the Effective Date shall be paid on the Effective Date, or as soon as practicable thereafter, by the Debtor or Post-Effective-Date Debtor. On and after the Effective Date, quarterly fees owed to the U.S. Trustee shall be paid by the Post-Effective-Date Debtor when due in accordance with applicable law. The Post-Effective-Date Debtor shall file all post-confirmation quarterly reports until the Chapter 11 Case is closed under section 350 of the Bankruptcy Code or the Post-Effective-Date Debtor is deemed dissolved or terminated pursuant to the terms hereof. The Post-Effective-Date Debtor may seek to close the Chapter 11 Case, in his, her or its discretion, on motion to the Bankruptcy Court.

19.2 Revocation of the Combined Plan and Disclosure Statement.

The Debtor reserves the right to revoke and withdraw the Combined Plan and Disclosure Statement at any time on or before the Confirmation Date. If the Debtor revokes or withdraws the Combined Plan and Disclosure Statement, or if Confirmation or the Effective Date does not occur, then the Plan shall be deemed null and void and, in such event, nothing contained herein shall be

deemed to constitute a waiver or release of any Claims by or against the Debtor or any other entity or to prejudice in any manner the rights of the Debtor or any Entity in any further proceedings involving the Debtor.

19.3 Severability of Plan Provisions.

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall, with the consent of each of the Debtor and the Prepetition Agent, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

19.4 Exhibits.

All exhibits attached to the Combined Plan and Disclosure Statement and the Plan Supplement are, by this reference, hereby incorporated herein. The Debtor reserves the right to make non-substantive changes and corrections to such Exhibits in advance of the Confirmation Hearing. If any Exhibits are changed or corrected, the replacement Exhibits will be filed with the Bankruptcy Court prior to the commencement of the Confirmation Hearing.

19.5 Notices.

All notices required or permitted to be made in accordance with the Plan shall be in writing and shall be delivered personally or by nationally recognized overnight or next-day courier service, first-class mail, electronic mail, or via facsimile with electronic confirmation of receipt as follows:

Counsel for Debtor:

Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tel. 302-652-4100, Fax 302-652-4400
Attn: Debra Grassgreen & James O'Neill
dgrassgreen@pszjlaw.com
joneill@pszjlaw.com

Post-Effective Date Debtor Representative:

To be determined.

19.6 Reservation of Rights.

Neither the filing of the Combined Plan and Disclosure Statement nor any statement or provision contained in the Combined Plan and Disclosure Statement, nor the taking by any party in interest of any action with respect to the Plan, shall: (a) be or be deemed to be an admission against interest and (b) until the Effective Date, be or be deemed to be a waiver of any rights any party in interest may have (i) against any other party in interest, or (ii) in or to any of the assets of any other party in interest, and, until the Effective Date, all such rights are specifically reserved. In the event that the Plan is not confirmed or fails to become effective, neither the Combined Plan and Disclosure Statement nor any statement contained in the Combined Plan and Disclosure Statement may be used or relied upon in any manner in any suit, action, proceeding, or controversy within or without the Chapter 11 Case involving the Debtor, except with respect to Confirmation of the Plan.

19.7 Defects, Omissions and Amendments.

The Debtor may, with the approval of the Bankruptcy Court and without notice to all Holders of Claims or Interests, insofar as it does not materially and adversely affect Holders of Claims, correct any defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary or desirable to expedite the execution of the Plan. The Plan may be altered or amended before or after Confirmation as provided in Section 1127 of the Bankruptcy Code if, in the opinion of the Bankruptcy Court, the modification does not materially and adversely affect the interests of Holders of Claims, so long as the Plan, as modified, complies with Sections 1122 and 1123 of the Bankruptcy Code and the Debtor has complied with Section 1125 of the Bankruptcy Code. The Plan may be altered or amended before or after the Confirmation Date but, prior to substantial Consummation, in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects Holders of Claims, so long as the Plan, as modified, complies with Bankruptcy Code Sections 1122 and 1123, the Debtor has complied with Bankruptcy Code Section 1125 and, after notice and a hearing, the Bankruptcy Court confirms such Plan, as modified, under Bankruptcy Code Section 1129.

19.8 Filing of Additional Documents.

The Debtor shall file with the Bankruptcy Court such agreements, instruments, pleadings, orders, papers, or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

19.9 Successors and Assigns.

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and/or assigns of such Entity.

19.10 Setoffs and Recoupments.

The Post-Effective-Date Debtor may, but shall not be required to, set off against or recoup from the payments to be made pursuant to the Plan in respect of a Claim, any claim of any nature

whatsoever that the Debtor, the Post-Effective-Date Debtor, or the Estate, as applicable, may have against the Holder of such Claim, but neither the failure to do so or the allowance of any Claim hereunder shall constitute a waiver or release of any such claim by the Debtor, the Post-Effective-Date Debtor, or the Estate, against such Holder.

19.11 Tax Exemption.

Pursuant to Section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of any security under the Plan, or the execution, delivery, or recording of an instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan, including, without limitation, any transfers to or by the Debtor, if on the Effective Date, and the Post-Effective-Date Debtor, if after the Effective Date, of the Debtor's property in implementation of or as contemplated by the Plan (including, without limitation, any subsequent transfer of property by the Post-Effective-Date Debtor) shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

19.12 Implementation.

Upon Confirmation, the Debtor shall be authorized to take all steps and execute all documents necessary to effectuate the provisions contained in the Plan.

19.13 Record Date.

To the extent a "Record Date" is required for implementation of the Plan, the record date shall be the voting record date established by the Bankruptcy Court in the order conditionally approving the Disclosure Statement or such other date as the Bankruptcy Court may set.

19.14 Certain Actions.

By reason of entry of the Confirmation Order, prior to, on, or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of directors, members, managers or other Interest Holders of the Debtor under the Plan, including, without limitation, (i) the Distribution of Cash pursuant to the Plan, (ii) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, and (iii) the adoption, execution, and implementation of other matters provided for under the Plan involving the company or organizational structure of the Debtor, shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable corporation/limited liability company laws, without any requirement of further action by the directors, members, managers or other Interest Holders of the Debtor, irrespective of whether the Confirmation Order specifically authorizes any such action.

Effective upon the Effective Date, the Debtor's formation documents shall be deemed amended to prohibit the issuance by the Debtor of nonvoting securities to the extent required under Section 1123(a)(6) of the Bankruptcy Code.

On or as soon as practicable following the Effective Date, the Post-Effective-Date Debtor shall be authorized to cancel, annul, and extinguish all Interests.

19.15 Substantial Consummation.

On the Effective Date, the Plan shall be deemed substantially consummated under Bankruptcy Code Sections 1101 and 1127(b).

19.16 Waiver of Fourteen-Day Stay.

The Debtor requests as part of the Confirmation Order a waiver from the Bankruptcy Court of the 14-day stay of Bankruptcy Rule 3020(e) and, to the extent applicable, a waiver of the 14-day stay of Bankruptcy Rule 6004(g).

19.17 Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

19.18 Entire Agreement.

On the Effective Date, the Plan and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## SECTION 20
## RECOMMENDATION

The Debtor strongly recommends that all creditors receiving a Ballot vote in favor of the Plan. The Debtor believes that the Plan is in the best interests of creditors. The Plan as structured, among other things, allows creditors with Allowed Claims to participate in distributions believed to be in excess of those that would otherwise be available were the Chapter 11 Case dismissed or converted under Chapter 7 of the Bankruptcy Code and minimizes delays in recoveries to creditors.

**FOR ALL THE REASONS SET FORTH IN THIS DISCLOSURE STATEMENT, THE DEBTOR BELIEVES THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES. THE DEBTOR URGES ALL CREDITORS ENTITLED TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED BY 4:00 P.M. EASTERN TIME ON JULY 29, 2025.**

Dated: June 26, 2025

Respectfully submitted,

SYNTHEGO CORPORATION

*/s/ Allen Soong*
Allen Soong
Chief Restructuring Officer

# EXHIBIT A

## Liquidation Analysis

**Synthego Liquidation Analysis - Summary**

| | Claim Class | Est. Claim ($ Millions) | Est. Liquidation Recovery | Plan Recovery |
|---|---|---|---|---|
| Unclassified Claims | | | | |
| -- | Admin Claims | $ 3.1 | 0.0% | 100.0% |
| -- | DIP (Incl. Roll Up, excl. fees/int.) | 25.0 | 34.1% | 100.0% |
| -- | Priority Tax | 0.1 | 0.0% | 100.0% |
| Class 1 | Priority Non-Tax Claims | 1.2 | 0.0% | 100.0% |
| Class 2 | Prepetition Lender (excl. Roll Up) | 64.1 | 0.0% | 98.4% |
| Class 3 | Other Secured | 0.0 | 0.0% | 100.0% |
| Class 4 | Unsecured | 4.6 | 0.0% | 4.3% |
| Class 5 | 2024 Non-conv. Notes | 96.7 | 0.0% | 0.0% |
| Class 6 | 2023 Subord. Conv. Notes | 43.4 | 0.0% | 0.0% |
| Class 7 | Interests | $ - | 0.0% | 0.0% |

**Liquidation Recovery Assumptions:**

*DIP Claim:* The most optimistic liquidation scenario yields $8.5M (or 34.1%) recovery to DIP lender. Assets with a book value totaling $53.5M produce a gross recovery of $10.9M (or 20%), which is then reduced by Chapter 7 Costs totaling $2.4M. For the avoidance of doubt, the DIP claim and Class Class 2 claim do not include post-petition fees or interest.

*All Other Claims:* 0% recovery due to insufficient funds following a minimal recovery to the DIP lender.

*Reference 'Liquidation Analysis - Detail' for further review.*

**Synthego Liquidation Analysis - Detail**

| Assets | Est. Assets ($ Millions) | Liquidation Recovery % | | | Liquidation Recovery ($ Millions) | | |
|---|---|---|---|---|---|---|---|
| | | Low | Med | High | Low | Med | High |
| **Gross Liquidation Proceeds** | | | | | | | |
| Cash | $ 3.4 | 100% | 100% | 100% | $ 3.4 | $ 3.4 | $ 3.4 |
| A/R, net | 2.7 | 30% | 60% | 80% | 0.8 | 1.6 | 2.2 |
| Inventory | 4.0 | 10% | 20% | 30% | 0.4 | 0.8 | 1.2 |
| Prepaid & Other | 6.0 | 2% | 5% | 10% | 0.1 | 0.3 | 0.6 |
| PP&E (net) | 34.7 | 2% | 5% | 10% | 0.7 | 1.7 | 3.5 |
| Intangible | 2.8 | 0% | 2% | 5% | - | 0.1 | 0.1 |
| **Total** | **$ 53.5** | **10%** | **15%** | **20%** | **$ 5.4** | **$ 7.9** | **$ 10.9** |
| **Chapter 7 Costs** | | | | | | | |
| Less: Ch 7 Trustee Fees | | 3.0% | 3.0% | 3.0% | $ (0.2) | $ (0.2) | $ (0.3) |
| Less: Ch 7 Professionals | | 4.0% | 4.0% | 4.0% | (0.2) | (0.3) | (0.4) |
| Less: Ch 7 Admin/Wind Down | | 100% | 80% | 60% | (1.8) | (1.5) | (1.2) |
| Less: Ch 11 Carve Out | | | | | (0.5) | (0.5) | (0.5) |
| **Total Ch. 7 Costs** | | | | | **$ (2.7)** | **$ (2.5)** | **$ (2.4)** |
| **Net Liquidation Proceeds Avail. for Distribution** | | | | | **$ 2.7** | **$ 5.3** | **$ 8.5** |

| | Est. Claims ($ Millions) | Liquidation Recovery % | | | Liquidation Recovery ($ Millions) | | |
|---|---|---|---|---|---|---|---|
| | | Low | Med | High | Low | Med | High |
| **Total Secured Claims Recovery** | | | | | | | |
| DIP (New $ + Roll Up) | $ 25.0 | 11% | 21% | 34% | $ 2.7 | $ 5.3 | $ 8.5 |
| **Total Secured Claims Recovery** | **$ 25.0** | **11%** | **21%** | **34%** | **$ 2.7** | **$ 5.3** | **$ 8.5** |
| **Net Liquidation Proceeds Avail. for Priority & Admin** | | | | | **$ -** | **$ -** | **$ -** |
| **Priority & Admin Claims** | | | | | | | |
| Priority Tax | $ 0.1 | 0% | 0% | 0% | $ - | $ - | $ - |
| Ch. 11 Admin | 3.1 | 0% | 0% | 0% | - | - | - |
| Ch. 11 Pro Fees, Net of Carve Out | 0.0 | 0% | 0% | 0% | - | - | - |
| Class 1 - Priority Non-Tax | 1.2 | 0% | 0% | 0% | - | - | - |
| **Total Priority & Admin Recovery** | **$ 4.4** | **0%** | **0%** | **0%** | **$ -** | **$ -** | **$ -** |
| **Net Liquidation Proceeds Avail. for Prepetition Lender, Other Secured, and General Unsecured** | | | | | **$ -** | **$ -** | **$ -** |
| **Prepetition Lender, Other Secured & General Unsecured** | | | | | | | |
| Class 2 - Prepetition Lender (less Roll Up) | $ 64.1 | 0% | 0% | 0% | $ - | $ - | $ - |
| Class 3 - Other Secured | 0.0 | 0% | 0% | 0% | - | - | - |
| Class 4 - GUCs | 4.6 | 0% | 0% | 0% | - | - | - |
| Class 5 - 2024 Senior Notes | 96.7 | 0% | 0% | 0% | - | - | - |
| Class 6 - 2023 Subord. Conv. Notes | 43.4 | 0% | 0% | 0% | - | - | - |
| **Total Recovery** | **$ 208.9** | **0%** | **0%** | **0%** | **$ -** | **$ -** | **$ -** |
| **Remaining Proceeds After GUCs** | | | | | **$ -** | **$ -** | **$ -** |